UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CARMELO ORTIZ, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civ. Action No. |
| | ) | <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | |
| | ) | COMPLAINT FOR VIOLATIONS OF THE |
| vs. | ) | FEDERAL SECURITIES LAWS |
| | ) | |
| UNITED STATES STEEL CORPORATION, | ) | |
| MARIO LONGHI, and DAVID B. BURRITT, | ) | <u>DEMAND FOR JURY TRIAL</u> |
| | ) | |
| Defendants. | ) ) | |
| | ) | <u>Electronically Filed</u> |

Plaintiff Carmelo Ortiz ("Plaintiff"), by and through Plaintiff's undersigned attorneys, individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts and on information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of certain of United States Steel Corporation's ("U.S. Steel" or "Company") public documents, conference calls, announcements, and U.S. Securities and Exchange Commission ("SEC") filings; wire and press releases published by and regarding the Company; analysts' reports and advisories about the Company; and information readily obtainable on the internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all persons who purchased or otherwise acquired U.S. Steel common stock between November 1, 2016 and April 25, 2017, inclusive ("Class Period"), against U.S. Steel and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act").  These claims are asserted against U.S. Steel and certain of its officers and/or directors who made materially false and misleading statements during the Class Period in press releases, analyst conference calls, and SEC filings.

2.      U.S. Steel is an integrated steel producer of flat-rolled and tubular products with major production operations in North America and Europe.  An integrated steel producer uses iron ore and coke as primary raw materials for steel production.  U.S. Steel has annual raw steel production capability of 22 million net tons (17 million tons in the United States and 5 million tons in Europe).  U.S. Steel supplies customers throughout the world primarily in the automotive, consumer, industrial, and oil country tubular goods markets.  U.S. Steel was the twenty-fourth

largest steel producer in the world in 2015. Also in 2015, according to publicly available information, U.S. Steel was the third largest steel producer in the United States. U.S. Steel is also engaged in other business activities consisting primarily of railroad services and real estate operations.

3.      In 2013, U.S. Steel launched a "transformational process called the 'Carnegie Way,'" named after U.S. Steel co-founder Andrew Carnegie. The Company told investors that the Carnegie Way was a "strategic, disciplined approach to transforming the Company to address the new realities of the marketplace."

4.      During 2016, U.S. Steel told investors it was transforming the Company through "the two phases of a focused execution on [its] stockholder value creation strategy." As part of the Carnegie Way, the strategy had two parts: "(1) earn the right to grow, and (2) drive and sustain profitable growth." The Company stated that its "long-term success depends on [its] ability to execute these phases and earn an economic profit across the business cycle." Defendants stated they were "working towards strengthening our balance sheet, with a strong focus on cash flow, liquidity, and financial flexibility." Based on the Carnegie Way philosophy, U.S. Steel "launched a series of initiatives" to "add value, re-shape the Company, and improve [its] performance across [its] core business processes, including commercial, supply chain, manufacturing, procurement, innovation, and operational and functional support." The Company told investors it was "on a mission to become an iconic industry leader" by creating "a sustainable competitive advantage with a relentless focus on economic profit, our customers, cost structure, and innovation." U.S. Steel stated that achieving its goals required "exemplary leadership and collaboration of all employees."

5.      To that end, in the Company's annual report for 2016, filed with the SEC on February 28, 2017 ("2016 10-K"), U.S. Steel pointed to $745 million of Carnegie Way benefits

realized in 2016 as a sign of "significant progress toward our goal of achieving economic profit across the business cycle." Labeling the progress as "real" and "substantial," U.S. Steel told investors that it was "not yet enough to fully overcome unfavorable market and business conditions." The 2016 10-K stated that "*[t]he Carnegie Way has already driven a shift in the Company that has enabled us to withstand the prolonged downturn in steel prices while positioning us for success in a market recovery*."

6.     During the Class Period, steel market conditions improved substantially. Indeed, in the first quarter of 2017, the average price of U.S. hot-rolled steel coil, a benchmark product used in a variety of products ranging from bridges to microwaves, rose 55% from a year earlier, helped by successful U.S. trade cases against foreign imports. By all accounts, U.S. Steel appeared primed to pounce on the domestic steel market turnaround.

7.     After the market closed on April 25, 2017, however, the Company reported what analysts labeled "hard-to-fathom" and "abysmal" financial results, as U.S. Steel revealed shortcomings that, according to *Bloomberg*, "choked earnings even as prices of the metal surged." Specifically, the Company reported a net loss of $180 million, or negative $1.03 per diluted share, and adjusted earnings before interest, tax, depreciation, and amortization ("EBITDA") of $74 million. The Company's earnings release revealed negative operating cash flow of $135 million, a significant decline in the Company's Flat-Rolled segment, and a reduced 2017 outlook that widely missed analyst expectations, including a *35% reduction* to 2017 EBITDA guidance. 2017 guidance was worse at the earnings level, where guidance was *cut 50%* from $3.08 per share to $1.50. The $1.50 earnings per share ("EPS"), however, included the benefit of an accounting change that cut $175 million from operating costs. Factoring that positive accounting change out of the mix, the Company's adjusted EPS guidance was closer to $0.85, a cut of

approximately **72%**.  The Company also eliminated language about being "cash positive" for the year.

