**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CHRISTAKIS VRAKAS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 17-579 |
| | ) | |
| v. | ) | Judge Cathy Bissoon |
| | ) | |
| UNITED STATES STEEL | ) | |
| CORPORATION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM ORDER

Pending before the Court are two motions to dismiss Plaintiffs' Amended Class Action

Complaint for Violations of the Federal Securities Laws (hereinafter "Amended Complaint,"

Doc. 58) filed by separate groups of Defendants. The first Motion to Dismiss (Doc. 109), filed

by Defendants Mario Longhi, David Burritt, Dan Lesnak, (the "Individual Defendants" or "the

Individual U.S. Steel Defendants") and United States Steel Corporation ("U.S. Steel" or the

"Company") (all collectively, the "U.S. Steel Defendants"), argues that the Amended Complaint

fails to satisfy the heightened pleading requirements of the Private Securities Litigation Reform

Act and Federal Rule of Civil Procedure 9(b). The second Motion to Dismiss (Doc. 114), filed

by a number of entities that served as underwriters for U.S. Steel's secondary public offering on

August 15, 2016, namely, Defendants J.P. Morgan Securities LLC, Goldman Sachs & Co. LLC,

Barclays Capital Inc., Wells Fargo Securities, LLC, Credit Suisse Securities (USA) LLC,

Morgan Stanley & Co. LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, PNC Capital

Markets LLC, Scotia Capital (USA) Inc., Citizens Capital Markets, Inc., SunTrust Robinson

Humphrey, Inc., BNY Mellon Capital Markets, LLC, Citigroup Global Markets Inc., Commerz

Markets LLC, The Huntington Investment Company, SG Americas Securities, LLC, The

Williams Capital Group, L.P., and ING Financial Markets LLC (collectively, the "Underwriter Defendants"),[1] argues that Plaintiffs have failed to plead adequate statutory standing and have failed to allege any material misrepresentations or omissions, among other arguments.

Plaintiffs have filed an Omnibus Brief in Opposition to Defendants' Motions to Dismiss, (hereinafter "Plaintiffs' Response," Doc. 121), to which all Defendants have filed an Omnibus Reply in Support of their Motions to Dismiss (hereinafter "Defendants' Reply," Doc. 126). Plaintiffs and the U.S. Steel Defendants have also filed respective requests for judicial notice and respective oppositions to their counterparties' requests for judicial notice (Docs. 111, 119, 120, 127-1). Two requests for judicial notice are now pending before the Court.

For the reasons that follow, the Court will grant the U.S. Steel Defendants' Request for Judicial Notice (Doc. 111) and take notice of the documents accompanying the supporting declaration (Doc. 112). The Court will also grant Plaintiffs' Request for Judicial Notice (Doc. 119) and take notice of Exhibits 1 and 2 accompanying the supporting declaration (Doc. 122).[2] Defendants' motions to dismiss will be granted in part and denied in part.

**BACKGROUND**

Lead Plaintiff Christakis Vrakas and Plaintiffs Leeann Reed and Robert Myer ("Plaintiffs") bring this putative securities fraud class action on behalf of themselves and the

---

[1] The Amended Complaint names as Defendants "Goldman Sachs & Co." and "Citigroup Capital Markets, Inc."—the Underwriter Defendants state that the correct names for these Defendants are, respectively, "Goldman Sachs & Co. LLC" and "Citigroup Global Markets Inc." (See Doc. 114.)

[2] There are two additional exhibits attached to this declaration, (Docs. 122-3, 122-4)—Plaintiffs do not clearly request that the Court take notice of these documents, as Plaintiffs' Request for Judicial Notice refers only to Exhibits 1 and 2, (see Doc. 119); Defendants argue that the Court may not properly take notice of these documents, (Doc. 127-1). The Court agrees with Defendants and finds that the remaining exhibits contain merits arguments and are thus not within the contemplation of Federal Rule of Evidence 201. The Court will disregard the remaining exhibits attached to Plaintiffs' declaration.

class of people, other than Defendants, who purchased or acquired U.S. Steel securities between January 27, 2016 and April 25, 2017 (the "Class Period"), or otherwise acquired shares pursuant to or traceable to the August 15, 2016 Secondary Public Offering ("SPO"). (Id. at 1.) Defendant U.S. Steel is a Delaware-incorporated and Pittsburgh-based company with operations in North America and Europe that produces flat-rolled and tubular steel products for customers worldwide. (Amended Complaint ¶¶ 1, 31.) The Individual Defendants are Mario Longhi, U.S. Steel's Chief Executive Officer ("CEO") from June 2013 to May 8, 2017, and its President from June 2013 to February 2017; David Burritt, U.S. Steel's President and CEO since May 2017 who served as U.S. Steel's President and Chief Operating Officer from February 2017 to May 2017 and its Executive Vice President and Chief Financial Officer between September 2013 and February 2017; and Dan Lesnak, U.S. Steel's General Manager of Investor Relations at all times relevant to this lawsuit. (Id. at ¶¶ 32, 36, 38.) The Underwriter Defendants, listed above, provided underwriting services to U.S. Steel for its SPO. (Id. at ¶ 41.)

To summarize the relevant narrative,[3] Plaintiffs allege that U.S. Steel engaged in extreme cost cutting measures, beginning in 2015, leading to a total lack of preventative maintenance and eventually to mounting unplanned outages of plant equipment. (Id. at ¶ 4.) Due to these outages, Plaintiffs allege that U.S. Steel's production consistently fell short during the Class Period. (Id. at ¶¶ 4-5.) Meanwhile, Plaintiffs claim that U.S. Steel implemented a "sham" initiative, called the Carnegie Way, which pretended to involve measures other than cost cutting, but which was ultimately a façade for cost cutting by 2015. (Id. at ¶¶ 3-4.) Plaintiffs' Complaint centers on the claim that the U.S. Steel Defendants repeatedly misled investors concerning the

_____

[3] The body of the Amended Complaint is 168 pages, containing 467 numbered paragraphs with factual allegations.

3

true purpose of the Carnegie Way as well as the true extent and causes of the unplanned shut-downs of steel production equipment in various flat-rolled steel production facilities. (Id. at ¶¶ 150, 156, 218.) Plaintiffs contend that these misrepresentations artificially inflated U.S. Steel's stock price, allowing Defendants Longhi and Burritt to sell their personal shares while the stock price was inflated. (Id. at ¶¶ 24, 219.)

Specifically, throughout the Amended Complaint, Plaintiffs claim that the U.S. Steel Defendants misled investors by engaging in four general categories of material misstatements:[4] (1) falsely claiming that critical elements of the Carnegie Way initiative, such as Reliability Centered Maintenance ("RCM")—defined as proactive rather than reactive maintenance—were being implemented, and with positive results, (e.g., id. at ¶¶ 106, 156, 188, 249);[5] (2) falsely reporting the amount of "realized" cost savings attributable to the Carnegie Way by including, for example, savings for projects that were not yet implemented, (e.g., id. at ¶¶ 152-55, 222, 248, 266); (3) falsely claiming that U.S. Steel's capital spending was appropriate, (e.g., id. at ¶¶ 156, 191); and (4) falsely claiming that the purpose of the SPO was broader than providing capital to invest in plant repairs and maintenance, (e.g., id. at ¶ 195).

