# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| CHRISTAKIS VRAKAS and LEANN REED,<br><br>       Plaintiffs,<br><br>   v.<br><br>UNITED STATES STEEL CORPORATION, MARIO LONGHI, DAVID B. BURRITT, and DAN LESNAK,<br><br>      Defendants. | Civil Action No. 17-579<br><br><br>Judge Cathy Bissoon |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Attorneys

Geoffrey J. Ritts
Adrienne Ferraro Mueller
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114-1190
(T) (216) 586-3939
(F) (216) 579-0212
gjritts@jonesday.com
afmueller@jonesday.com

Leon F. DeJulius, Jr.
Margaret C. Gleason
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
(T) (412) 391-3939
(F) (412) 394-7959
lfdejulius@jonesday.com
mcgleason@jonesday.com

*Attorneys for Defendants United States Steel Corporation, Mario Longhi, David Burritt, and Dan Lesnak*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ..........................................................................................1

BACKGROUND ..................................................................................................................2

    The 2015 Market Downturn and U.S. Steel's Turnaround .................................................2

    Procedural History ...........................................................................................................4

LEGAL STANDARD ...........................................................................................................6

ARGUMENT .......................................................................................................................8

I.       Plaintiffs Have Failed to Carry Their Burden of Proving that Common Questions Predominate ............................................................................................................................9

        A.     Plaintiffs Have Not Supplied a Damages Model That Fits Their Liability Theory ......................................................................................................10

        B.     Plaintiffs Fail to Provide a Workable Methodology to Address Damages on a Classwide Basis ......................................................................................14

II.     Plaintiffs Have Failed to Carry Their Burden of Proving Numerosity ............................20

III.   Plaintiffs Have Not Carried Their Burden of Proving That Leann Reed Will Adequately Represent the Proposed Class .......................................................................23

CONCLUSION ...................................................................................................................27

## TABLE OF AUTHORITIES

CASES                                                                    PAGE

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
    568 U.S. 455, 475 (2013) ............................................................................................7

*Behrend v. Comcast Corp.*,
    655 F.3d 182, 206 (3d Cir. 2011) ............................................................................11

*Berger v. Compaq Computer Corp.*,
    257 F.3d 475 (5th Cir. 2001) .............................................................................23, 24

*Bizzarro v. Ocean County*,
    No. 07-5665, 2009 WL 1617887 (D.N.J. June 9, 2009) ..........................................23

*Butler v. Sears, Roebuck & Co.*,
    727 F.3d 796 (7th Cir. 2013) ...................................................................................10

*Charal v. Andes*,
    81 F.R.D. 99 (E.D. Pa. 1979) ...................................................................................26

*Chudner v. Transunion Interactive, Inc.*,
    No. 09-CV-433-ER, 2010 WL 5662966 (D. Del. Dec. 15, 2010) ..........................15

*Clair v. DeLuca*,
    232 F.R.D. 523 (W.D. Pa. 2006) ......................................................................23, 26

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) .......................................................................................... passim

*Eisenberg v. Gagnon*,
    766 F.2d 770 (3d Cir. 1985) ......................................................................................6

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
    301 F.R.D. 116, 142 (S.D.N.Y. 2014) ....................................................................16

*General Tel. Co. of Sw. v. Falcon*,
    457 U.S. 147, 160 (1982) .........................................................................................11

*Griffin v. GK Intelligent Sys., Inc.*,
    196 F.R.D. 298 (S.D. Tex. 2000) .............................................................................26

*Hayes v. Wal-Mart Stores, Inc.*,
   725 F.3d 349 (3d Cir. 2013)..........................................................................20, 21

*In re Cigna Corp Securities Litig.*,
   No. 02-8088, 2006 WL 2433779 (E.D. Pa. Aug. 18, 2006) ....................................21

*In re ConAgra Foods, Inc.*,
   302 F.R.D. 537 (C.D. Cal. 2014) ..........................................................................16

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*,
   55 F.3d 768 (3d Cir. 1995).....................................................................................23

*In re Goldchip Funding Co.*,
   61 F.R.D. 592 (M.D. Pa. 1974)..............................................................................26

*In re Hydrogen Peroxide Antitrust Litig.*,
   552 F.3d 305 (3d Cir. 2008).......................................................................... passim

*In re Kosmos Energy Ltd. Sec. Litig.*,
   299 F.R.D. 133 (N.D. Tex. 2014) ..........................................................................24

*In re Linerboard Antitrust Litig.*,
   203 F.R.D. 197 (E.D. Pa. 2001) ............................................................................26

*In re Nexium Antitrust Litig.*,
   777 F.3d 9 (1st Cir. 2015)......................................................................................10

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   725 F.3d 244 (D.C. Cir. 2013) ..............................................................................14

*Kirkpatrick v. J.C. Bradford & Co.*,
   827 F.2d 718 (11th Cir. 1987) ..............................................................................26

*Lewis v. Knology, Inc.*,
   799 S.E.2d 247 (Ga. Ct. App. 2017), *cert. denied*, No. S17C1474, 2017 BL
   341054 (Ga. Sept. 13, 2017) .................................................................................25

*London v. Wal-Mart Stores, Inc.*,
   340 F.3d 1246 (11th Cir. 2003) ............................................................................26

*Marcus v. BMW of N. Am., LLC*,
   687 F.3d 583 (3d Cir. 2012)...................................................................................20

*Mielo v. Steak 'n Shake Operations, Inc.*,
    897 F.3d 467 (3d Cir. 2018)..................................................................................... passim

*Neale v. Volvo Cars N. Am.*,
    794 F.3d 353 (3d Cir. 2015).....................................................................................10, 14

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    259 F.3d 154 (3d Cir. 2001).......................................................................................7, 15

*Ohio Pub. Emps.' Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
    No. 4:08CV0160, 2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ...........................15

*Parko v. Shell Oil Co.*,
    739 F.3d 1083 (7th Cir. 2014) ...................................................................................19

*Sicav v. Wang*,
    No. 12CV6682, 2015 WL 268855 (S.D.N.Y. Jan. 21, 2015) ...................................16

*United States v. Beard*,
    542 F. App'x 529 (7th Cir. 2013) ..............................................................................21

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)..................................................................................6, 7, 19, 24

**OTHER AUTHORITIES**

7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice
    and Procedure 1766 (3d ed. 2005) ...........................................................................23

Fed. R. Civ. P. 41(a)(1)(A)(ii) ..........................................................................................25

Fed. R. Civ. P. 23 ..........................................................................................6, 7 9, 208

H.R. Conf. Rep. No. 104-369 (1995).................................................................................7

## PRELIMINARY STATEMENT

Plaintiffs' motion suffers from several fatal flaws, each of which should doom their bid for class certification.  First, and most strikingly, plaintiffs have not shown that common questions predominate.  They ignore the fact that the Court has dismissed the bulk of their liability theories.  The report of their expert, Dr. Michael L. Hartzmark, proceeds as if the motion-to-dismiss decision never happened, proposing to calculate damages based on both plaintiffs' extant and now-defunct liability theories, in clear conflict with Supreme Court precedent.  "Proposes to calculate" is the operative term, because plaintiffs provide nothing beyond vague gestures towards a damages model.  They merely assert that "a variety of commonly-utilized methods" exist that could, hypothetically, aid in determining damages, but never say how they would actually do it here, and ignore several major obstacles to a rigorous classwide treatment of damages.