8.     The Company's earnings release quoted Chief Executive Officer ("CEO") Mario Longhi ("Longhi") as stating, in part, that "***operating challenges at our Flat-Rolled facilities prevented us from benefiting fully from improved market conditions***."  Longhi also added that U.S. Steel would "not let favorable near-term business conditions distract us from taking the ***outages we need to revitalize our assets*** in order to achieve more reliable and consistent operations, improve quality and cost performance, and generate more consistent financial results."  He also added that U.S. Steel "made the strategic decision to accelerate [its] efforts to resolve the issues that challenge our ability to achieve sustainable long-term profitability."  During a conference call before the market opened on April 26, 2017, Longhi stated that in 2017 the Company would "be taking more downtime at our facilities, which will limit our steel production volumes."

9.     The market reaction to Defendants' disclosures was swift and severe.  After closing at $31.11 per share on April 25, 2017, U.S. Steel stock opened down 22% at $24.18 on April 26, 2017, and ultimately closed at $22.78, a decline of 26% on elevated trading volume of more than 101 million shares.

10.     Analysts responded negatively as well.  For example:

(a)     an Axiom analyst stated that if things are so bad during good times, the remainder of the Company's results in 2017 were "set to resemble a 'Nightmare on Elm Street'";

(b)     Jefferies stated that operational issues and myriad other headwinds pressured flat rolled results, which drove the "abysmal results";

(c)    Morgan Stanley called the reasons behind the Company's guidance cut unclear and stated that it was struggling to understand how U.S. Steel's costs moved up so much in the first quarter 2017;

(d)    KeyBanc stated that U.S. Steel's results were not an indictment on steel industry fundamentals, saying they appeared to be Company-specific;

(e)    BMO stated that the magnitude of the Company's earnings miss highlighted underlying unprecedented earnings volatility for U.S. Steel, even when compared to its high-beta steel making peers, and stated that U.S. Steel was now positioned as a company with meaningfully lower profitability, higher capital spending, and limited exposure to price swings; and

(f)    Macquarie Group stated the magnitude of the 2017 EPS guidance cut was even larger than first apparent because the new guidance of $1.50 included a previously outlined $0.60 gain from lower operating expenses, due to new accounting policies.  Therefore, the adjusted EPS guidance for 2017 would actually be only $0.90.

## JURISDICTION AND VENUE

11.    Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa.  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

12.    Venue is proper in this District pursuant to §27 of the 1934 Act.  The violations of law complained of herein occurred in part in this District, including the dissemination of materially false and misleading statements complained of herein into this District.  U.S. Steel's headquarters are located in this District at 600 Grant Street, Pittsburgh, Pennsylvania 15219-2800.

13.    In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to,

the mails, interstate telephone communications, and the facilities of the national securities markets. U.S. Steel trades in an efficient market on the New York Stock Exchange ("NYSE").

## PARTIES

14.     Plaintiff purchased U.S. Steel stock as described in the attached certification and suffered damages as a result of the securities fraud alleged herein.

15.     Defendant United States Steel Corporation is incorporated in Delaware and has its headquarters in this District.  Shares of U.S. Steel stock trade on the NYSE under the ticker symbol "X."

16.     Defendant Mario Longhi is the Company's CEO and a member of the Company's Board of Directors.  Prior to February 28, 2017, Longhi was also the Company's President.

17.     Defendant David B. Burritt ("Burritt") became the Company's President and Chief Operating Officer on February 28, 2017.  Prior to that, Burritt was the Company's Executive Vice President and Chief Financial Officer ("CFO").  Burritt currently has executive responsibility for all aspects of the Company's day-to-day business in the United States and Central Europe, and has continued to serve as CFO while the Company undertakes a search to fill that role.

18.     Defendants Longhi and Burritt (collectively, "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of U.S. Steel's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and investors, i.e., the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed

to, and were being concealed from, the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

19.     Defendants are liable for: (a) making false statements; or (b) failing to disclose adverse facts known to them about U.S. Steel. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of U.S. Steel stock was a success, as it: (a) deceived the investing public regarding U.S. Steel's prospects and business; (b) artificially inflated the price of U.S. Steel common stock; and (c) caused Plaintiff and other members of the Class, as defined below, to purchase U.S. Steel stock at inflated prices and suffer economic loss when the revelations set forth herein reached the market.

## CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired U.S. Steel stock during the Class Period ("Class"). Excluded from the Class are defendants and their families; the officers and directors of the Company, at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which defendants have or had a controlling interest.

21.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. U.S. Steel trades on the NYSE and has more than 174 million shares outstanding, owned by hundreds, if not thousands, of persons.

22.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to members of the Class which predominate over questions that may affect individual Class members include:

(a)     whether defendants violated the 1934 Act;

(b)     whether defendants omitted and/or misrepresented material facts;

(c)     whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     whether the price of U.S. Steel stock was artificially inflated; and

(f)     the extent of damages sustained by Class members and the appropriate measure of damages.

23.     Plaintiff's claims are typical of those of the Class because Plaintiff and the other Class members sustained damages from defendants' wrongful conduct.