**ANALYSIS**

Plaintiffs assert four securities fraud claims in the Amended Complaint: in Count I, Plaintiffs assert a claim under Section 10(b) of the Securities Exchange Act of 1934 (the

---

[4] The Amended Complaint describes 18 official statements and documents containing alleged misrepresentations, (see Amended Complaint ¶¶ 218-336); Plaintiffs' Response adopts four similar categories of misrepresentations, which the Court finds useful for organizational purposes, (see Plaintiffs' Response 18-19).

[5] Plaintiffs also claim that Defendants' statements were misleading by omission, as they failed to disclose to investors the nature and extent of the unplanned outages the Company was experiencing at its flat-rolled facilities, including their duration and cost, and thereby misrepresented the Company's capacity to meet demand. (E.g., Amended Complaint ¶¶ 171, 271-73.)

"Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, against the U.S. Steel Defendants; in Count II, Plaintiffs assert a claim under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, against the U.S. Steel Defendants; in Count III, Plaintiffs assert a claim under Section 11 of the Securities Acts of 1933 (the "Securities Act"), 15 U.S.C. § 77k, against the Individual and Underwriter Defendants; and in Count IV, Plaintiffs assert a claim under Section 15 of the Securities Act, 15 U.S.C. § 77o, against the Individual Defendants. (Amended Complaint ¶¶ 429-467.)

As to all of Plaintiffs' claims, the existence of a material misrepresentation or omission is a necessary element. In addition, as to claims under Section 10(b) of the Exchange Act, scienter is a necessary element. As discussed below, several of Plaintiffs' alleged theories of liability fail to satisfy the applicable pleading standards—either because they fail to plead a material misrepresentation or omission or fall within the protections of the safe harbor provision of the Private Securities Litigation Reform Act ("PSLRA"). The only theories that survive are those stemming from Defendants' alleged affirmative misrepresentations concerning past proactive maintenance at steel production facilities, and misleading statements concerning the Company's then-current capacity to meet demand.

The Court will address the relevant pleading standards and the required elements of the statutory claims, address the parties' respective requests for judicial notice, and then apply the pleading requirements to each alleged misrepresentation in turn to assess falsity. For the allegations that survive the Court's falsity analysis, the Court will address whether Plaintiffs have sufficiently pleaded scienter. Finally, relying on the Court's resolution of falsity, the Court will turn to the Securities Act claim against the Underwriter Defendants.

## I.    Legal Standards

### A.  Pleading Standards under the PSLRA and Rule 9(b)

In securities fraud cases under Section 10(b), heightened pleading rules apply under the PSLRA.  OFI Asset Mgmt. v. Cooper Tire & Rubber, 834 F.3d 481, 490 (3d Cir. 2016).  To survive a motion to dismiss, the complaint must first "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B); see also In re Suprema Specialties, Inc. Secs. Litig., 438 F.3d 256, 276 (3d Cir. 2006).  The complaint must also "state with particularity the facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A); see also Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007).  These pleading requirements are "[e]xacting."  Id. at 313.  Congress enacted these requirements "[a]s a check against abusive litigation by private parties," which "impose[s] substantial costs on companies and individuals whose conduct conforms to the law."  Id.

The PSLRA also contains a safe harbor provision, 15 U.S.C. § 78u-5(c), for situations in which plaintiffs allege that forward-looking statements were false or misleading.  Inst'l Investors Grp. v. Avaya, Inc., 564 F.3d 242, 254 (3d Cir. 2009).  Such statements do not give rise to liability if any one of the following conditions is true: (1) the statement is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward looking statement"; or (2) the statement is "immaterial"; or (3) plaintiffs fail to prove that the

statement was made by a person, or made or approved by an executive officer, with actual knowledge that the statement was false or misleading.  15 U.S.C. § 78u-5(c)(1).

In deciding whether a complaint alleging a Section 10(b) violation meets the PSLRA's pleading standards, the Court must take as true all of the well-pleaded factual allegations in the complaint; "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference and matters of which a court may take judicial notice"; and, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences."  Tellabs, 551 U.S. at 322-23.

Additionally, for all of Plaintiffs' claims, including Plaintiffs' securities fraud claims under Section 11 of the Securities Act, Federal Rule of Civil Procedure 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  Thus, the complaint must "plead the who, what, when, where, and how: the first paragraph of any newspaper story."  Avaya, Inc., 564 F.3d at 253 (quoting In re Advanta Corp. Sec. Litig., 180 F.3d 525, 534 (3d Cir. 1999) (internal quotation marks omitted)).

*B.  Elements of Securities Fraud Claims*

To state a claim under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), Plaintiffs must sufficiently plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 37-38 (2011) (quoting Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008)). Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, in relevant part, provides joint and several

liability for "every person who, directly or indirectly, controls any person liable under any provision of this title [15 U.S.C. §§ 78a, *et seq.*] or of any rule or regulation thereunder." 15 U.S.C. § 78t(a). In this context, the required scienter "embrac[es] [an] intent to deceive, manipulate, or defraud," with "a knowing or reckless state of mind." <u>Avaya, Inc.</u>, 564 F.3d at 252. To plead a "strong inference" of this state of mind under the PSLRA requires the inference to be "at least as compelling as any opposing inference one could draw from the facts alleged." <u>Tellabs, Inc.</u>, 551 U.S. at 324. The Court's analysis of scienter thus looks at the complaint holistically to determine whether the facts alleged give rise to such a compelling inference. <u>In re Hertz Global Holdings, Inc.</u>, 2018 U.S. App. LEXIS 26865, at *9 (3d Cir. Sept. 20, 2018).

Section 11 of the Securities Act, 15 U.S.C. § 77k, provides that if a company's registration statement with the Securities and Exchange Commission ("SEC") either "'contain[s] an untrue statement of a material fact' or 'omit[s] to state a material fact . . . necessary to make the statements therein not misleading,' a purchaser of the stock may sue for damages." <u>Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund</u>, 135 S. Ct. 1318, 1323 (2015) (quoting 15 U.S.C. § 77k(a)). Unlike a claim under Section 10(b) of the Exchange Act, a claim under Section 11 of the Securities Act imposes strict liability and does not require a plaintiff to prove "any intent to deceive or defraud." <u>Id.</u> Section 15 of the Securities Act, 15 U.S.C. § 77o, creates joint and several liability for "[e]very person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under section 11 [15 U.S.C. § 77k]." 15 U.S.C. § 77o(a).

## II.    Judicial Notice

The U.S. Steel Defendants have filed a Request for Judicial Notice (hereinafter "U.S. Steel's RJN," Doc. 111), with an accompanying Declaration in Support (hereinafter "U.S. Steel's

RJN Declaration," Doc. 112), requesting that the Court take notice of 45 exhibits appended

thereto.  Plaintiffs have also filed a Request for Judicial Notice (hereinafter "Plaintiffs' RJN,"

Doc. 119), with an accompanying Declaration (hereinafter "Plaintiffs' RJN Declaration," Doc.

122), requesting that the Court take notice of two exhibits appended thereto.  For the reasons

below, the Court grants both of these requests.