This attempt to skate by on generalities is not unique to plaintiffs' Rule 23(b)(3) arguments.  They likewise stumble over the Rule 23(a) hurdles, failing to demonstrate that the would-be class is sufficiently numerous.  Rather than provide evidence, they invite the court to speculate that there simply must be enough putative class members to justify class treatment.  And there are grave doubts about at least one plaintiff's—Leann Reed's—adequacy to serve as a class representative.  She has revealed herself to be remarkably detached from her case, handing over effective control to her attorneys, even to the point where her lawyers did not consult her before dismissing several of her claims with prejudice.  Such a representative cannot adequately protect the interests of absent class members.

These defects are dispositive.  Plaintiffs have not carried their burden of proving—by a preponderance of the admissible evidence—that each of Rule 23's requirements are met here.

1

Because their request for certification cannot withstand the "rigorous scrutiny" required by Third Circuit and Supreme Court precedent, the Court should deny the motion.

## BACKGROUND[1]

**The 2015 Market Downturn and U. S. Steel's Turnaround**

The proposed class period starts on January 27, 2016, when U. S. Steel was under siege. Depressed demand, mushrooming global supply, and a tidal wave of dumped foreign steel had driven steel prices to historic lows. U. S. Steel lost a billion dollars in the last quarter of 2015 alone. ECF 112-4, 4Q2015 and Full Year Results Press Release, at ECF PageID ("PID") 3. Observers questioned whether the Company could avoid bankruptcy, a fate that had befallen many other American steel companies. *See* Ex. 2, Bank of America Merrill Lynch, *FCF burn in 2016E attests to distress; Cutting price objective to $1 from $3* (Jan. 27, 2016) ("At current market conditions and absent a more confident credit market, U.S. Steel should be challenged to address" its debt payments coming due in 2017 and 2018); *see also, e.g.*, Ex. 3, Len Boselovic, *The outlook for U.S. Steel: bleak and bleaker*, Pittsburgh Post-Gazette (Nov. 1, 2015) ("What ails U.S. Steel and other domestic producers is largely out of their control — China's huge surplus of steelmaking capacity.").[2] But the next fifteen months—coinciding with the proposed class period—saw a dramatic turnaround for the Company. By the end of the proposed class period (April 25, 2017), U. S. Steel was markedly better off, by every measure.

In part, U. S. Steel and its leaders achieved this turnaround through the "Carnegie Way," a program to boost efficiency, enhance product quality, and align the Company with its key

---

[1] Additional facts are offered in the defendants' Memorandum of Law in Support of their Motion to Dismiss (ECF 110) and accompanying request for judicial notice (ECF 111).

[2] Exhibit citations ("Ex.") refer to the exhibits appended to the Declaration of Geoffrey J. Ritts, filed herewith.

customers.  The Company described the Carnegie Way as "a true journey, not a sprint," making

clear it would take years to achieve the goal of returning U. S. Steel to a position as one of

America's leading industrial firms.  ECF 112-36, 4Q2016 and Full Year Earnings Presentation,

at PID 15.  One component of the broader Carnegie Way involved implementing a reliability

centered maintenance ("RCM") program, a long-term initiative to allocate maintenance

resources more efficiently and progressively reduce unplanned equipment downtime.

Along with other successes, the Carnegie Way provided the foundation for the

Company's turnaround.  After losing more than $1.6 billion (-$11.24 per share) in 2015, U. S.

Steel pared its losses to $440 million (-$2.81 per share) in 2016, and then turned a profit of $387

million ($2.19 per share) in 2017.  Ex. 4, 2017 Form 10-K, at 6, 9.

The Company's stockholders shared in the benefits of the turnaround.  At the beginning

of the proposed class period, U. S. Steel's stock price was $6.67.  Ex. 7, U. S. Steel Corp.

Common Stock Closing Prices Data, at 1.  On April 26, 2017, the day after the end of the class

period (and following the temporary dip in the stock price that triggered this stock-drop suit), the

stock closed at $22.78, 242% higher than at the start of the class period.  *Id.* at 8.  By the end of

2017, U. S. Steel stock was trading at $35.19, fully *428%* above the start of the class period.  *Id.*

at 12  The market capitalization of U. S. Steel rose from $974 million at the start of the class

period, to $4 billion on April 26, 2017, and to over $6 billion at the end of 2017.[3]

---

[3] U. S. Steel had approximately 151 million outstanding shares at the start of the proposed class period, Ex.
5, 1Q2016 Form 10Q, at 3, approximately 176 million at the end of the proposed class period, Ex. 6, 2Q2017 Form
10Q, at 3, and approximately 176 million at the end of 2017, Ex. 4, 2017 Form 10-K, at F-8.

3

From the start of the proposed class period through the end of 2017, returns to U. S. Steel shareholders vastly outstripped the market as a whole, and the broader steel industry too:

| Percentage Change, January 27, 2016 (closing price) to December 29, 2017 (closing price)[4] | |
|---|---|
| U. S. Steel | 428% |
| S&P 600 Steel Index | 159% |
| S&P 500 Index | 42% |

Of course, U. S. Steel's stock price still fluctuated, as the prices of all stocks do. *See* Ex. 8, Vrakas Dep. Tr., at 187:12–188:7 (admitting that stock prices go up and down for many non-illicit reasons).  Thus when the Company announced, on April 25, 2017, first-quarter 2017 earnings that fell short of analyst projections, its stock price dipped.  The inevitable stock-drop suits followed soon after.

**Procedural History**

This lawsuit began in May 2017.  Plaintiffs filed the operative complaint, the Amended Complaint, in October 2017.  ECF 54.  The Amended Complaint asserted claims against U. S. Steel and the Individual Defendants pursuant to Sections 10 and 20 of the Exchange Act, and against the U. S. Steel Defendants and a group of underwriters pursuant to Sections 11 and 15 of the Securities Act arising out of a secondary public offering that U. S. Steel conducted in August 2016 (the "SPO").

The Court largely granted the defendants' motions to dismiss in a Memorandum Opinion on September 29, 2018.  ECF 133.   Of the plaintiffs' four main theories, only one survived:  the

---

[4] On January 27, 2016, the S&P 500 index closed at 1,883, and on December 29, 2017, it closed at 2,674. On January 27, 2016, the S&P 600 Steel index closed at 79; it closed at 203 on December 29, 2017. *See* Ex. 7, U. S. Steel Corp. Common Stock Closing Prices Data, at 1, 12.