24.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

25.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**DEFENDANTS' FALSE AND MISLEADING STATEMENTSAND OMISSIONS**

26.     On November 1, 2016, the Company reported its third quarter 2016 ("3Q2016") financial results.  The Company reported net earnings of $51 million, or $0.32 per diluted share, and operating cash flow of $264 million, representing a significant turnaround from the third quarter

2015, when the Company reported a net loss of $173 million and a $1.18 loss per diluted share, as well as the second quarter 2016, when the Company reported a net loss of $46 million, or $0.32 loss per diluted share.  The earnings release stated, in part:

> Third quarter results for our Flat-Rolled segment improved from the second quarter as both spot and contract prices increased, and **benefits from an improving product mix and our Carnegie Way initiatives continued to grow**.  **Operational issues adversely impacted shipments from our Flat-Rolled facilities.  In the last half of the third quarter, we experienced unplanned outages at several of our steelmaking and finishing facilities**.  Our third quarter shipments were negatively impacted by approximately 125,000 tons as a result of unplanned outages, as **our streamlined plant operating configuration extends the time it takes to recover volumes from unplanned outages**.  A planned outage and lower operating rates at our mining operations also negatively impacted our results.

27.     Commenting on U.S. Steel's results, the release included the following statements from Longhi:

> Our third quarter results improved significantly from the second quarter as each of our segments improved, resulting in our highest quarterly segment income since the fourth quarter of 2014.  **We faced some operational challenges that limited our ability to realize the full benefits of an improving pricing environment, but we continued to make progress in our Carnegie Way transformation efforts.  With our very strong cash and liquidity position, we remain focused on the investments that we need to continue to make to revitalize our facilities and deliver value-enhancing solutions for our customers**.

> As we move through the rest of 2016, operational issues remain a headwind for us, as we continue to recover from unplanned outages in the third quarter, while also completing our planned maintenance outages.  **We have identified the critical assets that require additional capital investment and increased maintenance spending in order to improve our reliability and quality, and to lower our costs.  We plan to use our strong cash and liquidity position to expedite the revitalization of our facilities and to fund additional growth projects.  This will enhance the ongoing development of the differentiated solutions that make us a strategic business partner for our customers.  We continue to make progress on our Carnegie Way transformation, and we have many opportunities ahead of us**.

28.     On November 2, 2016, the Company filed with the SEC its quarterly report on Form 10-Q for the third quarter ended September 30, 2016 ("3Q2016 10-Q").  The quarterly report reiterated the financial results from the November 1, 2016 news release and included Sarbanes-

Oxley ("SOX") certifications signed by Longhi and Burritt stating, among other things, that the

quarterly report did "not contain any untrue statement of a material fact or omit to state a material

fact necessary to make the statements made, in light of the circumstances under which such

statements were made, not misleading with respect to the period covered by this report."   The

3Q2016 10-Q also stated, in relevant part:

> Net sales were $2,686 million in the three months ended September 30, 2016, compared with $2,830 million in the same period last year.  ***The decrease in sales for the Flat-Rolled segment primarily reflected decreased shipments (decrease of 141 thousand net tons) due to operational issues across our Flat-Rolled facilities. In the last half of the third quarter of 2016 we experienced unplanned outages at several of our steelmaking and finishing facilities and our current operating configuration in 2016 extends the time it takes to recover volumes from unplanned outages***.  Additionally, sales in our Flat-Rolled segment decreased due to reduced coke and iron ore pellet sales to U. S. Steel Canada Inc.  These decreases were partially offset by higher average realized prices (increase of $44 per net ton) due to improved spot market prices.

29.    Also on November 2, 2016, the Company held a conference call to discuss its

3Q2016 financial results.  Longhi, Burritt, and Dan Lesnak ("Lesnak"), the Company's General

Manager of Investor Relations, participated in the call on behalf of the Company.  Longhi made the

following opening statements, in relevant part:

> We continue to make significant progress on improving our business model, lowering our breakeven point, improving our already industry-leading safety performance, and strengthening our balance sheet.  We have faced and continue to face many challenges, some at the Company level and some at the industry level.  At the Company level, we have streamlined our operating configuration, including the temporary idling of facilities to create greater production efficiencies under today's market conditions and have made many hard decisions to permanently address unprofitable businesses and facilities with a final resolution of our former operations in Canada now within our sights.
>
> *    *    *
>
> ***We are accelerating our investments in our facilities to achieve sustainably better and more consistent operating performance including improved reliability, quality, delivery, and customer service.  Innovation in both products and processes is the foundation for our future success***.

30.    Later in the call, Longhi fielded a number of questions from analysts about the Company's Carnegie Way initiative.  In one exchange, Longhi assured an analyst that the Company was not underspending on the capital side as a result of Carnegie Way, and instead was "investing appropriately and making sure that everything we know is being addressed."  Specifically, Longhi stated, in relevant part:

> Sure.  First and foremost, thanks for describing the nature of what we are doing here as a journey because it truly is, and ***I would offer that no, we have not been under spending.  What we have been doing is—we've only been able to accomplish what we have accomplished and gotten to the position that we are because we have been investing appropriately and making sure that everything we know is being addressed and moving to minimize the conditions that we experienced in the past quarter, which is unplanned events.  So we've been able to get to this point because we've been doing all of the right things***.  The reality, though, is as we go into a different mix and we begin to operate under much more tight conditions, every single thing that impacts, we don't have the capacity to more quickly—to recover.