The Court's analysis is guided by the following legal standards.  Federal Rule of

Evidence 201(b) states that:

> The court may judicially notice a fact that is not subject to reasonable dispute because it:
>
> (1) is generally known within the trial court's territorial jurisdiction; or
> (2) can be accurately and readily determined from sources whose accuracy cannot
>     reasonably be questioned.

Fed. R. Evid. 201(b).  Federal Rule of Evidence 201(c) requires that the Court "take judicial

notice if a party requests it and the court is supplied with the necessary information."  Fed. R.

Evid. 201(c)(2).  Federal Rule of Civil Procedure 12(d) requires the Court to convert a motion

under Rule 12(b)(6) to a motion for summary judgment if "matters outside the pleadings are

presented to and not excluded by the court."  Fed. R. Civ. P. 12(d).  However, the Court need not

effect such conversion when considering undisputedly authentic documents upon which a

complaint is based, or other properly noticed documents.  Pension Benefit Guar. Corp. v. White

Consol. Indus., Inc., 998 F.2d 1192, 1196-97 (3d Cir. 1993).

In light of these Rules, and the body of cases in this Circuit applying them, the Court may

take judicial notice of the following categories of documents:

(1) "a 'document *integral to or explicitly relied* upon in the complaint,'" for the purpose

of determining whether allegations of fraud are sufficiently pleaded, In re Burlington Coat

Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (quoting Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1220 (1st Cir. 1996));

(2) public records for assessing the existence of relevant materials, including "properly-authenticated public disclosure documents filed with the SEC," Oran v. Stafford, 226 F.3d 275, 289 (3d Cir. 2000), as well as records of public agency administrative proceedings, see Baker v. Moon Area School District, 2018 WL 4057179, at *4 (W.D. Pa. Aug. 27, 2018), records indicating when public events occurred or public records became available, see Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P., 435 F.3d 396, 401 n.15 (3d Cir. 2006), and newspaper articles for the truth of generally known facts, Peters v. Del. River. Port Auth., 16 F.3d 1346, 1357 (3d Cir. 1994); and

(3) stock price data, including reported compilations of stock price data from reliable sources, for the truth of the information, In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1331 (3d Cir. 2002).

While the Court may take notice of such documents for what they state, the Court must be cautious not to take notice of the truth of any matters that can be reasonably contested.  See id.; cf. S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd., 181 F.3d 410, 427 n.7 (3d Cir. 1999) ("it has been suggested that the appropriate analogy is the hearsay rule").  The Court can, and must, consider nonculpable scienter inferences that can be drawn from these documents when deciding a motion to dismiss under Section 10(b) of the Exchange Act.  See Tellabs, 551 U.S. at 323 ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss . . . .  The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?"); In re Radian Sec. Litig., 612 F. Supp. 2d 594, 608, 612

n.21 (E.D. Pa. 2009) ("[b]ecause the documents upon which the defendants' theory is based are publicly filed SEC documents, the Court can consider the evidence offered here by the defendants in support of their inference of nonculpability").  The Court also may take notice of the dictionary definition of a word to discern its ordinary meaning.  Bonkowski v. Oberg Indus., Inc., 992 F. Supp. 2d 501, 510-11 (W.D. Pa. 2014), aff'd, 787 F.3d 190 (3d Cir. 2015).

As to the U.S. Steel Defendants' RJN, all of the documents for which they request judicial notice fall into one of the above categories.

The Amended Complaint quotes, cites or integrally relies upon documents including: U.S. Steel's Class Period (and immediate pre- and post-Class Period) annual reports, quarterly reports, press releases and quarterly earnings releases, presentations, question and answer documents, and earnings call transcripts; as well as International Trade Commission ("ITC") testimony transcripts from the August 18, 2015 and May 24, 2016 ITC investigation hearings.  Accordingly, the Court takes notice of Exhibits 3-7, 10, 12-21, 23-26, 35-42, and 44 to U.S. Steel's RJN Declaration.

The Court also takes notice of the following publicly disclosed SEC filings, which provide relevant context for Plaintiffs' claims: U.S. Steel's 2013 and 2014 Annual Reports, Exhibits 1 and 2 to U.S. Steel's RJN Declaration; U.S. Steel's Definitive Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, Exhibit 11 to U.S. Steel's RJN Declaration; U.S. Steel's Prospectus Supplement filed pursuant to Rule 424(b)(2), Exhibit 22 to U.S. Steel's RJN Declaration; and compiled and individual statements of changes in beneficial ownership (Forms 4s), Exhibits 30-31 and 33 to U.S. Steel's RJN Declaration.  The Court also takes notice of the screenshots at Exhibit 43 to U.S. Steel's RJN Declaration for the dates on which ITC hearing transcripts became publicly available online.

The Court takes notice of historic stock price data compiled by Bloomberg, Exhibits 8-9 and 27-29 to U.S. Steel's RJN Declaration. The Court also takes notice of Defendants' newspaper articles, Exhibits 32 and 24 to U.S. Steel's RJN Declaration, but only for the generally known or incontestable facts, cited in U.S. Steel's MTD Brief, that "stocks moved sharply higher" after the 2016 presidential election, (U.S. Steel's MTD Brief 30), and that in several years between 2007 and 2016, dismissal rates for securities class actions exceeded 50%, (id. at 3).

Finally, the Court takes notice of the fact that Oxford English Dictionary Online defines "liquidity," in relevant part, as "[t]he interchangeability of assets and money," Exhibit 45 to U.S. Steel's RJN Declaration.

As to Plaintiffs' request, the Court takes notice of Exhibits 1 and 2 to Plaintiffs' RJN Declaration, which contain, respectively, the historical stock prices of U.S. Steel on certain dates between June 18, 2014 and April 25, 2017, and the 2017 Proxy Statement relied upon in the Amended Complaint and filed with the SEC.

### III.    Alleged Misrepresentations and Omissions

Because the existence of a properly alleged misrepresentation or omission is necessary for each of Plaintiffs' theories of liability, the Court will address each such allegation in turn.

  A.  *Falsely claiming that RCM was being implemented "across all of our facilities"; and that U.S. Steel was spending money to invest in preventative maintenance during the Class Period, with positive results*

Plaintiffs allege that "Defendants affirmatively misrepresented that U.S. Steel was *proactively* implementing maintenance under the RCM element of the Carnegie Way initiative," (Plaintiffs' Response 29), by falsely stating—in every quarterly earnings presentation during the Class Period—that U.S. Steel "continue[s] to implement our reliability centered maintenance

[RCM] process across all of our facilities," (Amended Complaint ¶¶ 7, 115, 156, 188, 248, 266). In addition, Plaintiffs claim that U.S. Steel falsely represented that it was spending money to conduct proactive maintenance. (E.g., id. at ¶ 156 (U.S. Steel stated in a 2016 press release: "We took significant actions to align our overhead costs with our operations, ***contributing $100 million to our Carnegie Way benefits*** for this year.") (emphasis in Amended Complaint).) To take another example, during a conference call with analysts on November 2, 2016, to discuss U.S. Steel's third quarter 2016 financial results, Defendant Longhi stated:

> We are accelerating our investments in our facilities to achieve sustainability better and more consistent operating performance including improved reliability, quality, delivery, and customer service.

(Id. at ¶ 299 (emphasis omitted).)