4

assertion that defendants made misstatements about the reliability centered maintenance program. The Court distilled the surviving RCM issues to three questions: "[w]hether U. S. Steel implemented RCM during the Class Period"; "[w]hether U. S. Steel was spending money to implement [RCM]"; and whether there were any "beneficial consequence[s] of RCM." *Id.* at 17.[5]

The Court dismissed the plaintiffs' other principal theories with prejudice: alleged misstatements "falsely reporting the amount of 'realized' cost savings attributable to the Carnegie Way" (*id.* at 19–21); "falsely claiming that U. S. Steel's capital spending was appropriate" (*id.* at 21–24); and "falsely claiming that the purpose of the SPO was broader than providing capital to invest in plant repairs and maintenance" (*id.* at 24–25). *See also* ECF 142, 11/5/18 Order (denying plaintiffs' motion for reconsideration). In the months since the Court's Order on the motion to dismiss, the case has shrunk further. First, plaintiff Myer withdrew from the action. *See* ECF 173. Then, plaintiffs voluntarily dismissed the Securities Act claims with prejudice; as a result, the Underwriter Defendants are out of the case. *See* ECF 176. What remains of this action is a stub of the Amended Complaint.

Plaintiffs moved for class certification on April 19, 2019, seeking to certify a class of "[a]ll persons or entities who purchased or otherwise acquired United States Steel Corporation common stock and options during the period from January 27, 2016 through April 25, 2017, inclusive, and were injured thereby." Excluded from the Class are Defendants as well as certain

---

[5] The only other alleged misstatements surviving the motion to dismiss relate to "three specific unplanned outages that Plaintiffs allege to have occurred in April 2016" (*id.* at 17), about which there was never any alleged "corrective" disclosure.

5

additional individuals or entities.  ECF 183, Pl.'s Mem. in Support of Class Certification ("Pl.'s

Mem."), at 2.  The proposed class representatives are Christakis Vrakas and Leeann Reed.[6]

## **LEGAL STANDARD**

To succeed in certifying their proposed class, plaintiffs must prove, by a preponderance

of the evidence, that the proposed class satisfies all of the Rule 23 requirements.  *In re Hydrogen*

*Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008).  This means plaintiffs must prove

that the proposed class meets each of the four Rule 23(a) prerequisites—numerosity,

commonality, typicality, and adequacy—as well as at least one of the three Rule 23(b) criteria.

Fed. R. Civ. P. 23.  Here, plaintiffs seek certification pursuant to Rule 23(b)(3), *see* ECF 183,

Pl.'s Mem., at PID 9, meaning they must show that common questions of law or fact

predominate over individualized ones and that a class action is superior to other possible

methods of adjudicating the case, Fed. R. Civ. P. 23(b)(3).

The Court should reject sloppy arguments that ask it to presume facts as true without

evidentiary proof.  This is because Rule 23 "does not set forth a mere pleading standard."  *Wal-*

*Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  Instead, the Rule "calls for a rigorous

analysis," *Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 483 (3d Cir. 2018), where the

plaintiffs "must be prepared to prove that there are *in fact* sufficiently numerous parties, common

questions of law or fact, etc."  *Dukes*, 564 U.S. at 350.  This means there is no presumption in

favor of class certification, and any cases suggesting otherwise are bad law.  *See Mielo*, 897 F.3d

at 483 ("We repeat (hopefully for the last time): the 'relaxed' Rule 23 standard suggested in

*Eisenberg* [*v. Gagnon*, 766 F.2d 770 (3d Cir. 1985)] is no longer the law of this circuit.  When

---

[6] The Court rejected plaintiffs' untimely attempt to add the Oklahoma Firefighters Pension and Retirement System as an additional plaintiff and proposed class representative on April 23, 2019 (ECF 188 ("Plaintiffs have not shown good cause to add an additional named plaintiff at this stage of the litigation, two months after the deadline for adding parties provided in the Court's Case Management Order (Doc. 165 ).").

courts harbor doubt as to whether a plaintiff has carried her burden under Rule 23, the class should not be certified.").  Additionally, the Supreme Court has repeatedly emphasized that courts should not shy away from addressing the merits of a plaintiff's case to the extent necessary to determine whether the plaintiff has met her Rule 23 burdens.  *See, e.g.*, *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) ("our cases requir[e] a determination that Rule 23 is satisfied, even when that requires inquiry into the merits of the claim"); *Dukes*, 564 U.S. at 351 (class certification questions "[f]requently . . . entail some overlap with the merits of the plaintiff's underlying claim.  That cannot be helped.").

It is important for courts to apply a "rigorous analysis," because an improvidently certified class creates unfair pressure on defendants to settle meritless claims.  *See Mielo*, 897 F.3d at 483.  Indeed, the Third Circuit has recognized that "[i]n some cases, class certification 'may force a defendant to settle rather than incur the costs of defending a class action and run the risk of potentially ruinous liability.'"  *Hydrogen Peroxide*, 552 F.3d at 310 (quoting Fed. R. Civ. P. 23 advisory committee's notes, 1998 Amendments).  Given that "denying or granting class certification is often the defining moment in class actions," courts in the Third Circuit take note of the potential for "the size of the class and number of claims [to] place acute and unwarranted pressure on defendants to settle" and factor it into the class certification analysis.  *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 162, 167 n.8 (3d Cir. 2001); *see also Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 475 (2013) ("In enacting the [PSLRA], Congress recognized that although private securities-fraud litigation furthers important public-policy interests . . . such lawsuits have also been subject to abuse, including the 'extract[ion]' of 'extortionate "settlements"' of frivolous claims." (quoting H.R. Conf. Rep. No. 104-369, pp. 31–32 (1995))).

7

Throughout their brief, the plaintiffs repeatedly invite the Court to commit legal error: they suggest that class certification requirements can be met without evidence; that the defendants bear the burden of disproving those requirements; or that the class certification standards apply differently in securities cases than other kinds of litigation. *See, e.g.*, ECF 183, Pl's Mem., at 8 (describing purported presumption of numerosity in securities cases), 9 ("commonality requirement 'permissively applied' in securities fraud class actions" (citation omitted)), 10 (low difficulty of establishing typicality), 11–12 (defendants bear burden of disproving adequacy of representation). They are incorrect: securities cases must clear the same hurdles as any other would-be class action. *Hydrogen Peroxide*, 552 F.3d at 321–22 ("it does not follow that a court should relax its certification analysis, or presume a requirement for certification is met, merely because a plaintiff's claims" come in the context of a securities fraud action).

Plaintiffs' motion comes up short. As discussed in the following pages, the plaintiffs haven't offered nearly enough proof to meet their obligations, and instead ask the Court to take their word for it. The Court should refuse their invitation and deny the motion.