31.    Separately, when asked about maintenance spending in 2016 and 2017, Longhi and Lesnak confirmed that the Company was not cutting back maintenance spending on its U.S. Flat-Rolled facilities, and in fact was spending more on those facilities:

> **Longhi**:  Yes.  Dan [Lesnak] has been working with the folks to get—we are in the planning phase right now, but if you look at some of the levels of operations that we've had this year compared to history, we certainly have a much more streamlined footprint with changes of nature in which how much money you've spent.  But as we learn more about the opportunities that we have to continue to improve faster, we are going to be allocating.  ***Now we do have a much better comfortable position to go address it in a better and faster manner, which will certainly increase or pro rata to what we have been doing before***.  And Dan is going to be in a position to provide a little more clarity on that as we go forward.

> **Lesnak**:  I would just say that we did say we are going to spend more in 4Q to accelerate the improvements in the facilities.  That will bring us year over year pretty consistent with last year, and to Mario's point, we have a lot less facilities than we did last year.  ***So I think if you think about maintenance actually on a per ton of capacity that is running, we are actually spending more on our facilities this year than we did last year so I think we are doing a pretty good job of addressing some challenges.  We are not cutting back; we are getting things done a little bit faster now***.

32.    Later in the call, Longhi emphasized "very significant levels of improvement" the

Company had realized from Carnegie Way while downplaying operational issues:

> We've had a quarter where some of the efforts had to be diverted a little bit to make sure that we addressed the unforeseen challenges that came our way.  But in spite of that, we still—I think we ended the quarter with more than 300 new initiatives being completed.  And I think going into the next quarter, there are probably another 500 slated to be pursued.  So in the pipeline, it is even much greater than that.  So I wouldn't focus so much on the actual dollars that you saw coming out of this quarter. I think there is more to come.  Eventually, these things will begin to taper off as we get closer to the point of—that we can achieve an incredibly higher level of competitive base from a cost perspective.  And that is the ultimate goal of what we are relentlessly pursuing.
>
> **On the other hand, the Carnegie Way also in contrast has very significant levels of improvement on the overall value chain.  You look at the amount of cash that we have been able to generate both from operations as well as the value chain and the logistics side of things**.  We are talking here about some different types of innovations, and we just mentioned a couple of them here in packaging and automotive.  **So this whole context is what the Carnegie Way encompasses.  It is not just the cost**, and I think we are going to continue to show interesting results in both fronts.

33.    The Company also released a presentation dated November 1, 2016 with slides on the

Company's 3Q2016 financial results.  Regarding Carnegie Way, the presentation stated, in relevant

part:

> **Our pace of progress on the Carnegie Way transformation continues to exceed our expectations.  The continuing benefits are improving our ability to earn the right to grow and then drive sustainable profitable growth over the long-term as we deal with the cyclicality and volatility of the global steel industry**.  With over 7,500 active projects, we have many opportunities ahead of us.
>
> *        *        *
>
> Our Carnegie Way transformation is a true journey, not a sprint.  However, we are more than two full years in and our progress continues to exceed expectations.  **The hard work of The Carnegie Way transformation is translating into stronger financial results and better performance for our investors, customers**, and employees.  Our aspiration to become sustainably profitable, of earning economic profit across the cycle and being profitable across the trough remains unchanged, and The Carnegie Way is helping us get closer to that goal.

34.     The presentation also touted "*[i]mproved results despite operating challenges*" in the Flat-Rolled Segment.  The improvements were attributed in part to "our Carnegie Way initiatives." Carnegie Way was also credited with "*improving earnings power*," including the addition of $55 per ton of "Carnegie Way Benefits" to the EBITDA of the Flat-Rolled Segment.

35.     On January 31, 2017, the Company announced its full year 2016 results, reporting a full year net loss of $440 million, or $2.81 loss per diluted share, operating cash flow of $727 million, and full year adjusted EBITDA of $510 million.  The Company also reported a fourth quarter 2016 ("4Q2016") net loss of $105 million, or $0.61 loss per diluted share, compared to fourth quarter 2015 net loss of $1.1 billion, or $7.74 loss per diluted share.  The earnings release stated, in part:

> Fourth quarter results for our Flat-Rolled segment declined as compared with the third quarter primarily due to a decrease in average realized prices, fewer shipments, as well as increased outage spending.  *Planned outages as part of our previously announced asset revitalization process limited the amount of tons we could ship in the quarter*. *Full-year Flat-Rolled segment results for 2016 improved from 2015 largely due to lower raw material costs, lower spending, and benefits provided by our Carnegie Way efforts*. These improvements were partially offset by lower average realized prices and shipments.

36.     Regarding the Company's guidance for 2017, the January 31, 2017 release stated, in part:

> *If market conditions*, which include spot prices, raw material costs, customer demand, import volumes, supply chain inventories, rig counts and energy prices, *remain at their current levels*, we expect:
>
> - *2017 net earnings of approximately $535 million, or $3.08 per share, and EBITDA of approximately $1.3 billion*;
>
> - *Results for our Flat-Rolled, European, and Tubular segments to be higher than 2016*;
>
> - *To be cash positive for the year, primarily due to improved cash from operations*; and

- Other Businesses to be comparable to 2016 and approximately $50 million of postretirement benefit expense.

***We believe market conditions will change, and as changes occur during the balance of 2017, our net earnings and EBITDA should change consistent with the pace and magnitude of changes in market conditions***.