Contrary to these representations, Plaintiffs allege that U.S. Steel was unable to, and did not, maintain or invest in its assets at these times. (Amended Complaint ¶ 191.) For example, U.S. Steel allowed "a backlog of 253 projects categorized as 'S-1' projects [meaning immediate need for repair]" to accrue as of July 25, 2016 at the flat-rolled steel production facility at Great Lakes Works. (Id. at ¶ 137.) And several confidential witnesses ("CWs")[6] across U.S. Steel's facilities—including Great Lakes Works, Mon Valley Works and Gary Works—allege in essence "that during 2015 and 2016, U.S. Steel allowed the steel making machinery and

---

[6] Plaintiffs include allegations based on interviews with eleven CWs, including witnesses such as CW#1, "a former Division Administrative Assistant at [U.S. Steel's] Gary Works facility from January 2013 to May 2016" who "was also a Carnegie Way team member during the Class Period . . . [and who] participated in training U.S. Steel personnel about the Carnegie Way"; CW#2, whose "role as a Carnegie Way team member was to impart training and information to Company Employees regarding the methodologies associated with the Carnegie Way"; CW#5, "a former U.S. Steel Director of Reliability Centered Maintenance at Great Lakes Works from March 2016 to July 2016"; and CW#9, "a former U.S. Steel Financial Analyst from January 2015 to October 2016" who "was responsible for capital spending for all of U.S. Steel's business lines." (Id. at ¶¶ 62-72.)

equipment to run until it broke, rather than providing preventative maintenance" and that "the RCM program was ignored." (E.g., id. at ¶¶ 112-14.) Plaintiffs, through the particular accounts of confidential witnesses, provide numerous examples of specific instances in which proactive maintenance would have been performed if an initiative for proactive maintenance had existed at the relevant times in the relevant places; they allege in these examples that U.S. Steel deferred maintenance to the point of severe malfunction as opposed to implementing RCM in any form. (E.g., id. at ¶¶ 110-11, 113, 122, 131-35, 138, 140-42.)

In sum, Plaintiffs claim that U.S. Steel consistently told investors during the Class Period that it was implementing RCM at all facilities when U.S. Steel was not implementing RCM at any facilities. (Id. at ¶ 273 ("U.S. Steel was no[t] making 'so many' investments, it was making no investments."); see also Plaintiffs' Response 10.)[7]

As Plaintiffs note, U.S. Steel's MTD Brief does not directly address the alleged affirmative misstatements regarding RCM and preventative maintenance. (Plaintiffs' Response 19 n.9.)[8] Rather, the U.S. Steel Defendants characterize U.S. Steel's statements regarding RCM

---

[7] As further support for their account, Plaintiffs cite Company data indicating that capital expenditures, which "were calculated based on revenue projects and plant managers' requests for repairs and upgrades" declined 44.9% between fiscal years 2015 and 2016, with a 66.9% decline in capital expenditures in flat-rolled facilities. (Id. at ¶¶ 145-46.) They also cite statements that U.S. Steel executives made to the International Trade Commission ("ITC") concerning U.S. Steel's lack of capacity to invest in new technologies and products given international competition and other pressures. (See id. at ¶ 191.) These statements will be discussed below.
[8] Plaintiffs also argue that Defendants have waived any objection to the falsity of the affirmative statements regarding RCM by failing to address these affirmative statements in their opening briefs. (Plaintiffs' Response 19 n.9.) Given the length and complexity of Plaintiffs' Amended Complaint as well as Defendants' clear effort to respond holistically to Plaintiffs' claims, including those concerning proactive maintenance, (see U.S. Steel's MTD Brief 23), the Court finds that Defendants have not conceded the falsity of the affirmative statements regarding RCM. See United States v. Fredericks, 684 F. App'x 149, 160 n.5 (3d Cir. 2017) (finding that a party, by articulating an argument in his brief, albeit not thoroughly, did not forfeit the argument, which the court found to be meritless).

as statements "in the nature of omissions" because the statements failed to disclose that U.S.

Steel was, in Plaintiffs' view, underinvesting. (U.S. Steel's MTD Brief 17-18.) The U.S. Steel

Defendants also argue that Section 10(b) claims cannot flow from disagreements with

management decisions, and that Plaintiffs' claims boil down to disagreements with management

decisions. (Id.) The Court disagrees with Defendants as to both points.

First, the Court finds that statements such as "[w]e continue to implement our reliability

centered maintenance process across all of our facilities," (Amended Complaint ¶ 7 (emphasis

omitted)), and "[w]e took significant actions to align our overhead costs with our operations,

contributing $100 million to our Carnegie Way benefits for this year," (id. at ¶ 156 (emphasis

omitted)), are affirmative statements. These statements, and similar statements that the U.S.

Steel Defendants are alleged to have made throughout the Amended Complaint, concern past

actions that U.S. Steel either took, or did not take, as a matter of fact. They are not statements

"in the nature of omissions"; the statements are not merely misleading by virtue of omitted

information, but rather contain affirmatively false statements of fact (taking Plaintiffs'

allegations as true). Cf. In re Advanta Corp., 180 F.3d at 538-39 (analyzing portrayals of

company policies as "statements," but finding that such statements were not material because the

disclosure of omitted facts would have had no substantial likelihood of altering the total mix of

available information). As a result, Defendants' arguments concerning Plaintiffs' failure to meet

the pleading requirements for a Section 10(b) omission claim, which Plaintiffs do not assert as to

RCM, simply miss the mark.

Second, the U.S. Steel Defendants argue, citing In re Craftmatic Securities Litigation,

890 F.2d 628 (3d Cir. 1989), that "claims essentially grounded on corporate mismanagement are

not cognizable under federal law," id. at 638-39, by virtue of the Supreme Court's holding in

Sante Fe Industries, Inc. v. Green, 430 U.S. 462 (1977) that a claim under Section 10(b) fails as

to "transactions which constitute no more than internal corporate mismanagement," id. at 479.

(U.S. Steel's MTD Brief 19.)  Defendants' argument goes too far.  There is nothing in either of

these cases to suggest that alleged corporate mismanagement shields Defendants from liability

under Section 10(b).  Rather, a claim of mismanagement absent "any deception,

misrepresentation, or nondisclosure" is what fails to suffice under federal securities laws.  Santa

Fe, 430 U.S. at 476; see also Craftmatic, 890 F.2d at 639 ("Although allegations of failure to

disclose mismanagement alone do not state a claim under federal securities law, a claim that

defendants failed to disclose material facts may be actionable.").  As discussed above, Plaintiffs

allege that Defendants made affirmative factual misrepresentations to investors that influenced

their investment decisions, not merely poor internal management decisions that they failed to

disclose.  As a result, Defendants' cases are inapposite.[9]

Finally, Defendants argue that their statements concerning RCM are not false or

misleading because Plaintiffs fail to include "any allegation that U.S. Steel did not accurately

disclose its investment numbers."  (U.S. Steel's MTD Brief 19.)  Although this statement is

arguably false, (see, e.g., Amended Complaint ¶ 156 ("[w]e . . . contribut[ed] $100 million to our

Carnegie Way benefits for this year")), there is no requirement that a sufficiently pleaded

---

[9] By contrast, Plaintiffs provide several examples of persuasive cases in which affirmative
misstatements or omissions concerning whether maintenance is being performed satisfied the
pleading standards of the PSLRA.  E.g., No. 84 Emp'r-Teamster Joint Council Pension Trust
Fund v. Am. W. Holding Corp., 320 F.3d 920, 935 (9th Cir. 2003) ("Plaintiffs have sufficiently
pleaded the materiality of [defendant's] misrepresentations regarding its maintenance issues . . . .
A reasonable investor would find significant the information regarding the company's deferred
maintenance costs, unsafe maintenance practices, and possible sanction."); In re BP Prudhoe Bay
Royalty Trust Sec. Litig., 2007 WL 3171435, at *9 (W.D. Wash. Oct. 26, 2007) ("There are
adequate allegations in Plaintiffs' Complaint . . . under the PSLRA when they made
representations about the maintenance, operation and condition of the pipelines, as well as
estimates of future net oil production.").

misstatement or omission under Section 10(b) must include investment numbers; Defendants cite no cases for this proposition. Consequently, Defendants arguments on this point lack a basis in law.