## **<u>ARGUMENT</u>**

To gain class certification, plaintiffs must prove by a preponderance that they satisfy all the prerequisites of Rule 23(a) and the conditions of at least one of the subsets of Rule 23(b). Plaintiffs fail at both tasks: they have not demonstrated compliance with the demanding predominance requirements of Rule 23(b)(3), nor have they proven numerosity or adequacy (as to plaintiff Reed) under Rule 23(a). We address predominance first, because of the striking

similarities between this case and the Supreme Court's *Comcast* decision, which requires denial of the instant motion.

## I.      Plaintiffs Have Failed to Carry Their Burden of Proving that Common Questions Predominate.

Rule 23(b)(3) requires plaintiffs to demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). This is no easy task: although governed by the same preponderance-of-the-evidence standard as the other Rule 23 determinations, *Mielo*, 897 F.3d at 484, the Supreme Court has recognized that, "[i]f anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast*, 569 U.S. at 34.

Plaintiffs cannot clear this hurdle for two reasons. First, plaintiffs' expert, Dr. Michael L. Hartzmark, has not provided a classwide damages methodology that "fits" the theories that are still in litigation here. Instead, Dr. Hartzmark incorporates supposed damages from theories the Court dismissed, proceeding as if the motion-to-dismiss decision never happened (*see* ECF 133). This is a clear-cut violation of *Comcast*'s central holding: "that a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." 569 U.S. at 35. Second, Dr. Hartzmark has not supplied a damages methodology that accounts for the circumstances of this case in a scientifically-rigorous fashion, and thus plaintiffs have failed to prove that a classwide method of addressing damages exists. These faults preclude class certification.

### A.   Plaintiffs Have Not Supplied a Damages Model That Fits Their Liability Theory.

The central teaching of *Comcast* is that a plaintiff cannot obtain class certification with a damages model that does not correspond to her theory of liability: "at the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case." 569 U.S. at 35 (citation omitted); *see also Neale*, 794 F.3d at 374 ("*Comcast* held that an antitrust litigation class could not be certified because the plaintiffs' damages model did not demonstrate the theory of antitrust impact that the district court accepted for class-action treatment."); *In re Nexium Antitrust Litig.*, 777 F.3d 9, 18 (1st Cir. 2015) (under *Comcast*, "a class action is improper unless the theory of liability is limited to the injury caused by the defendants.  In other words, the defendants cannot be held liable for damages beyond the injury they caused."); *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 799 (7th Cir. 2013) ("*Comcast* holds that a damages suit cannot be certified to proceed as a class action unless the damages sought are the result of the class-wide *injury* that the suit alleges.").  That teaching dooms plaintiffs' bid for class certification here.  To the extent Dr. Hartzmark offers any damages methodology at all, it focuses not on the liability theory that survived the Court's motion-to-dismiss ruling, but would also assess damages based on the theories the Court dismissed.

*Comcast* was an antitrust case.  Initially, the plaintiffs asserted claims under four different theories, alleging that each resulted in consumers paying artificially inflated prices (much as plaintiffs here allege U. S. Steel's stock price was artificially inflated).  *Comcast*, 569 U.S. at 31.  The district court accepted just one of these theories, dismissed the others, and proceeded to certify a class.  *Id.* at 31–32.  The plaintiffs' only evidence that damages could be addressed on a classwide basis, however, came from their expert's testimony.  *Id.* at 31.  That testimony relied on complex mathematical models to calculate classwide damages based on supposed price

10

inflation, but "the model did not isolate damages resulting from any one theory of antitrust

impact," instead computing damages as if all four originally asserted liability theories were still

part of the litigation. *Id.* at 32.  On appeal, the defendants complained that this mismatch

rendered the plaintiffs' damages model incapable of demonstrating the measurability of

classwide damages, thereby precluding certification, but the Third Circuit refused to engage with

their argument on grounds that doing so would touch on the merits of the case. *Id.*  The Third

Circuit thought it enough for the plaintiffs to "assure us that if they can prove [liability], the

resulting damages are capable of measurement and will not require labyrinthine individual

calculations." *Id.* (quoting *Behrend v. Comcast Corp.*, 655 F.3d 182, 206 (3d Cir. 2011)).

      The Supreme Court reversed, holding that the district court erred in certifying the class.

First, the Court explained that the fact that an argument against certification relates to the

underlying merits of the case does not permit courts to ignore such issues.  Instead, "certification

is proper only if the 'trial court is satisfied, after a rigorous analysis, that the prerequisites of

Rule 23(a) have been satisfied,'" even if doing so requires "the court to probe behind the

pleadings." *Id.* at 33 (quoting *General Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)).

      Second, the Court held that the class could not be certified because plaintiffs' model fell

"far short of establishing that damages are capable of measurement on a classwide basis," due to

its failure to distinguish between the dismissed and still-live liability theories. *Id.* at 34.  The

Court elaborated:

> We start with an unremarkable premise.  If respondents prevail on
> their claims, they would be entitled only to damages resulting from
> reduced overbuilder competition, since that is the only theory of
> antitrust impact accepted for class action treatment by the District
> Court.  It follows that a model purporting to serve as evidence of
> damages in this class action must measure only those damages
> attributable to that theory.  If the model does not even attempt to

11

> do that, it cannot possibly establish that damages are susceptible of
> measurement across the entire class for purposes of Rule 23(b)(3).

*Id.* at 35.

The circumstances here are strikingly similar to *Comcast*.  As in *Comcast*, the Amended Complaint here alleged four liability theories: 1) that U. S. Steel misled investors about its investments in RCM and the benefits derived therefrom (such as the Company's capacity to meet demand); 2) that the Company falsely reported the amount of "realized" cost savings from its Carnegie Way initiatives; 3) that U. S. Steel falsely claimed that its capital spending was appropriate; and 4) that it misrepresented the purpose of the August 2016 SPO.  ECF 133, Memorandum Opinion & Order, at 12–25.  The Amended Complaint alleged that each of those four categories of misrepresentations caused U. S. Steel securities to trade at inflated prices, and that their price fell at the end of the proposed class period when the market learned the "truth" supposedly concealed by the alleged misstatements.  ECF 65, Amended Compl., ¶¶ 429–67.

As in *Comcast*, the Court here pared the four liability theories to one.  ECF 133, Memorandum Opinion & Order, at 5 ("The only theories that survive are those stemming from Defendants' alleged affirmative misrepresentations concerning past proactive maintenance at steel production facilities, and misleading statements concerning the company's then-current capacity to meet demand."); *see also id.* at 19–21 (dismissing claims based on alleged misstatements about realized Carnegie Way benefits), 21–24 (dismissing claims about adequacy of capital investments), 24–25 (dismissing claims about purpose of August 2016 SPO).

And as in *Comcast*, the plaintiffs' damages expert here proceeds as if all the original liability theories were still in the case.  Dr. Hartzmark's entire report—all of his opinions about market efficiencies, causes and effects, and his damages "methodology"—is based on his assumption that every allegation in the amended complaint is true, including the dismissed

claims.  ECF 184-1, ¶ 2 ("I have reviewed the [Amended] Complaint and assume the allegations are true for purposes of this report.").  In other words, Dr. Hartzmark assumes that the price of U. S. Steel securities indeed was artificially inflated by supposed misstatements about Carnegie Way benefits, about the adequacy of capital spending, and about the purpose of the August 2016 SPO, and he further assumes that the stock price drop on April 26, 2017 was attributable to the correction of those misstatements—even though the Court dismissed those theories of liability.