37.    Commenting on the Company's results, the January 31, 2017 earnings release quoted

Longhi as stating:

***We entered 2016 facing very challenging market conditions, but remained focused on our Carnegie Way transformation efforts. Despite lower average realized prices and shipments in 2016, our results are better as we continued to improve our product mix and cost structure***. Our focus on cash, including better working capital management and opportunistic capital markets transactions, resulted in an improved debt maturity profile and stronger cash and liquidity. ***We are well positioned to accelerate the revitalization of our assets to improve our operating reliability and efficiency, and deliver value-enhancing solutions to our customers***.

\*      \*      \*

***We are starting 2017 with much better market conditions than we faced at the beginning of 2016. Our Carnegie Way transformation efforts over the last three years have improved our cost structure, streamlined our operating footprint and increased our customer focus. These substantive changes and improvements have increased our earnings power.*** While ***we will benefit from improved market conditions***, they continue to be volatile and we must remain focused on improving the things that we can control. Pursuing our safety objective of zero injuries, ***improving our assets*** and operating performance, and driving innovation that creates differentiated solutions for our customers ***remain our top priorities***.

38.    The following day, February 1, 2017, the Company held a conference call to discuss

its 4Q2016 and full year 2016 financial results. Longhi, Burritt, and Lesnak participated in the call

on behalf of the Company. During his opening remarks, Longhi stated, in part:

***The hard and competent work of the Carnegie Way transformation is translating into stronger financial results. And better performance for our investors, customers*** and employees. ***As we have demonstrated over the last couple of years, we have a robust process in place that has consistently generated benefits. Even during times of difficult market conditions***.

\*      \*      \*

- 14 -

We have given you regular updates on the significant progress we have made on improving our cost structure. And our increased focus on our customers through our commercial entities, which has resulted in the continuing improvement and our value added product mix. *We have also been investing our facilities as we indicated last quarter*. Increasing the base and magnitude of our efforts in this area is a priority for this year.

                          *        *        *

Our Carnegie Way transformation efforts have improved our cost structure, streamlined our operating footprint, and increased our customer focus. *These substantial changes and improvements have increased our earnings power and while we will benefit from improved market conditions, they continue to be volatile.* We must remain focused on improving the things that we can control.

39.    Later in the call, defendants were asked "what volume improvement we might be able to anticipate in [the Flat-Rolled Segment] in 2017 under your current configuration? It was helpful you clarified that you're running, what, three blast furnaces." Longhi responded: "*Our blast furnace capacity is going to be capable of supplying whatever additional alternatives that we're going to find out there . . . . What we do anticipate is to be more reliable than we were so we can benefit from being able to roll more slabs.*" Longhi added that he expected about 5% volume growth in 2017 compared to 2016.

40.    When asked by another analyst about the Company's queue of potential capital projects, Longhi stated, in part:

I think that, you know, *we see that there is a lot of value in continu[ing] to invest in our facilities and invest in our innovation. . . . It's a myriad of projects that we have under the Carnegie Way concept*. And it's not in the hundreds, it's in many cases in the thousands.

41.    The Company also released a presentation dated January 31, 2017 with slides on the Company's 4Q2016 and full year 2016 financial results. Regarding Carnegie Way, the presentation stated, in relevant part:

*We are starting 2017 with much better market conditions than we faced at the beginning of 2016. Our Carnegie Way transformation efforts over the last three years have improved our cost structure, streamlined our operating footprint and*

***increased our customer focus.  These substantive changes and improvements have increased our earnings power.***

*              *              *

***Our pace of progress on the Carnegie Way transformation continues to exceed our expectations.  The continuing benefits are improving our ability to earn the right to grow and then drive sustainable profitable growth over the long-term as we deal with the cyclicality and volatility of the global steel industry***.  With over 4,000 active projects, we have many opportunities ahead of us.

42.     The presentation also credited Carnegie Way with "***improving earnings power***," including the addition of $55 per ton of "Carnegie Way Benefits" to the EBITDA of the Flat-Rolled Segment.

43.     On February 28, 2017, the Company filed with the SEC its 2016 10-K, which was signed by Longhi and Burritt, and included SOX certifications signed by each of them.  The 2016 10-K reiterated the financial results outlined in the January 31, 2017 earnings release. Discussing the Company's operations, the 2016 10-K stated, in relevant part:

In 2013, U. S. Steel launched a transformational process called the "Carnegie Way," named after the famed American industrialist and U. S. Steel co-founder Andrew Carnegie.  The Carnegie Way is a strategic, disciplined approach to transforming the Company to address the new realities of the marketplace.  Through the Carnegie Way, we focus on our strengths and where we can create the most value for all U. S. Steel stakeholders, including our stockholders, employees, customers and suppliers. The Carnegie Way is a framework that helps employees address all aspects of our business and achieve sustainable improvements through process efficiencies and strategic investments.  We have been working through a series of transformational initiatives that we believe will enable us to more effectively add value, respond to customer needs, get leaner faster, right-size our operations and improve our performance across our core business process capabilities, including commercial, supply chain, manufacturing, procurement, innovation, and operational and functional support.  Key accomplishments to date include a more intense focus on cash flow, a stronger balance sheet and a revised approach to how we view shipment volume and production.  In pursuing our financial goals, we will not sacrifice our commitment to our core values of safety and environmental stewardship.  We also recognize that achieving this goal requires exemplary leadership and collaboration among all employees, and we are committed to attracting, developing and retaining a workforce with the talent, skills and integrity needed for our long-term success. ***The Carnegie Way has already driven a shift in the Company that has enabled us to***

*withstand the prolonged downturn in steel prices while positioning us for success in a market recovery*.