The Court thus finds that Plaintiffs have sufficiently pleaded affirmative misrepresentations concerning whether U.S. Steel implemented RCM during the Class Period and whether U.S. Steel was spending money to implement this initiative.

In addition, Plaintiffs allege that every quarterly earnings statement during the Class Period stated that the benefits of RCM implementation "are starting to be reflected in fewer unplanned outages and lower maintenance costs." (Amended Complaint ¶¶ 7, 115, 156, 188, 248, 266.) As Plaintiffs have sufficiently pleaded that RCM was not implemented during the Class Period, they have also sufficiently pleaded that any statement claiming a beneficial consequence of RCM, such as the statement quoted above, is a false statement.[10]

Relatedly, in light of the three specific unplanned outages that Plaintiffs allege to have occurred in April 2016, (see id. at ¶¶ 170-71), Plaintiffs' allegations that Defendants failed to disclose the nature and severity of these unplanned outages during conference calls on April 27, 2016 and July 27, 2016, survive U.S. Steel's MTD as to falsity. For example, Defendant Burritt stated on the April call that "we remain also ready to increase our supply" to meet additional market demand. (Id. at ¶ 254.) Defendant Longhi, when commenting on U.S. Steel's capacity to

---

[10] As discussed above, every quarterly earnings statement during the Class Period referred to "fewer unplanned outages." (Amended Complaint ¶¶ 7, 115, 156, 188, 248, 266.) Plaintiffs also claim that these statements were false because unplanned outages were increasing rather than decreasing during the Class Period. (Id. at ¶¶ 167, 170-71.) While Plaintiffs make this broad claim, they fail to allege the level of unplanned outages prior to the Class Period or the level of unplanned outages during the Class Period. As a result, there are insufficient facts from which the Court could plausibly infer that that unplanned outages were increasing, and Plaintiffs' claims fail to the extent that they rely only on the falsity of U.S. Steel's statements that unplanned outages were decreasing.

satisfy demand on July 27, 2016, stated "we certainly are capable of supplying [hot-rolled steel]—we still have capacity available . . . we're still ready to support the market." (<u>Id.</u> at ¶ 271.) Assuring investors that capacity exists when it does not, at least absent serious caveats under the circumstances, states actionable falsity. <u>Cf., e.g.</u>, <u>No. 84 Emp'r-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.</u>, 320 F.3d 920, 935 (9th Cir. 2003) (falsely assuring investors that maintenance issues were being addressed was actionable violation). "[W]here a defendant affirmatively characterizes management practices as 'adequate,' 'conservative,' 'cautious,' and the like, the subject is 'in play.'" <u>Oran</u>, 226 F.3d at 285 (quoting <u>Shapiro v. UJB Financial Corp.</u>, 964 F.2d 272, 282 (3d Cir. 1992)). Once in play, "the securities laws are clearly implicated if [the defendant] nevertheless intentionally or recklessly omits certain facts contradicting these representations." <u>Id.</u> And, statements fall outside the protection of the PSLRA's safe harbor provision if they are not forward-looking statements.

The Court must take as true Plaintiffs' allegations concerning U.S. Steel's inability to meet market demand by virtue of its severe and persistent maintenance problems, as supported by the actual decline in production at the relevant times. (<u>See</u> Amended Complaint ¶¶ 175-76, 212-13, 270-72.) Defendants Longhi and Lesnak placed the issue of U.S. Steel's present capacity to meet demand on the table during the April and July 2016 conference calls, yet failed to provide warnings concerning the severity of ongoing maintenance issues that were then impeding production capacity. Instead, Defendant Lesnak characterized maintenance and outage costs as not "material," and mischaracterized the source of increased maintenance costs as "a normal planned blast furnace outage." (<u>Id.</u> at ¶ 272.) Defendants' argument that it disclosed the fact that it had experienced several unplanned outages to investors and disclosed the general risk of future unplanned outages in separate materials, (U.S. Steel's MTD Brief 22), while true, is not

responsive to Plaintiffs' claim that the severe nature and extent of these outages were material to investors' assessment of the Company's capacity to meet market demand, (e.g., Amended Complaint ¶ 273). Thus, Plaintiffs have sufficiently pleaded the falsity, or falsity by omission, of the April 27 and July 27, 2016 statements concerning U.S. Steel's capacity to meet demand, given the true scope and severity of U.S. Steel's undisclosed maintenance and outage problems.[11]

### B. Falsely reporting the amount of "realized" cost savings attributable to the Carnegie Way

During every Class Period quarter, and the quarter immediately preceding the Class Period, U.S. Steel reported a specific dollar value for the cost savings attributable to the Carnegie Way. (E.g., Amended Complaint ¶¶ 222 (January 26, 2016 press release reported "$815 million of Carnegie Way benefits we realized in 2015"), 266 (July 26, 2016 second quarter earnings

---

[11] To the extent Defendants argue that the PSLRA's safe harbor provision protects a statement of present capacity to meet demand because it is a "statement of future economic performance," 15 U.S.C. §78u-5(i)(1)(C), (see U.S. Steel's MTD Brief 25-26), the Court disagrees that such statements of present capacity depend on future events to be either true or false, and finds that these are not forward-looking statements. See Avaya, Inc., 564 F.3d at 256 (claims about a company's current capacity to meet anticipated future liabilities are present statements of fact); Curran v. Freshpet, Inc., 2018 WL 394878, at *4 (D.N.J. Jan. 12, 2018) ("Plaintiffs have adequately alleged that Defendants made actionable misleading statements about their ability to grow [product] placement"); cf. In re Aetna Sec. Litig., 617 F.3d 272, 281 (3d Cir. 2010) (reasoning that "whether Aetna's pricing was, in fact, disciplined could not have been determined at the time defendants made the statements" because "disciplined" was defined in part as profitable in the future). The capacity of U.S. Steel's facilities at a given point in time is a fact that exists at that time, regardless of future events. However, the Court agrees with Defendants that the safe harbor applies to statements that were genuinely forward-looking, such as those stating that the company was "well positioned to respond to improving market conditions." (E.g., Amended Complaint ¶ 224.) The Court finds that Defendants' disclosures, (see U.S. Steel's MTD Brief 27), were sufficiently tailored to such vague statements of future performance as to bring these statements within the protection of the safe harbor. See GSC Partners CDO Fund v. Washington, 368 F.3d 228, 243 n.3 (3d Cir. 2004) ("To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions . . . which the plaintiffs challenge." (internal citation omitted)).

presentation reported "the full year impact from Carnegie Way benefits in 2016 is $645 million as compared to 2015 as the base year").) Plaintiffs do not claim that the actual cost savings value of the Carnegie Way in every quarter was zero, but rather claim that these reported values are false and misleading because they are materially overstated. (E.g., id. at ¶ 228.)