His report describes (vaguely) how he would assess damages based on "the level of artificial inflation in the prices of U. S. Steel common stock caused by the Defendants' alleged misstatements," *id.* ¶ 120, but he does not give any hint as to whether or how he would focus solely on "inflation" arising from the RCM-related alleged misstatements.  Nor does he reveal whether or how he would factor out "inflation" caused by the alleged misstatements that the court dismissed.  His damages methodology thus "does not even attempt" to measure "only those damages attributable" to plaintiffs' surviving liability theory.  *Comcast*, 569 U.S. at 35.

As discussed in the accompanying rebuttal report of defendants' expert, Dr. Paul Zurek, "Dr. Hartzmark does not address how one would separate the inflationary impact of the different types of allegations that were originally alleged by Plaintiffs in their Amended Complaint in this matter but that were subsequently dismissed by the Court."  Ex. 1, Zurek Rpt. ¶ 6.  "Because he provides no information about how one would separate out the inflationary impact of these dismissed allegations, Dr. Hartzmark has effectively provided nothing more than a very high-level description (lacking any specificity to account for the various complications in this matter) of how one might estimate the *combined inflationary impact and resulting damages from all of the alleged misstatements in the Amended Complaint, both those that were dismissed and those that were not*."  *Id.* ¶ 49 (emphasis added).  *See also id.* ¶ 48 ("Dr. Hartzmark's report does not

address at all how one would determine the inflationary impact of [the dismissed] alleged misstatements, or how one would isolate and remove from his damages calculation the portion of the stock price decline on April 26, 2017 that resulted from the correction of those alleged misstatements.").

The situation here is the very one that doomed class certification in *Comcast*:  there, as here, the plaintiffs' expert's damages "model did not isolate damages resulting from any one theory," instead "assum[ing] the validity of all four theories . . . initially advanced by [plaintiffs] . . . and [did] not attribute damages to any one particular theory."  *Comcast*, 569 U.S. at 32, 36–37.  This case fits precisely within the *Comcast* paradigm, foreclosing class certification.

**B.      Plaintiffs Fail to Provide a Workable Methodology to Address Damages on a Classwide Basis.**

Even aside from the failure of Dr. Hartzmark to provide a damages methodology that fits the plaintiffs' remaining liability theory, plaintiffs have not proven that there exists a scientifically-rigorous methodology capable of addressing damages on a classwide basis.

It is true that the need to calculate individualized damages for different class members will not necessarily defeat certification.  *Neale v. Volvo Cars of N. Am.*, 794 F.3d 353, 374–75 (3d Cir. 2015).  This is because the use of a damages model *may* render those individual calculations "formulaic"—although many individual calculations may be necessary, they need not be difficult to resolve.

But this presupposes the existence of an acceptable model for measuring these classwide damages by "quantify[ing] the injury in fact to all class members attributable to the defendants'" alleged misconduct.  *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252 (D.C. Cir. 2013).  Without such a model, the court has no basis to conclude that damages indeed are

14

susceptible to a "formulaic" classwide treatment:  the "mechanical" quality of the task disappears.  *See* ECF 183, Pl.'s Mem., at 28.

What the plaintiffs *cannot* do in the face of a complex case is skate by on promises that damages issues can be figured out later on, after a class has been certified.  The Third Circuit and its constituent district courts are clear on this point.  *See, e.g.*, *Hydrogen Peroxide*, 552 F.3d at 318 ("The evidence and arguments a district court considers in the class certification decision call for rigorous analysis.  A party's assurance to the court that it intends or plans to meet the requirements is insufficient."); *Newton*, 259 F.3d at 191 ("Plaintiffs maintain their expert can devise a formula for calculating injury and damages that will allay manageability concerns.  Yet we are hesitant to rely on a formulaic nostrum given the consequences if it fails to meet expectations."); *Chudner v. Transunion Interactive, Inc.*, No. 09-CV-433-ER, 2010 WL 5662966, at *1 n.1 (D. Del. Dec. 15, 2010) (denying certification where plaintiff "merely assure[d] the Court that, as to [damages calculations], an expert will be provided at trial").

Other courts addressing securities cases around the country agree.  Recently, for example, the Northern District of Ohio considered a case where the plaintiff's expert's damages "methodology" consisted of little more than threadbare assertions that there were "unspecified 'valuation tools' available to measure damages," without specifying how damages could be addressed on a rigorous classwide basis.  *Ohio Pub. Emps.' Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, No. 4:08CV0160, 2018 WL 3861840, at *19 (N.D. Ohio Aug. 14, 2018) (citation omitted).  It wasn't enough: the court denied certification, finding that "When a class plaintiff presents a damages model that is vague, indefinite, and unspecific, or simply asserts . . . that there are unspecified 'tools' available to measure damages, the model amounts to no damages model at all, and the class cannot be certified."  *Id.* (citation omitted).  The Sixth Circuit denied

15

the plaintiff's motion for leave to file a Rule 23(f) appeal.  No. 18-310 (6th Cir. Jan. 23, 2019).

*See also, e.g.*, *Sicav v. Wang*, No. 12 Civ. 6682, 2015 WL 268855, at *6 (S.D.N.Y. Jan. 21,

2015) (denying class certification in securities case where "plaintiffs have not shown or

explained, concretely, how damages would be calculated as to any individual purchaser"); *In re

ConAgra Foods, Inc.*, 302 F.R.D. 537, 552 (C.D. Cal. 2014) (same; "Although the

methodologies he describes may very well be capable of calculating damages in this action,

[plaintiffs' economic expert] has made no showing that this is the case."); *Fort Worth Emps.'

Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 142 (S.D.N.Y. 2014) (same; "without

assurances beyond [plaintiffs' proffered expert's] say-so, the Court cannot conclude that there is

a damages model that will permit the calculation of damages on a classwide basis").

Plaintiffs' expert, Dr. Hartzmark, acknowledges that determining damages in a securities

class action alleging fraud-on-the-market claims requires a series of intricate calculations and

theoretical modeling exercises in order to determine what the "true" value of the securities

during the class period would have been had the market known the allegedly misrepresented or

concealed information.  ECF 184-1, Hartzmark Rpt., ¶ 119.  Yet rather than delve into the

calculations and methods needed to assess those damages in this particular case, Dr. Hartzmark

devotes a scant two-and-one-half pages of his 57-page expert report (and its hundreds of pages of

appendices) to the issue.  *Id*. ¶¶ 118–25.  He does not supply a damages model at all, let alone a

detailed one that provides any guidance.  For example, with respect to the need to determine the

true value of U. S. Steel securities on any given date during the class period, he does not discuss

how he might calculate such prices.  Instead, he vaguely refers to "a variety of commonly-

utilized methods." *Id.* ¶ 119.  He then assures the Court that "no matter which method might be

chosen at the merits stage of this litigation, the methodology . . . is common to all putative class

members and will be applied on a class-wide basis." *Id.*  In fact, the entire damages

methodology section could easily be cut-and-pasted into an expert report for *any* fraud-on-the-

market securities claim; all Dr. Hartzmark would need to do is swap out the name of the

defendant company. *Id.* ¶¶ 119–24.  *Nothing* about Dr. Hartzmark's damages discussion is

tailored to this particular case—the discussion wholly consists of general statements.