44. After the market closed on April 25, 2017, the Company issued a release announcing its first quarter 2017 ("1Q2017") financial results, revealing worsening financial results despite improved market conditions. The release reported a surprising net loss of $180 million, or $1.03 loss per diluted share, adjusted EBITDA of $74 million, and negative operating cash flow of $135 million, which was "primarily associated with an investment in working capital in the quarter." The release also stated, in relevant part:

> First quarter results for our Flat-Rolled segment declined significantly compared with the fourth quarter, as we expected, primarily due to higher raw material costs, increased planned outage costs, seasonally lower results from our mining operations, and restart costs associated with the Granite City hot strip mill and our Keetac iron ore mine. Also contributing to the decline in results was a $20 million charge from using the last-in-first-out (LIFO) inventory method in the first quarter, while we recognized a $40 million LIFO benefit in the fourth quarter. These factors were only partially offset by higher average realized prices and benefits from slightly increased shipments that were limited by operating challenges at our facilities.

> First quarter results for our European segment improved compared with the fourth quarter due to increased average realized prices and a favorable first-in-first-out (FIFO) inventory impact. These benefits were partially offset by lower shipment volumes and higher raw material costs, particularly for coking coal and iron ore.

> First quarter results for our Tubular segment improved compared with the fourth quarter due to higher prices, increased shipments, lower spending and the absence of an unfavorable lower of cost or market adjustment for obsolete inventory taken in the fourth quarter. These benefits were partially offset by increased substrate costs.

45. The April 25, 2017 earnings release also substantially reduced the Company's 2017 guidance, cutting earnings from $535 million to $260 million and eliminating prior language that the Company would be cash flow positive in 2017. The release stated, in relevant part:

> If market conditions, which include spot prices, raw material costs, customer demand, import volumes, supply chain inventories, rig counts and energy prices, remain at their current levels, we expect:

> • 2017 net earnings of approximately $260 million, or $1.50 per share, and adjusted EBITDA of approximately $1.1 billion;

- Results for our Flat-Rolled, European, and Tubular segments to be higher than 2016; and

- Other Businesses to be comparable to 2016 and approximately $50 million of postretirement benefit expense.

We believe market conditions will change, and as changes occur during the balance of 2017, we expect these changes to be reflected in our net earnings and adjusted EBITDA.

46.    Quoting Longhi, the April 25, 2017 release included the following statements:

While our segment results improved by over $200 million compared with the first quarter of 2016, *operating challenges at our Flat-Rolled facilities prevented us from benefiting fully from improved market conditions*.  However, we continue to be encouraged by the strength of our European business and we are also seeing improving energy markets.  Overall, improved commercial conditions more than offset higher raw materials and energy costs and increased maintenance and outage spending driven by our asset revitalization efforts.  *The execution of our asset revitalization program and the continued implementation of reliability centered maintenance practices are critical to achieving sustainable improvements in our operating performance and costs*.  We have built the financial strength and resources to move forward more aggressively on these initiatives, and remain focused on providing the service and solutions that will create value for our stockholders, customers, employees, and other stakeholders.

\*      \*      \*

Market conditions have continued to improve, and we will realize greater benefits as these improved conditions are recognized more fully in our future results.  We are focused on long-term and sustainable improvements in our business model that will position us to continue to be a strong business partner that creates value for our customers.  This remains a cyclical industry and we will not let favorable near-term business conditions distract us from taking the outages we need to revitalize our assets in order to achieve more reliable and consistent operations, improve quality and cost performance, and generate more consistent financial results.  We issued equity last August to give us the financial strength and liquidity to position us to establish an asset revitalization plan large enough to resolve our issues, and to see that plan through to completion.  As we get deeper into our asset revitalization efforts, we are seeing opportunities for greater efficiency in implementing our plan. We believe we can create more long-term and sustainable value by moving faster now.  *We have made the strategic decision to accelerate our efforts to resolve the issues that challenge our ability to achieve sustainable long-term profitability*. We believe our objective to achieve economic profit across the business cycle will result in true value creation for all of our stakeholders over the long-term.

47.    Before the market opened the following day, April 26, 2017, the Company held a

conference call to discuss its 1Q2017 financial results.  Longhi, Burritt, and Lesnak participated in

the call on behalf of the Company.  During his opening remarks, Longhi stated in part:

> Last quarter, we discussed the comprehensive asset revitalization plan we are
> implementing to improve our profitability and competitiveness and to meet or exceed
> the increasing expectations of our customers.
>
> ***This is a multiyear plan that will take 3 to 4 years till full implementation and is
> not just sustaining capital and maintenance spending***.  These projects will deliver
> both operational and commercial benefits.  As we get deeper into our asset
> revitalization efforts, we are seeing opportunities for greater efficiency in
> implementing our plan.
>
> We believe we can create more long term and sustainable value by moving faster
> now.  ***And we have made a strategic decision to accelerate our efforts to address
> some of the issues and implement the improvements that will enhance our ability to
> achieve sustainable long-term profitability***.
>
> ***As a result of this acceleration, we now expect our investment in asset
> revitalization in 2017 to be approximately $300 million higher than it was in 2016.
> We will be taking more downtime at our facilities, which will limit our steel
> production volumes*** and with the restart of our Lone Star welded pipe mill, that I
> mentioned earlier, we'll resume shipping hot-rolled bands to our Tubular segment.
> ***Based on these factors, we will have fewer tons available to offer into the spot
> market after taking care of our strategic customers' requirements***.
>
> We currently expect our flat-rolled shipments to third-party customers will be
> approximately 10 million tons this year.