To support this claim, Plaintiffs rely on the statements of two confidential witnesses: CW#1 and CW#8. "CW#1 was a former Division Administrative Assistant at the Company's Gary Works facility from January 2013 to May 2016, . . . [and] a Carnegie Way team member during the Class Period, which meant that CW#1 participated in training U.S. Steel personnel about the Carnegie Way." (Id. at ¶ 62.) "CW#8 was a former Operations & Manufacturing Manager for Pickle Line/Cold Mill Operations-Irvin Works from June 2013 to August 2016, responsible for overseeing all union employees that worked on the pickle line." (Id. at ¶ 69.)

CW#1 observed, at weekly meetings in 2015 and 2016, that early-stage Carnegie Way projects would often be elevated to complete status within the accelerated timeframe of a single workweek and then credited with saving "as much as $4-$5 million," even though these projects had not yet been implemented. (Id. at ¶¶ 152-54.) In addition, CW#8 saw "charts showing the Carnegie Way savings . . . [which] would show savings that had supposedly been achieved by certain projects, although some of the projects had not yet been implemented." ((Id. at ¶ 155 (emphasis omitted).)

The U.S. Steel Defendants argue that Plaintiffs' allegations fail to state particular facts that would imply that the Carnegie Way savings U.S. Steel reported each quarter are connected to the inflated estimates that CW#1 and CW#8 observed. (U.S. Steel's MTD Brief 14-17.) For example, Plaintiffs do not identify any particular projects whose savings were miscounted, or the

true value of Carnegie Way savings for any quarter.[12] (Id. at 14.)  The Court agrees with Defendants, and finds that Plaintiffs have failed to plead sufficiently that any of the reported quarterly savings figures were actually and materially false.  Under the PSLRA, Plaintiffs must plead with particularity "the 'true facts'" that permit the Court to infer falsity.  Cal. Pub. Emps. Ret. Sys. v. Chubb Corp., 394 F.3d 126, 145 (3d Cir. 2004).  Here, there are insufficient alleged facts to connect the dots in a way that would permit the Court to infer that Carnegie Way savings were materially overstated in any quarterly reports.  See OFI Asset Mgmt., 834 F.3d at 496 ("we decline to connect those dots"); cf. In re Hertz, 2018 U.S. App. LEXIS 26855, at *10-*11 ("[T]he Court did not effectively require the [plaintiffs] to submit 'smoking-gun' evidence to survive the defendants' motions to dismiss.  It simply emphasized that the [complaint] lacked allegations connecting the fact that [the company] had 'accounting problems . . . caused by the Individual Defendants' with an inference that 'those defendants were aware that they caused those problems[.]'").  To the extent that Plaintiffs' theories of liability are based on the falsity of these reported Carnegie Way savings figures, these theories are dismissed.

   *C. Falsely claiming that U.S. Steel's capital spending was appropriate*

   Plaintiffs argue that the U.S. Steel Defendants falsely assured investors during the Class Period that the Company was not under-spending on capital investments.  For example, during

---

[12] Plaintiffs do allege that "CW#8 recalled seeing a project on the reports relating to the delivery end of the cold mill at Irvin Works that was shown to be saving the Company money in 2016, yet in actuality, the project had not been implemented yet."  (Amended Complaint ¶ 155.)  But Plaintiffs do not allege any of the details that would enable the Court to infer how CW#8 became aware of the inclusion of this project in the reported figure, how CW#8 knew that this project had not yet been implemented as of the date of the quarterly report, or how much money this project was reported to save.  As a result, the isolated factual conclusion that this project was falsely shown to be saving money fails the pleading-with-particularity requirement of the PSLRA.

the November 2, 2016 conference call, when asked whether U.S. Steel had been under-investing

in its facilities, Defendant Longhi stated:

> I would offer that, no, we have not been under-spending.  What we've been doing is, we've only been able to accomplish what we've accomplished and gotten to the position that we are, because we've been investing appropriately in making sure that everything that we know is being addressed and moving to minimize the conditions that we experienced in the past quarter, which is unplanned events.  So we've been able to get to this point, because we've been doing all of the right things.

(Id. at ¶ 301 (emphases omitted).)  As with their arguments concerning RCM implementation,

the U.S. Steel Defendants argue that Plaintiffs' objections to the veracity of these statements "are

disagreements with business decisions masquerading as claims for securities fraud" and that

"U.S. Steel was not required to adopt Plaintiff's [sic] description of its capital expenditures as

'underinvestment.'"  (U.S. Steel's MTD Brief 18.)  Here, as to Plaintiffs' claims concerning U.S.

Steel's characterization of its capital spending as appropriate under the circumstances, the Court

agrees with Defendants and will dismiss this theory of liability.

"Rule 10b-5 liability does not attach merely because 'at one time the firm bathes itself in

a favorable light' but '[l]ater the firm discloses that things are less rosy.'"  In re Advanta Corp.,

180 F.3d at 538 (quoting DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990)).  Rather,

as stated above, Plaintiffs must plead with particularity "the 'true facts'" that permit the Court to

infer falsity.  Chubb Corp., 394 F.3d at 145.

Plaintiffs allege that U.S. Steel's characterizations of its capital investment spending as

"appropriate[]" or "right" were false for two reasons.  However, neither of these reasons implies

falsity and both are essentially claims of corporate mismanagement.

First, as proof of falsity, Plaintiffs cite statements that U.S. Steel's executives made to the

ITC during the ITC's anti-dumping investigations in August 2015 and May 2016 indicating that

U.S. Steel was not in a position to make certain important investments in technology.  For

example, Defendant Longhi said in May 2016 "[t]he last two years should have been banner years . . . [, w]e should have been able to . . . make badly needed profits and re-invest some of those profits into new technologies and new products" and said "the American [cold-rolled steel] industry's operating income and operating margins have been low and continue to decline . . . they are nowhere near where they need to be for us to invest in our future, to compete at home and abroad." (Amended Complaint ¶191 (emphases omitted).) And Rob Kopf, U.S. Steel's General Manager, said in August 2015 that "those investments that we need to make are being— we're not able to make them right now, given the fact that these people are coming in and taking $750 million of revenue that this industry should have used to invest in further products." (Id. (emphases omitted).)