This is precisely the sort of "just trust us, we'll tell you later" strategy that cannot survive

the "rigorous" analysis the Court must conduct under Rule 23(b)(3).  *See Hydrogen Peroxide*,

552 F.3d at 318.  Plaintiffs need to show *now* that there is a scientifically rigorous methodology

to address damages on a classwide basis in *this case*. [7]

Moreover, although their brief and expert report cast the eventual discovery of some sort

of damages model as inevitable, there is grave doubt that any such methodology exists.  There

are several complications that the plaintiffs have not even begun to address.  For example, the

plaintiffs seem to assume that the entire amount of the change in the stock and option prices on

April 26, 2017 (the first trading day after the supposed "corrective" disclosures) constitutes class

damages.  *See* ECF 183, Pl.'s Mem., at 28 ("one can determine the amount of inflation in the

prices of U. S. Steel stock and options caused by Defendants' alleged misstatements and

omissions based on the price reaction to the corrective disclosure on April 25, 2017").  But this

would wildly overstate plaintiffs' damages:  U. S. Steel released a significant amount of

information at the end of the proposed class period, much of it unrelated to the alleged fraud.

*See* Ex. 1, Zurek Rpt. ¶¶ 50–57 (addressing "confounding" disclosures at end of proposed class

period).  Plaintiffs would be entitled to damages stemming only from U. S. Steel's alleged

---

[7]  Significantly, Dr. Hartzmark does not know whether he would be the one actually formulating and applying a damages methodology here:  he has not been retained to calculate any damages for this case, does not know whether he will be, and does not know whether he or somebody else would ultimately be the one calculating damages for the plaintiffs.  Ex. 9, Hartzmark Dep., 92: 2–20.

corrective disclosure of the misstatements that are still at issue in the case.  Yet plaintiffs

nowhere discuss how they would determine how much, if any, of the drop in U. S. Steel's

securities prices at the end of the class period was attributable to the alleged "fraud," and how

much was due to other disclosures not at issue in this lawsuit.  *See id.* ¶ 57 ("In sum, Dr.

Hartzmark's report fails to detail how he would, or whether one even could, remove the impact

of any confounding factors that contributed to the U.S. Steel stock price decline on April 26,

2017.").

Similarly, plaintiffs and Dr. Hartzmark provide no guidance on how they would account

for variations in alleged price inflation over the course of the proposed class period.  *See id.*

¶¶ 58–78 (discussing time-varying price inflation and silence of Hartzmark report on the topic).

As explained by Dr. Zurek, to the extent U. S. Steel's stock price was inflated by alleged

misstatements about RCM, the amount of that inflation almost certainly would have varied

across the class period, due to significant changes in the economic environment and the steel

market during that time.  *Id.* ¶ 62 (one of "at least two drivers of . . . alleged price inflation

during the proposed Class Period" would include "the market's assessment of future customer

demand for steel in the broader market, which evolved during the proposed Class Period").  But

"Dr. Hartzmark has not provided any detail as to what methodology he would employ to address

this issue, if one exists."  *Id.* ¶ 78.

The complications inherent to a damages methodology for U. S. Steel options are even

greater, and Dr. Hartzmark addresses none of them.  To start, all the same challenges to

calculating inflation in stock prices "would equally apply to calculating inflation for U.S. Steel's

options," because "the prices of options depend on the price of the common stock."  *Id.*  ¶ 79.

Thus, Dr. Hartzmark's failure to provide any information about how a damages methodology

might address confounding disclosures or time-varying inflation means he has not provided a rigorous damages model for either U. S. Steel stock or options.  *Id.*  Moreover, while Dr. Hartzmark says that the Black-Scholes options pricing model might be a component of a damages methodology for options, he says nothing about whether he would, or how he could, determine the "but-for" volatility of U. S. Steel's stock price, an input to the Black-Scholes model.  *Id.* ¶ 94 ("[T]here is no basis to assume that U.S. Steel's common stock price volatility in the actual world would equal that in the 'but-for' world.  Crucially, Dr. Hartzmark has provided no support for his assumption of holding volatility constant when computing the 'but-for' option price.  If volatility cannot be held constant, artificially assuming that it is constant would lead to an incorrect calculation of option values, and therefore damages.")

These vagaries are non-trivial.  A viable damages methodology must be able to address these challenges in a scientifically rigorous fashion.  Plaintiffs do not come close to demonstrating how they might do that, raising the specter that, if the Court grants certification, later stages of this litigation would descend into a quagmire of damages problems.  Plaintiffs bear the burden of proving, by a preponderance, that such problems will not come to pass.  Yet instead of offering evidence to support a predominance finding, plaintiffs' cavalier "just trust us" arguments treat Rule 23 as if it were "a mere pleading standard."  *See Dukes*, 564 U.S. at 350; *see also Parko v. Shell Oil Co.*, 739 F.3d 1083, 1086 (7th Cir. 2014) (reversing grant of class certification where district judge "treated predominance as a pleading requirement.  He thought it enough at this stage that the plaintiffs *intend* to rely on common evidence and a single methodology to prove both injury and damages . . . . But if intentions (hopes, in other words) were enough, predominance, as a check on casting lawsuits in the class action mold, would be

19

out the window.").  Rule 23 requires much more; accordingly, the Court should deny

certification.

## II.    <u>Plaintiffs Have Failed to Carry Their Burden of Proving Numerosity.</u>

Plaintiffs must prove that their proposed class "is so numerous that joinder of all

members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "Like other factual determinations

underlying Rule 23 determinations, it is a 'plaintiff's burden to demonstrate numerosity by a

preponderance of the evidence.'"  *Mielo*, 897 F.3d at 484 (quoting *Hayes v. Wal-Mart Stores,*

*Inc.*, 725 F.3d 349, 358 (3d Cir. 2013)).  Before it can judge that the numerosity threshold has

been satisfied, the "court must be presented with evidence that would enable the court to [make

its determination] without resorting to mere speculation."  *Id.*

This means that there must be more to a plaintiff's numerosity arguments than appeals to

"common sense."  *See Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 596 (3d Cir. 2012).  And

although "Rule 23(a)(1) does not require a plaintiff to offer direct evidence of the exact number

and identities of the class members," in the absence of such information, "a plaintiff must show

sufficient circumstantial evidence specific to the products, problems, parties, and geographic

areas actually covered by the class definition to allow a district court to make a factual finding."