48.    During the question-and-answer session that followed, defendants were asked

whether the total cost of the accelerated revitalization plan would exceed $1 billion.  Burritt

responded:

> ***It's more than that.  But we were ramping up right now. . . . this is an investment
> year, but this is a rampup***.  We're accelerating where we thought we do this year,
> we're still in a ramp-up phase. *It takes a lot of advance engineering and planning for
> a lot of these projects.  **So we would expect going forward that the numbers get
> bigger before they get smaller***.

49.    As the call continued, Burritt admitted that defendants needed to "do better" and "move faster" in revitalizing Company assets, stating, "[w]e need to perform" and "[w]e need to execute."

50.    The market's reaction to the disclosures in the Company's earnings release and earnings conference call was swift and severe.  After closing at $31.11 per share on April 25, 2017, the stock opened at $24.18 on April 26, 2017, and ultimately dropped 26.8% to close at $22.78 per share on abnormally high trading volume of 101 million shares traded.  *The drop represented the largest one-day decline in the price of U.S. Steel stock since at least 1991.*

51.    Analyzing the reasons behind the Company's poor performance, *Bloomberg* reported that:

> Longhi is paying the price of spending frugally on the company's blast furnaces during lean years when a flood of cheap Chinese imports kept prices low and forced producers to defend margins.  The investment backlog means he's now unable to reap the rewards of a price recovery spurred by government restrictions on imports.
>
> The CEO may have focused too much on lobbying for trade cases to defend the U.S. steel industry and too little on improving operational efficiency, according to Gordon Johnson, an analyst at Axiom Capital Management.
>
> "They're structurally worse off than everyone else given the age of their blast furnaces and that everyone else is in electric-arc furnaces," Johnson said by telephone.  "This is going to cost them a lot of money and who's going to say they can catch up?"
>
> *        *        *
>
> The quarterly results contrast those of the biggest U.S. steel producer, Nucor Corp.  The Charlotte, North Carolina-based company painted a rosier picture for the current quarter, citing higher margins at its plate mills and increasing profitability in its downstream products.  Nucor operates steelmaking furnaces that use scrap instead of iron ore as its main component, a process that uses less energy and is more efficient than the blast furnaces that U.S. Steel mostly relies on.

52.    Also reporting on the Company's surprisingly poor performance, *Fox Business* wrote:

> U.S. Steel has been one of the leaders in lobbying for tariffs on steel imports, but it seems to have lost focus on its own business.  While others were investing in

improving technology and costs during the downturn, U.S. Steel was trying to save money and put off investments. That's coming back to haunt the company now and could lead to losses for years to come. Unless metals prices increase dramatically, I don't see a positive financial result ahead for the company. Thus, right now this is a stock I would stay away from, despite today's sell-off.

53.    The true facts, which were known by defendants but concealed from the investing public during the Class Period, were as follows:

        (a)    while the Company was implementing its Carnegie Way program, it was focused on cutting costs and was not making investments necessary to position U.S. Steel so that it could respond to improved market conditions;

        (b)    defendants' failure to invest in improving capital assets during the industry downturn, in order to report apparent financial improvements, meant that U.S. Steel had higher production costs than its competitors, even in the face of improved pricing, which would negatively impact its financial results;

        (c)    defendants were forestalling expensive capital equipment upgrades in order to boost the Company's short term financial results at the expense of long-term financial performance, leaving U.S. Steel in need of accelerated, costly equipment upgrades that would leave the Company years away from generating improved financial performance; and

        (d)    as a result of the foregoing, defendants' statements regarding the Company's outlook and expected financial performance were false and misleading and lacked a reasonable basis when made.

54.    As a result of defendants' false statements and material omissions, U.S. Steel stock traded at artificially inflated prices during the Class Period. After the above revelations were revealed to the market, however, the price of U.S. Steel stock declined significantly as the artificial inflation was removed.

## ADDITIONAL SCIENTER ALLEGATIONS

55.      As alleged herein, defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading, knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding U.S. Steel, their control over and/or receipt and/or modification of allegedly materially misleading misstatements, and/or their associations with the Company, which made them privy to confidential proprietary information concerning U.S. Steel, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION/ECONOMIC LOSS

56.      During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of U.S. Steel stock and operated as a fraud or deceit on Class Period purchasers of U.S. Steel stock by failing to disclose and misrepresenting the adverse facts detailed herein.  When defendants' prior misrepresentations and fraudulent conduct were disclosed, and the risks concealed by defendants' misrepresentations and omissions materialized and became apparent to the market, the price of U.S. Steel stock fell precipitously as the prior artificial inflation came out.  As a result of their purchases of U.S. Steel stock during the Class Period, Plaintiff and the other Class members suffered economic loss, i.e., damages, under the federal securities laws when the truth about U.S. Steel was revealed through the disclosures specified herein, which removed the artificial inflation from the price of U.S. Steel common stock.