The relevant ITC statements, such as those above, do not tend to show falsity because they are entirely consistent with U.S. Steel's (allegedly false) characterizations of its capital investments in November 2016. Not only did the ITC statements on August 15, 2015 and May 24, 2016 occur well before the November 2, 2016 call, but they were also directed toward the external market environment facing U.S. Steel rather than the internal environment at the Company. Thus, Plaintiffs' allegations, when collectively accepted as true, merely show that U.S. Steel stated that external factors prevented the Company from making needed investments in new products and technologies at a certain point in time, and that, at a later time, the Company's overall capital investments were appropriate under the circumstances. (See U.S. Steel's MTD Brief 21-22.) The Amended Complaint does not indicate sufficient particular details, under the heightened pleading requirements of the PSLRA, to explain why U.S. Steel's statements regarding the appropriateness of their investments were objectively false— particularly given Plaintiffs' allegations that the Company stood on the brink of bankruptcy and

23

was forced to make difficult decisions concerning its expenditures, (Amended Complaint ¶¶ 97-99, 116). In addition, these allegations fail to plead a Section 10(b) violation for an independent reason: whether investments in one area or another at a specific point in time are "appropriate" is a quintessential corporate management decision, and disagreements with such decisions absent factual misstatements or material omissions "do not state a claim under federal securities law." Craftmatic, 890 F.2d at 639.

Second, Plaintiffs allege—per the opinion of a confidential witness, an Area Manager for Blast Furnace Maintenance and Services from November 2014 to 2015—that "'everybody [within U.S. Steel] knows that' the Company was under-investing." (Amended Complaint ¶¶ 71, 147 (emphasis omitted).) This statement of opinion does not show that U.S. Steel's investments were objectively inappropriate; like the statements above, it states a pure disagreement with the investment decisions of the Company, which does not suffice to state securities fraud on its own. Craftmatic, 890 F.2d at 639.

> ### D. Falsely claiming that the purpose of the SPO was broader than providing capital to invest in plant repairs and maintenance

Plaintiffs make much of the U.S. Steel and Underwriter Defendants' statement, within their Expanded SPO Prospectus, that the proceeds of the SPO would be used "for financial flexibility, capital expenditures and other general corporate purposes." (Amended Complaint ¶¶ 195, 197.) Plaintiffs claim that this statement was false when made and is contradicted by Defendant Longhi's April 25, 2017 statement that the true purpose of the SPO was "to give us the financial strength and liquidity to position us to establish an asset revitalization plan large enough to resolve our issues and to see that plan through to completion." (Id. at ¶ 195 (emphases omitted).) Very simply, as Defendants argue, (U.S. Steel's MTD Brief 17), there is no inconsistency between these statements.

Plaintiffs have failed to plead particular facts supporting a reason why the relevant statement of purpose was false. Plaintiffs argue that the initial statement was false because funds raised for "general corporate purposes" must be allocated to an ongoing initiative rather than to a new plan, such as an undisclosed asset revitalization plan. (Plaintiffs' Response 28.) Even if the Court were to credit this argument, it fails to address the remainder of the purposes described in the SPO prospectus, which include "capital expenditures." Consequently, Plaintiffs' theories of liability are dismissed to the extent they allege that SPO's statement of purpose was false.

## IV. Scienter

Having addressed the misstatements and omissions alleged in the Amended Complaint, Plaintiffs' only theories of liability that sufficiently plead falsity concern Defendants' alleged affirmative misrepresentations regarding the implementation of RCM, and misleading statements concerning the Company's then-current capacity to meet demand. The Court must now analyze whether these misstatements and omissions pass muster under another of the PSLRA's heightened pleading requirements—that Plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). The required state of mind "embrac[es] [an] intent to deceive, manipulate, or defraud," with "a knowing or reckless state of mind." Avaya, Inc., 564 F.3d at 252.

Plaintiffs may meet their burden under this pleading standard by alleging specific facts that give rise to an inference—at least as compelling as any other—that the Section 10(b) Defendants knew that their statements were materially false or misleading when made. Id. at 267; In re Hertz, 2018 U.S. App. LEXIS 26865, at *11. As the Court's analysis must be undertaken holistically in light of Defendants' alleged misstatements, id., the Court has analyzed the well-pleaded and judicially noticed facts to determine if Plaintiffs' allegations suffice. For

the reasons that follow, the Court concludes that Plaintiffs have met their burden to plead scienter as to the Company's affirmative misrepresentations regarding the implementation of RCM, and misleading statements concerning the Company's then-current capacity to meet demand.

Plaintiffs' scienter allegations fall into seven categories: (1) the Individual Defendants admitted to the ITC that their investments were insufficient, thus proving knowledge; (2) the Individual Defendants were aware of the non-implementation of RCM because they received and discussed reports indicating as much; (3) after the SPO, the Individual Defendants admitted that the SPO was conducted for asset revitalization alone; (4) the Individual Defendants reviewed and approved U.S. Steel's maintenance and capital budgets; (5) the timing of Defendant Longhi's retirement suggests scienter; (6) the flat-rolled segment was U.S. Steel's core business; and (7) the Individual Defendants had motives to misstate facts—such as to facilitate insider trading, to increase proceeds from the SPO, to satisfy U.S. Steel's credit facility obligations, and to preserve their compensation. (Amended Complaint ¶¶ 366-415.)

Many of these categories relate to allegations that are no longer relevant given the nature of the misstatements that have the survived the Court's falsity analysis.[13] For purposes of the surviving misstatements, one category of scienter allegations suffices to raise a strong inference

---

[13] For example, as explained above, U.S. Steel's ITC testimony in August 2015 and May 2016 did not contradict U.S. Steel's statements concerning the appropriateness of its capital investments at the time. The Court also finds that the ITC testimony was consistent with U.S. Steel's other statements to investors and analysts—in each instance, the allegedly contradictory ITC statements were merely directed to different topics or periods of time. (See U.S. Steel's MTD Brief 21-22.) Plaintiffs and Defendants dispute the extent to which the ITC hearings were public—however, given the consistency of the ITC statements with U.S. Steel's undisputedly public statements, the degree to which the ITC hearings and transcripts were public is immaterial. In any event, the ITC testimony provides no support for an inference of knowledge or recklessness as to Defendants' alleged affirmative misrepresentations and misleading statements.

that the Individual Defendants knew that their statements were false when made, which is all that Plaintiffs are required to plead. See In re Hertz, 2018 U.S. App. 26865, at *11 (approving that "the Court only required the [plaintiffs] to plead factual allegations supporting a cogent inference that the Individual Defendants knowingly made material misstatements, or that they made material misstatements with reckless disregard for the truth of those statements"). Accordingly, the Court will analyze Plaintiffs' allegations concerning whether the Individual Defendants were aware of the non-implementation of RCM and the full nature and extent of the Company's unplanned outages during the Class Period. The Court will also address the opposing inference that Defendants propose.

Plaintiffs state that the Individual Defendants were personally aware of the full nature and extent of the unplanned outages that the Company was experiencing throughout the Class Period by virtue of their access to a Daily Report of Operations ("DRO") and an Operating Efficiency Report ("OER"). (Amended Complaint ¶ 6.) They allege that these reports included sufficient information ("such as tons produced, tons shipped, production delay, and tons per turn," id.) to show that RCM was not being implemented. According to U.S. Steel's former Chief Operating Officer from June 2005 to December 2010, John Goodish, he created the DRO every morning during his employment, and the DRO was available to all executives; CW#5, "a former U.S. Steel Director of Reliability Centered Maintenance at Great Lakes Works from March 2016 to July 2016," (id. at ¶ 66), confirmed that he reviewed the DROs every day throughout his relevant employment, and that all employees who worked in operations had such access, (id. at ¶¶ 177-79). CW#5 also reviewed a monthly OER, which included facility- and unit-level information indicating downtime from repairs and outages. (Id. at ¶¶ 181-82.) CW#5

personally discussed the information contained in the OERs with the Individual Defendants at quarterly meetings. (Id.)