*Id.*  Then—and only then—"may the court rely on 'common sense' to forgo precise calculations

and exact numbers."  *Id.* (citation omitted).  Furthermore, "where a putative class is some subset

of a larger pool, the trial court may not infer numerosity from the number in the larger pool

alone."  *Hayes*, 725 F.3d at 358.

Recently, the Third Circuit explicitly acknowledged that, after many years of relaxed

treatment, courts now must give the numerosity requirement "real teeth."  *Mielo*, 897 F.3d at 484

(quotation omitted).  Unfortunately for the plaintiffs, their numerosity argument relies entirely on

the old paradigm, where courts indulged "presumption[s] that the numerosity requirement is

satisfied when a class action involves a nationally traded security."  ECF 183, Pl's. Mem., at 8

(quoting *In re Cigna Corp Sec. Litig.*, No. 02-8088, 2006 WL 2433779, at *2 (E.D. Pa. Aug. 18,

2006)).  *Cigna*, and other cases like it, no longer are good law: they run head-on into the

Supreme Court's and Third Circuit's recent declarations that there are no presumptions in favor

of class certification; that plaintiffs must prove that all of the Rule 23 requirements have been

met; and that those seeking class certification in securities cases need to meet the same

evidentiary thresholds as plaintiffs in other types of cases.  *See* "Legal Standard," *supra* at 6–8.

Considered in this light, plaintiffs' one-page numerosity argument comes up woefully

short.  The only rationale they provide in support of their numerosity claim is the number of

outstanding shares and average daily trading volume during the class period, as well as the total

quantity of call and put option contracts expiring after April 27, 2017.  ECF 183, Pl's. Mem., at

8.  Essentially, instead of proffering admissible evidence about the number of would-be class

members, plaintiffs merely point to the number of shares and options and the volume of trading

activity and ask the Court to assume that there *simply must* be enough class members to justify

class treatment.  The Third Circuit has expressly rejected this strategy of gesturing to a sea of

*potential* class members and asking a district court to "infer numerosity from the number in the

larger pool alone."  *See Hayes*, 725 F.3d at 358.  Plaintiffs' argument is precisely the sort of

evidence-free appeal to "common sense" that cannot suffice to meet their burden of proof.  *See*

*Mielo*, 897 F.3d at 484–85.

This failure of proof requires that the motion be denied.  *See United States v. Beard*, 542

F. App'x 529, 530 (7th Cir. 2013) ("[W]hen a dispute will be decided based on a preponderance

of the evidence . . . a party who shuns the opportunity to present evidence is almost assured of

losing.").  Moreover, it is not at all clear that numerosity evidence would have supported the

plaintiffs' motion, if they had bothered to marshal it.  They seek to certify a class of "All persons

or entities who purchased or otherwise acquired United States Steel Corporation common stock

and options during the [class] period . . . *and were injured thereby.*"  ECF 183, Pl's. Mem., at 1–

2 (emphasis added).  Yet from the start of the proposed class period to the day after its close

(including the dip after the announcement of the earnings miss for 1Q17), U. S. Steel stock rose

***242%***, from $6.67 to $22.78 per share.  ECF 112-8, 1/27/2016 U. S. Steel Stock Chart, at PID 2;

ECF 133, 9/29/2018 Memorandum Order Granting Request for Judicial Notice, at PID 2.  It

easily beat relevant benchmarks, outperforming the S&P 500 by 215%, the Dow Jones U.S. Iron

& Steel index by 160%, and the S&P 600 Steel index by 65%.  *Id.*  By the end of 2017, U. S.

Steel stock was trading ***428%*** higher than its closing price on the first day of the proposed class

period.  *See supra* at 3–4.  The Company's market capitalization grew by $3 billion during the

proposed class period, and by $5 billion between the start of the period and the end of 2017.  *See*

*supra* at 3.  Therefore, it is likely that a great number of U. S. Steel stockholders weren't injured

at all, but in fact derived substantial benefit from defendants' stewardship of the Company.  *See*

Ex. 9, Hartzmark Dep., at 105:5–7 ("Q:  Did the value of your investments triple between

January 2016 and April 2017?  A:  I wish.")[8]

In summary, plaintiffs provide no evidence of the size of their putative class—just

supposition about the number of *possible* class members.  In contrast, the Company's robust

performance calls into doubt how many security holders were actually "injured" and thus would

qualify as class members under the proposed class definition.  Plaintiffs have therefore failed to

---

[8] As to option holders, Dr. Hartzmark said "I can't say how many were harmed versus how many were
not."  Ex. 9, Hartzmark Dep., at 141:6–7.

carry their burden of demonstrating numerosity by a preponderance of the admissible evidence, and certification should be denied.

**III.    Plaintiffs Have Not Carried Their Burden of Proving That Leeann Reed Will Adequately Represent the Proposed Class.**

In class actions, as in other representations, lawyers must be answerable to their clients. One of the fundamental purposes of Rule 23(a)(4)'s adequacy requirement is "to ensure that the parties are not simply lending their names to a suit controlled entirely by the class attorney." 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1766 (3d ed. 2005) (collecting cases). "The protection of the absentee[] [class members'] due process rights depends in part on the extent the named plaintiffs are adequately interested to monitor the attorneys." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995). An adequate representative must have the "ability to understand and control the litigation, make decisions regarding settlement, and identify, retain, and monitor competent counsel for the class." *Clair v. DeLuca*, 232 F.R.D. 523, 525 (W.D. Pa. 2006). *See also Berger v. Compaq Computer Corp.*, 257 F.3d 475, 483 (5th Cir. 2001) (reversing grant of class certification and appointment of lead plaintiff where lower court improperly shifted burden of proof of adequacy to defendants and "applied an impermissibly lax standard for adequacy that ignores the PSLRA's mandate that class representatives, and not lawyers, must direct and control the litigation").

Citing the aptly titled *Bizzarro v. Ocean County*, No. CIV. A. 07-5665, 2009 WL 1617887, at *14 (D.N.J. June 9, 2009), plaintiffs assert that defendants bear the burden of demonstrating that the named plaintiffs cannot adequately represent the class. ECF 183, Pl.'s Mem., at 11–12. *Bizzarro*—and any other cases stating a similar rule—represent flatly incorrect statements of the law. It is the "party seeking class certification" who bears the responsibility of

23

"affirmatively demonstrat[ing] his compliance with" all elements of Rule 23, including adequacy.  *See Dukes*, 564 U.S. at 350–51.  And plaintiffs must carry that burden by a preponderance of the evidence.  *Hydrogen Peroxide*, 552 F.3d at 307.