57.     By failing to disclose to investors the adverse facts detailed herein, defendants presented a misleading picture of U.S. Steel's business and prospects.  Defendants' false and misleading statements had the intended effect and caused U.S. Steel stock to trade at artificially inflated levels throughout the Class Period.

58.     As a direct result of the disclosure and materialization of the risk identified herein, the price of U.S. Steel stock fell precipitously.  This removed the artificial inflation from the price of U.S. Steel stock, causing real economic loss to investors who had purchased U.S. Steel stock at artificially inflated prices during the Class Period.

59.     The price declines were a direct result of the nature and extent of defendants' fraud being revealed and the risks associated therewith materializing to investors and the market through defendants' disclosures.  The timing and magnitude of the price declines in U.S. Steel stock negate any inference that the losses suffered by Plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct.  The economic loss, i.e., damages, suffered by Plaintiff and the other Class members, was a direct result of defendants' fraudulent scheme to artificially inflate the price of U.S. Steel stock and the subsequent significant decline in the value of U.S. Steel stock when defendants' prior misrepresentations and other fraudulent conduct were revealed and the risks associated with defendants' fraud materialized.

## PRESUMPTION OF RELIANCE

60.     At all relevant times, the market for U.S. Steel stock was an efficient market for the following reasons, among others:

(a)     U.S. Steel stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     as a regulated issuer, U.S. Steel filed periodic public reports with the SEC;

(c)     U.S. Steel regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     U.S. Steel was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

61.     As a result of the foregoing, the market for U.S. Steel stock promptly digested current information regarding U.S. Steel from all publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all purchasers of U.S. Steel stock during the Class Period suffered similar injury through their purchase of U.S. Steel stock at artificially inflated prices and a presumption of reliance applies under the fraud-on-the-market doctrine.

62.     A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on defendants' material omissions.  Because this action involves defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of defendants' material Class Period omissions, that requirement is satisfied here.

**NO SAFE HARBOR**

63.    The "Safe Harbor" warnings accompanying U.S. Steel's reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.   To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.  *See* 15 U.S.C. §78u-5(b)(2)(A).

64.    Defendants are also liable for any false and misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of U.S. Steel who knew that the FLS was false. In addition, the FLS were contradicted by existing, undisclosed material facts that were required to be disclosed so that the FLS would not be misleading.  Finally, most of the purported Safe Harbor warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.

**COUNT I**

**For Violations of Section 10(b) of the 1934 Act and Rule 10b-5**
**Against All Defendants**

65.    Plaintiff incorporates ¶¶1-64 by reference.

66.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

67.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and the other Class members in connection with their purchases of U.S. Steel stock during the Class Period.

68.    In addition to the duties of full disclosure imposed on defendants, as a result of their affirmative false and misleading statements to the public, defendants had a duty to promptly disseminate truthful information with respect to U.S. Steel's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market price of the Company's stock would be based on truthful, complete, and accurate information. SEC Regulations S-X (17 C.F.R. §210.01, *et seq*.) and S-K (17 C.F.R. §229.10, *et seq*.).

69.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other Class members have suffered damages in connection with their respective purchases and sales of U.S. Steel stock during the Class Period, because, in reliance on the integrity of the market, they paid artificially inflated prices for U.S. Steel stock and experienced loses when the artificial inflation was released from U.S. Steel stock as a result of the revelations and risk materializations, and the stock price decline detailed herein. Plaintiff and the other Class members would not have purchased U.S. Steel stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements and omissions.

70.    By virtue of the foregoing, U.S. Steel and the Individual Defendants have each violated §10(b) of the 1934 Act, and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations of §20(a) of the 1934 Act
### Against All Defendants

71.     Plaintiff incorporates ¶¶1-64 by reference.

72.     The Individual Defendants acted as controlling persons of U.S. Steel within the meaning of §20(a) of the 1934 Act.  By reason of their controlling positions with the Company, and their ownership of U.S. Steel common stock, the Individual Defendants had the power and authority to cause U.S. Steel to engage in the wrongful conduct complained of herein.  U.S. Steel controlled the Individual Defendants and all of its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Declaring that this action is a proper class action, designating Plaintiff as Lead Plaintiff, certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure, and designating Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such equitable, injunctive, or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: May 3, 2017

LAW OFFICE OF ALFRED G. YATES, JR. PC
ALFRED G. YATES, JR.
GERALD L. RUTLEDGE


*s/Alfred G. Yates, Jr.*

ALFRED G. YATES, JR. (PA17419)

GERALD L. RUTLEDGE (PA62027)
300 Mt. Lebanon Boulevard, Suite 206-B
Pittsburgh, PA  15234
Telephone: (412) 391-5164
Facsimile: (412) 471-1033
Email: yateslaw@aol.com

*Local Counsel for Plaintiff*

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON (CA174882)
600 West Broadway, Suite 1540
San Diego, CA  92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
Email: frankj@johnsonandweaver.com

JOHNSON & WEAVER, LLP
MICHAEL I. FISTEL, JR. (GA262062)
40 Powder Springs Street
Marietta, GA  30064
Telephone: (770) 200-3104
Facsimile: (770) 200-3101
Email: michaelf@johnsonandweaver.com

*Attorneys for Plaintiff*