Given these well-pleaded particulars, Plaintiffs raise a strong inference that the Individual Defendants knew about the true state of their facilities and maintenance initiatives when they made affirmative misrepresentations regarding the implementation of RCM and misleading statements concerning the Company's capacity to meet demand. See In re Royal Dutch/Shell Transp. Sec. Litig., 380 F. Supp. 2d 509, 561 (D.N.J. 2005) ("a plaintiff relying on internal reports must specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them" (quoting Chubb Corp., 394 F.3d at 147)).

Defendants urge the Court to disregard the above allegations as insufficiently particular to show knowledge. (U.S. Steel's MTD Brief 34-35.) They rely on Klein v. Autek Corp., 147 F. App'x 270 (3d Cir. 2005), for the proposition that plaintiffs subject to the PSLRA "must go beyond vague and generic descriptions of the documents upon which they rely, and instead describe those documents in specific detail." Id. at 276. Applying this standard, the Court finds that Plaintiffs have gone above and beyond their burden by particularly pleading the categorical contents of the relevant reports, the reports' frequency of distribution, the process by which the reports were disseminated and discussed at the Company, and the personal knowledge of a witness who discussed the contents of the reports with the Individual Defendants.

Defendants also urge the Court to reach an opposing inference as to scienter: that U.S. Steel merely executed a business strategy to deal with difficult market conditions. (U.S. Steel's MTD Brief 28.) Defendants' opposing inference, however, fails to explain why the Individual Defendants would have no personal knowledge of the maintenance conditions at their Company. As Plaintiffs' surviving theories of liability relate solely to the Company's false and misleading

statements on the implementation of RCM and the Company's production capacity, the fact that Defendants executed a business strategy in a difficult market has no tendency to contradict the inference of knowledge that Plaintiffs propose. While it is plausible that the Individual Defendants were not driven by a specific intent to deceive their investors when they made the relevant statements, the inference that the Individual Defendants were aware of the falsity of their claims is certainly "at least as compelling as any opposing inference." Tellabs, Inc., 551 U.S. at 324.

## V. Securities Act Section 11 Claim Against the Underwriter Defendants

The Underwriter Defendants' Memorandum of Law in Support of their Motion to Dismiss, (hereinafter, "Underwriter Defendants' MTD Brief," Doc. 115), argues that Plaintiffs have failed to plead adequate statutory standing and that they have failed to plead material misrepresentations or omissions in the documents related to the SPO. The Court will address each argument in turn.

### A. Statutory Standing under Section 11

Section 11 of the Securities act creates a right to sue for "any person acquiring" a security whose registration statement "contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). As a result, by virtue of Section 11, Plaintiffs must adequately plead that they acquired the securities that were the subject of the relevant prospectus and registration statement. Controlling precedent in the Third Circuit holds that plaintiffs may allege generally that their purchases of stock were in or traceable to the relevant stock offering. In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 274 n.7 (3d Cir. 2006) ("We agree with this view [of the Second and Eighth Circuits] and hold that plaintiffs' assertions of purchases 'in' and

'traceable to' the [relevant] stock offerings were sufficient at the pleading stage."). Plaintiffs

Meyer and Reed allege that they purchased approximately 18,500 shares "pursuant to and/or

traceable to the Company's secondary public offering." (Amended Complaint ¶¶ 29-30, 459.)

While the Underwriter Defendants argue for a higher pleading standard as to traceability,

(Underwriter Defendants' MTD Brief 5-6), the Court is bound by the precedential opinions of

the Court of Appeals for Third Circuit; Plaintiffs' allegations suffice.[14]

     *B.  Material Misrepresentations and Omissions in the SPO Documents*

     As to the SPO, the Amended Complaint states the following concerning the contents of

the relevant prospectus and registration statement:

> The registered common stock was issued and sold pursuant to the Form S-3 Registration
> Statement, filed with the SEC on March 3, 2016[,] which incorporated by reference the
> 2015 Form 10-K. In connection with the SPO, the Company filed the SPO Prospectus on
> August 8, 2016 which incorporated by reference: (i) the 2015 Form 10-K; (ii) the First
> Quarter 2016 Form 10-Q and Q1 2016 Earnings Presentation and (iii) the Second Quarter
> 2016 Form 10-Q and the Q2 Earnings Presentation. Also in connection with the SPO, the
> Company filed the Expanded SPO Prospectus[,] which incorporated by reference: (i) the
> 2015 Form 10-K; (ii) the First Quarter 2016 Form 10-Q and Q1 2016 Earnings
> Presentation; and (iii) the Second Quarter 2016 Form 10-Q and Q2 2015 Earnings
> Presentation.

(Amended Complaint ¶ 451.) Two of the documents referenced above (collectively, the "SPO

Documents"), namely, the Q1 2016 and Q2 2016 Earnings Presentations, contain one of the

statements discussed in the Court's falsity analysis as to Plaintiffs' Section 10(b) claims: "We

continue to implement our reliability centered maintenance process across all of our facilities.

The benefits are starting to be reflected in fewer unplanned outages and lower maintenance

costs." (Id. at ¶ 248 (emphasis omitted).) For the reasons stated previously, the Court finds that

---

[14] The Court is not persuaded by the argument that Bell Atlantic Corp. v. Twombly, 550 U.S.
544 (2007) and Ashcroft v. Iqbal, 556 U.S. 662 (2009), require more than what Plaintiffs have
alleged, as the Court finds that Plaintiffs' allegations as to their stock purchases are entirely
plausible.

Plaintiffs have sufficiently pleaded the falsity of this statement, but have insufficiently pleaded falsity as to the other statements in the SPO Documents.  As a result, the Underwriter Defendants' MTD will be denied to the extent that Plaintiffs' claims against them relate to this statement and granted to the extent that Plaintiffs' claims against them relate to any of the categories of alleged misstatements above that the Court has found to be insufficiently pleaded as to falsity.

* * *

Accordingly, U.S. Steel's RJN (Doc. 111) and Plaintiffs' RJN (Doc. 119) are **GRANTED**.  U.S. Steel's MTD (Doc. 109) is **DENIED** as to Plaintiffs' theories of liability found to be sufficiently pleaded as to falsity in Section III.A, above, and **GRANTED** as to all remaining theories of liability.  The Underwriter Defendants' MTD (Doc. 114) is **DENIED** as to Plaintiffs' theory of liability found to be sufficiently pleaded as to falsity in Section V.B., above, and **GRANTED** as to all remaining theories of liability.

If Plaintiffs wish to file a second amended complaint addressing the pleading deficiencies identified above, they may do so on or before **October 30, 2018**.  This will be Plaintiffs' last and final opportunity to amend their claims.  If Plaintiffs do not file a second amended complaint by October 30, 2018, the theories of liability identified above as deficient will be dismissed with prejudice.

IT IS SO ORDERED.

September 29, 2018

s\Cathy Bissoon_____
Cathy Bissoon
United States District Judge

cc (via ECF email notification):

All Counsel of Record