Yet rather than providing substantial, credible evidence that Reed is an "active, able class representative[] who [is] informed and can demonstrate [she is] directing the litigation," *Berger*, 257 F.3d at 483, plaintiffs rely exclusively on a self-serving, lawyer-authored declaration, coupled with assertions in their brief.  *See* ECF 183, Pl.'s Mem., at 12–13; ECF 184-6, Declaration of Leeann Reed in Support of Plaintiffs' Motion for Class Certification, at ¶¶ 4–5, 20.  But promises to "vigorously monitor" the case cannot satisfy plaintiffs' burden to prove by a preponderance of the evidence that Reed in fact has been and will be an adequate representative. This is particularly true where, as here, discovery reveals grave reasons to doubt a plaintiff's adequacy.  *See In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 146–47 (N.D. Tex. 2014) (denying class certification where only evidence supporting adequacy was plaintiff's "formulaic, boiler-plate" declaration; "[t]o credit it—with its dearth of supporting facts—would be to engage in the type of pro-plaintiff presumptions prohibited" by recent Supreme Court cases such as *Wal-Mart v. Dukes* and *Comcast v. Behrend*).

Most troublingly, it has emerged that Reed was not consulted in advance about the dismissal with prejudice of her claims under the Securities Act of 1933, Counts III and IV in the Amended Complaint.  *See* ECF 176, 3/18/19 Order, at PID 2 (dismissing the Securities Act claims "in their entirety with prejudice").  Reed was the only plaintiff asserting those claims, because plaintiff Vrakas did not claim to have purchased any shares in or traceable to U. S. Steel's August 2016 SPO and former plaintiff Myer had withdrawn from the case.  *See* ECF 172,

Stipulation Regarding Voluntary Dismissal of Claims Asserted by Plaintiff Robert Myer
Pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii).

The list of materials Reed says she reviewed in this matter conspicuously omits the
stipulation by which her Securities Act claims were dismissed, as well as the order approving the
stipulation. *See* ECF 184-6, Declaration of Leeann Reed in Support of Plaintiffs' Motion for
Class Certification, ¶ 15 (not listing the March 15, 2019 Stipulation (ECF 175), or the March 18,
2019 Order (ECF 176)). And in her deposition, Reed confirmed that she was not part of the
decision-making process at all, but rather was the passive recipient of information after the fact
that her claims had been abandoned. *See* Ex. 10, L. Reed Dep. 193:25–197:15 (Reed was merely
"informed" that the Securities Act claims had been dismissed, rather than "consulted"
beforehand).[9]

Reed's lack of involvement in the strategy behind or advance knowledge of the dismissal
of her Securities Act claims is not the only evidence of her inadequacy. By the time of her
deposition, more than a week after the parties' mediation statements had been exchanged, and
after she had twice met with counsel to prepare for her deposition, she had not reviewed
"anything related to the mediation." L. Reed. Dep., at 203:12–23. More problematic from an
adequacy perspective, she did not expect her opinion to be sought in connection with the
mediation, did not plan to attend the mediation (and in fact did not), and did not expect to weigh

---

[9] While they did not consult with Reed before abandoning the Securities Act claims, plaintiffs' counsel did
confer with the defendants, writing: "And just to confirm, defendants agree not to seek costs or sanctions related to
the Section 11 claim, correct?" (Ex. 11, 3/14/19 email from S. Hopkins), thus creating at least the appearance that
Reed's interests were traded off against counsel's possibly competing interests, unbeknownst to her.

This is not the first time the Levi & Korsinsky firm has dismissed a lawsuit or a claim without its client's
knowledge or prior authorization. *See, e.g., Lewis v. Knology, Inc.*, 799 S.E.2d 247, 251 (Ga. Ct. App. 2017)
(affirming denial of class certification in a shareholder suit on adequacy grounds where proposed class
representative was "not aware that her Delaware lawsuit had been dismissed," or that "a lawsuit had been filed in
her name in Georgia"), *cert. denied*, No. S17C1474, 2017 BL 341054 (Ga. Sept. 13, 2017).

in on any potential resolution of the case, explaining "That's why I have legal counsel." *Id.* at 204:8, 17–19.

But hiring qualified counsel is no substitute for personally representing the class, since "what is required with respect to adequacy of representation [includes] that a named plaintiff . . . be willing to contest an action by his attorneys with which he did not agree." *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 213 (E.D. Pa. 2001) (citation omitted). This is critical. "Because absent members of the class would be conclusively bound by the results obtained by these representatives and their attorneys, due process requires that they be more than pro forma representatives. . . . An attorney who prosecutes a class action with unfettered discretion becomes, in fact, the representative of the class. This is an unacceptable situation because of the possible conflicts of interest involved." *In re Goldchip Funding Co.*, 61 F.R.D. 592, 594–95 (M.D. Pa. 1974). Plaintiff Reed has abdicated her obligation to "control the litigation" and "make decisions regarding settlement." *Clair*, 232 F.R.D. at 525. She therefore cannot serve as a class representative. *See Charal v. Andes*, 81 F.R.D. 99, 102 (E.D. Pa. 1979) (plaintiff deemed inadequate class representative due to her "total abdication of . . . independence to the judgment of [her] lawyer"); *see also Griffin v. GK Intelligent Sys., Inc.*, 196 F.R.D. 298, 302 (S.D. Tex. 2000) (representatives were inadequate because they "have taken little or no supervisory role over lead counsel").[10]

---

[10] *Accord, e.g.*, *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1254 (11th Cir. 2003) (where a plaintiff's "participation is so minimal that they virtually have abdicated to their attorneys the conduct of the case," the plaintiff is inadequate); *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 727 (11th Cir. 1987) (trial court may deny class certification "where the class representatives had so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys").

Because plaintiffs have failed to carry their burden of proving that Reed will adequately represent the proposed class, their motion must be denied to the extent it seeks her appointment as a class representative.

## **CONCLUSION**

For the reasons discussed above, the Court should deny the plaintiffs' motion for class certification.

Dated:  June 18, 2019                          Respectfully submitted,

                                               *s/ Geoffrey J. Ritts*
                                               Geoffrey J. Ritts
                                               Adrienne Ferraro Mueller
                                               JONES DAY
                                               North Point
                                               901 Lakeside Avenue
                                               Cleveland, OH 44114-1190
                                               (T) (216) 586-3939
                                               (F) (216) 579-0212
                                               gjritts@jonesday.com
                                               afmueller@jonesday.com

                                               Leon F. DeJulius, Jr.
                                               Margaret C. Gleason
                                               JONES DAY
                                               500 Grant Street, Suite 4500
                                               Pittsburgh, PA 15219
                                               (T) (412) 391-3939
                                               (F) (412) 394-7959
                                               lfdejulius@jonesday.com
                                               mcgleason@jonesday.com

                                               *Attorneys for Defendants United States Steel Corporation, Mario Longhi, David Burritt, and Dan Lesnak*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of June, 2019, a true and correct copy of this Defendants' Opposition to Plaintiffs' Motion for Class Certification was filed and served on counsel of record via the United States District Court for the Western District of Pennsylvania's CM/ECF system.


*/s/ Geoffrey J. Ritts*