# IN THE UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| *In re U. S. Steel Consolidated Cases* | Civil Action No. 17-579 |
|  | Judge Cathy Bissoon |

**DECLARATION OF SHANNON L. HOPKINS IN SUPPORT OF: (I) PLAINTIFFS'
MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN
OF ALLOCATION; AND (II) LEAD COUNSEL'S MOTION FOR AWARD OF
ATTORNEYS' FEES AND LITIGATION EXPENSES, AND SERVICE AWARDS TO
PLAINTIFFS PURSUANT TO 15 U.S.C. §78u-4(a)(4)**

## TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................................... 2

II.     HISTORY AND PROSECUTION OF THE ACTION ........................................... 5

    A.      Background ......................................................................................................... 5

    B.      Procedural History ............................................................................................ 6

        1.      Commencement of the Action and the Appointment of Lead Plaintiff and Lead Counsel ...................................................................................... 6

        2.      Lead Counsel's Litigation Team ........................................................... 7

        3.      Filing the Amended Complaint and Substantially Defeating Defendants' Motion to Dismiss ................................................................................. 9

        4.      Certifying the Class ............................................................................. 15

        5.      The Parties' Extensive Discovery Efforts .......................................... 19

            a)      Written Discovery ................................................................... 19

            b)      Fact Witness Depositions ........................................................ 23

            c)      Expert Discovery .................................................................... 24

        6.      The U. S. Steel Defendants' Motion to Decertify the Class .................... 28

        7.      Mediation and Settlement ................................................................... 30

III.    SUMMARY OF THE SETTLEMENT, PLAN OF ALLOCATION & NOTICE PROGRAM ....................................................................................................... 32

IV.     RISKS OF CONTINUED LITIGATION ........................................................... 34

    A.      Risks Concerning Liability .............................................................................. 35

    B.      Risks Concerning Loss Causation and Damages ................................................. 37

V.      THE FEE AND EXPENSE APPLICATION ....................................................... 39

    A.      Lead Counsel's Request is Fair and Reasonable and Warrants Approval ........... 40

        1.      The Favorable Settlement Achieved ........................................................ 40

        2.      The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Continent Cases ................................. 41

        3.      The Time and Labor Devoted to the Action by Plaintiffs' Counsel ......... 42

        4.      The Quality of Plaintiffs' Counsel's Representation ............................... 44

    B.      Lead Counsel's Request for Litigation Expenses Warrants    Approval ............. 44

        1.      Lead Counsel Seeks Payment of Plaintiffs' Counsel's Reasonable and Necessary Litigation Expenses from the Settlement Fund ....................... 44

        2.      Reimbursement to Lead Plaintiffs is Fair and Reasonable ....................... 46

VI.     EXHIBITS ........................................................................................................... 47

VII.    CONCLUSION..............................................................................................................48

Shannon L. Hopkins declares as follows pursuant to 28 U.S.C. §1746:

1.    I, Shannon L. Hopkins, am a partner of the law firm of Levi & Korsinsky, LLP ("Levi & Korsinsky" or "L&K").[1] Levi & Korsinsky serves as Court-appointed Lead Counsel for Lead Plaintiff Christakis Vrakas and additional Plaintiff Leeann Reed ("Plaintiffs") in the above-captioned Action, which alleges violations of Sections 10(b) and 20(a) of the Securities Exchange of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, against the U. S. Steel Defendants: United States Steel Corporation, Mario Longhi, David Burritt, and Dan Lesnak (collectively "Defendants," and with Plaintiffs, the "Parties"). I have personal knowledge of the matters set forth herein based on my active supervision of, and participation in, the prosecution and resolution of the Action.

2.    I submit this declaration in support of: (1) Plaintiffs' motion, pursuant to Federal Rule of Civil Procedure 23(e), for final approval of the proposed Settlement that will resolve the claims asserted in the Action and approval of the proposed plan of allocation of the proceeds of the Settlement (the "Plan of Allocation"); and (2) Lead Counsel's motion, on behalf of all Plaintiffs' Counsel,[2] for an award of attorneys' fees and litigation expenses and for awards to the Plaintiffs pursuant to 15 U.S.C. §78u-4(a)(4) (the "Fee and Expense Application").

3.    In support of these motions, Plaintiffs and Lead Counsel are also submitting the exhibits attached hereto, the Memorandum of Law in Support of Motion for Final Approval of Class Action Settlement and Plan of Allocation (the "Settlement Memorandum"), and the Memorandum of Law in Support of Motion for Award of Attorneys' Fees and Litigation Expenses,

---

[1] Unless otherwise stated or defined in this Declaration, all capitalized terms used herein shall have the meanings provided in the Stipulation and Agreement of Settlement dated as of May 20, 2022 (ECF 329-1) (the "Stipulation").

[2] On February 15, 2019, the Court appointed Vincent Coppola of Pribanic & Pribanic as Liaison Counsel. Collectively, Levi & Korsinsky and Mr. Coppola are referred to as "Plaintiffs' Counsel."

and Service Awards to Plaintiffs Pursuant to 15 U.S.C. §78u-4(a)(4) (the "Fee Memorandum").

I.    **INTRODUCTION**

4.    Since this Action began over five years ago, Plaintiffs and Plaintiffs' Counsel actively and vigorously prosecuted the claims asserted in this Action. Only after this significant effort did Plaintiffs and Plaintiffs' Counsel succeed in obtaining an outstanding recovery for the Settlement Class, totaling $40 million in cash. As detailed herein, Plaintiffs and Plaintiffs' Counsel believe that the proposed Settlement represents an excellent result and is in the best interest of the Settlement Class.

5.    Plaintiffs and Plaintiffs' Counsel were well informed of the strengths and weaknesses of the claims and defenses asserted in the Action at the time they reached the proposed Settlement. As described in further detail herein, by the time they agreed to the proposed Settlement, Lead Plaintiffs and Plaintiffs' Counsel had:

a.    conducted an extensive investigation into the alleged violations of the federal securities laws at issue, including: (i) a thorough review of United States Securities and Exchange Commission ("SEC") filings and other publicly filed documents, securities analyst reports, Company press releases, presentations and earnings call transcripts, media reports, steel industry publications and other publicly available information; (ii) interviews with former U.S. Steel employees with knowledge of the allegations asserted; (iii) review of filings with the Federal Trade Commission; and (iv) consultation with experts;

b.    drafted a detailed Amended Complaint based on this investigation;

c.    successfully opposed the U. S. Steel Defendants' motion to dismiss the Amended Complaint;

d.  successfully moved for class certification, including conducting related discovery and preparing opening and rebuttal expert reports on market efficiency and damages, taking and defending expert depositions, and defeating the U. S. Steel Defendants' appellate challenge to the Court's decision certifying a class;

e.  undertook substantial and highly contested fact discovery, which included obtaining and reviewing more than 2.5 million pages of documents produced by the U. S. Steel Defendants and third parties pursuant to more than 50 subpoenas; taking, defending, and/or participating in 34 fact witness depositions (including a seven-part 30(b)(6) deposition of U. S. Steel); serving and responding to interrogatories; and engaging in a number of significant discovery disputes;

f.  consulted extensively throughout the litigation with experts concerning damages and loss causation, RCM processes, the maintenance of steelmaking equipment, statistical analysis, insider trading and executive compensation, and economic conditions in the steel market during the Class Period, including submitting expert opening and rebuttal reports and taking depositions of the U. S. Steel Defendants' five experts and defending depositions of Plaintiffs' six experts on these issues;

g.  opposed the U. S. Steel Defendants' motion for class decertification; and

h.  participated in four separate mediation sessions with the U. S. Steel Defendants and a settlement conference before the Court.

6.    The Settlement was achieved only after extensive and contentious arm's-length negotiations between the Parties, including a settlement conference before this Court, and formal mediation process overseen by highly respected mediators with extensive experience mediating large, complex securities class actions. The Parties engaged in four mediation sessions: first on

May 15, 2019 with former U.S. District Judge Layn R. Phillips of Phillips ADR Enterprises LLC, next on April 19, 2021 and August 26, 2021 with Robert Meyer, Esq. of JAMS, and finally on February 15, 2022 with David M. Murphy, Esq. of Phillips ADR Enterprises LLC. Following the fourth mediation session, Mr. Murphy issued a mediator's proposal to settle all claims in exchange for $40 million in cash, which the Parties accepted.

7.      Plaintiffs and Plaintiffs' Counsel believe that the Settlement represents a very favorable outcome for the Settlement Class and that its approval would be in the best interests of the Settlement Class because, as detailed below, the proposed $40 million Settlement represents a fair and adequate percentage of the estimated recoverable damages that Plaintiffs reasonably believed could be established at trial (particularly in a complex securities class action like this Action), and Plaintiffs faced significant risks in establishing the U. S. Steel Defendants' liability and proving damages in the Action.

8.      Thus, as explained further below, the Settlement provides a considerable benefit to the Settlement Class by conferring a substantial, certain, and immediate recovery while avoiding the significant risks of continued litigation, including additional litigation expenses and the risk that the Settlement Class could recover less than the Settlement Amount (or nothing at all) after years of additional litigation and delay.

9.      In addition to seeking final approval of the Settlement, Plaintiffs seek approval of the proposed Plan of Allocation. As discussed in further detail below, the Plan of Allocation, which is set forth in the Notice mailed to potential Settlement Class Members, provides for the distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment by the Court on a *pro rata* basis based on the timing and number of securities they purchased or otherwise acquired that were eligible to participate in the Settlement.

10.     Plaintiffs' Counsel worked hard and skillfully to overcome substantial obstacles and achieve an extremely beneficial Settlement for the Settlement Class. Plaintiffs' Counsel prosecuted this case on a fully contingent basis and incurred significant Litigation Expenses and thus bore all the risk of an unfavorable result. For their considerable efforts in prosecuting the case and negotiating the Settlement, Lead Counsel is applying for an award of attorneys' fees for Plaintiffs' Counsel of one-third of the Settlement Fund. As discussed in the Fee Memorandum, the requested one-third fee of the Settlement Fund – which has been reviewed and approved by Plaintiffs – is well within the range of percentage awards granted by courts in this Circuit and elsewhere in similarly sized securities class action settlements. The requested fee is further confirmed as reasonable because it calculates to a substantial discount to the lodestar incurred by Plaintiffs' Counsel, representing a negative lodestar multiplier of approximately .81, whereas in contingent cases like this, plaintiffs' counsel are typically paid a multiple above their actual lodestar when reaching a highly successful outcome. Lead Counsel respectfully submit that the fee request is fair and reasonable in light of the result achieved in the Action, the efforts of Plaintiffs' Counsel, and the risks and complexity of the litigation.

11.     Lead Counsel's Fee and Expense Application also seeks payment of Litigation Expenses incurred by Plaintiffs' Counsel in connection with the institution, prosecution, and settlement of the Action totaling $2,711,338.12, plus reimbursement of $80,000 in the aggregate to Plaintiffs for their costs and expenses directly related to their representation of the Settlement Class, as authorized by the PSLRA.

## II.     HISTORY AND PROSECUTION OF THE ACTION

### A.     Background

12.     In this Action, Plaintiffs allege that the U. S. Steel Defendants are liable for

materially untrue statements and omissions of material fact made to investors, including in U. S. Steel's SEC filings, earnings calls, and presentations during the Class Period (between January 27, 2016 and April 25, 2017). At all relevant times, Defendant Longhi was U. S. Steel's Chief Executive Officer, Defendant Burritt was U. S. Steel's Chief Financial Officer, and Dan Lesnak was U. S. Steel's General Manager, Investor Relations.

13.    Plaintiffs allege that the U. S. Steel Defendants' Class Period public statements contained false and misleading statements and omissions regarding U. S. Steel's investments in, and implementation of, Reliability Centered Maintenance ("RCM"), certain stated benefits achieved from the RCM program, the nature of alleged unplanned outages, and U. S. Steel's capacity to meet market demand.

14.    Plaintiffs contend that these alleged misstatements and omissions caused the Company's securities prices to trade at artificially inflated prices during the Class Period.

### B.    Procedural History

#### 1.    Commencement of the Action and the Appointment of Lead Plaintiff and Lead Counsel

15.    Two class action complaints were filed in May 2017 in the Western District of Pennsylvania against the U. S. Steel Defendants asserting that, between November 1, 2016 and April 25, 2017, the U. S. Steel Defendants were liable for violations of Sections 10(b) and 20(a) of the Exchange Act, and Rule l0b-5 promulgated thereunder. Such actions included this Action and *Payne, et. al., v. United States Steel Corp., et. al.*, No. 2:17-cv-660.

16.    In accordance with the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), notice to the public was published via PR Newswire setting forth the deadline by which putative class members could move the Court to be appointed as lead plaintiff in the Action.

17.    On July 3, 2017, Lead Plaintiff Vrakas, as well as several other movants, timely

filed motions seeking appointment as lead plaintiff in the Action, approval of lead counsel, and consolidation of the Action with the *Payne* Action. ECF Nos. 12-26.

18.    On July 6, 2017, the Court ordered, consistent with its Practices and Procedures, that all responses to the pending motions for consolidation, appointment as lead plaintiff, and appointment of lead counsel be filed by July 14, 2017. ECF 28.

19.    On July 14, 2017, Mr. Vrakas responded to all other competing motions in compliance with the Court's order. ECF 40. Each of the other competing movants indicated either that they did not oppose Mr. Vrakas's appointment as lead plaintiff, withdrew their motion, or otherwise did not file a response.

20.    On August 16, 2017, the Court ordered consolidation of the *Payne* Action into this Action under the caption "'*In re U.S Steel Consolidated Cases*, Civil Action No. 17-559,' or a reasonable equivalent[.]" ECF 47. Further, pursuant to the PSLRA, the Court appointed Mr. Vrakas as Lead Plaintiff in this Action, appointed Levi & Korsinsky as Lead Counsel, and appointed O'Kelly Ernst & Joyce, LLC as liaison counsel. *Id.*

### 2.    Lead Counsel's Litigation Team

21.     Throughout this litigation, Plaintiffs' Counsel took all reasonable measures to ensure that the Action was staffed appropriately to minimize costs and lodestar wherever reasonably possible without negatively impacting the prosecution of the Action and Plaintiffs' ability to maximize the potential recovery to members of the Settlement Class.

22.    The U. S. Steel Defendants hired Jones Day, a law firm well-known for its litigation practice, including securities litigation specifically, to defend them in this lawsuit. Jones Day expended tremendous resources and assembled a large team of partners and associates to defend the Action. Given the nature of complex securities litigation, Jones Day also most likely had substantial numbers of additional attorneys, paralegals, and support staff working behind the

scenes.

23.     As such, Lead Counsel had to assemble a legal team that could effectively and efficiently litigate against Defendants' well-funded and formidable defense team, while still litigating efficiently and economically. The primary team members involved in prosecuting the Action included partners Shannon L. Hopkins and Gregory M. Potrepka, and several current or former associates. Other attorneys from Levi & Korsinsky also worked on the case and assisted with specific aspects of the litigation.

24.     Lead Counsel also retained Vincent Coppola as liaison counsel as he regularly appears before, and is highly familiar with, procedures in the Western District of Pennsylvania. The Court substituted Mr. Coppola as liaison counsel on February 15, 2019. ECF 168.

25.     In addition, Lead Counsel assembled teams of staff attorneys for the extremely time-intensive and critical tasks of reviewing, analyzing, and digesting the large volume of complex documents produced in the case. Lead Counsel's staff attorneys primarily focused on reviewing and analyzing electronically produced documents and assisting with the preparation of depositions and mediations. To avoid any doubt, Lead Counsel's staff attorneys did far more than merely code documents or engage in rote word searches. They were integrally involved in analyzing Defendants' and non-parties' sizable document productions, which involved finding and developing critical information about the claims and defenses in this Action. The attorneys' work of scouring the voluminous productions and following up on that information was critical to Lead Plaintiffs' successful prosecution of this Action.

26.     Staff attorneys also made critical contributions to counsel's preparation for the numerous depositions taken in the Action. Indeed, our staff attorneys, on their own and in collaboration with other team members, performed extensive searches to identify critical witnesses

to depose, and prepared detailed summaries and "witness kits" for fact and expert witnesses who were deposed in the case. These witness kits typically consisted of "hot" documents, as well as a detailed index summarizing the documents to guide the depositions. Staff attorney deposition preparation involved extensive analysis of the facts and the witness, as well as the exercise of significant critical judgment in deciding which of the thousands of documents to include for potential use with a deposition witness. In preparing deposition materials, these attorneys became, in effect, subject matter experts on a particular witness and, working closely with the more senior attorneys taking the depositions, they contributed significantly to the preparation and conduct of the examination of the witness.

27.    By assembling a team of experienced, highly capable, and trusted staff attorneys, Lead Counsel ensured that they could devote talented attorneys to the critical tasks of analyzing documents and preparing for depositions, assisting with the preparation of briefing and other submissions, and performing other tasks. These attorneys dedicated themselves to the prosecution of the Action and developed knowledge of complex facts. They were critical in allowing Lead Counsel to litigate effectively against the team of highly talented lawyers who defended the Action.

### 3.    Filing the Amended Complaint and Substantially Defeating Defendants' Motion to Dismiss

28.    Following this Court's August 16, 2017 order appointing a lead plaintiff and lead counsel, Lead Plaintiff and Lead Counsel continued their extensive investigation into the claims and potential claims against the U. S. Steel Defendants. Lead Counsel worked assiduously to discover key facts and develop the most salient and persuasive elements of this case.

29.    Lead Counsel reviewed a substantial volume of materials authored, issued, or presented by U. S. Steel. These included U. S. Steel's periodic financial reports, numerous filings with the SEC, conference call transcripts, registration statements, prospectuses, press releases,

investor presentations, and other public communications issued during the Class Period and beyond concerning the U. S. Steel Defendants.

30.    Lead Counsel further reviewed hundreds of news articles, trade publications, securities analyst reports, filings with the International Trade Commission and market commentary reports concerning U. S. Steel and the steel industry that were issued before, during, and beyond the Class Period to gauge the impact of U. S. Steel's statements on the marketplace and assess the dynamics of the domestic steel market, more generally. Given that U. S. Steel was followed by multiple analysts and that the steel market garnered significant analyst and media attention prior to and during the Class Period, the volume of these materials was substantial.

31.    Lead Counsel also conducted interviews with confidential witnesses, who were primarily former U. S. Steel employees. These efforts directly benefitted the Settlement Class. For example, the Complaint recited statements from former U. S. Steel employees who recalled specific meetings and reports contradicting the Individual Defendants' public statements that were known to Defendants at the time of the alleged misstatements. ECF 65 at ¶¶70, 136, 152, 182, 372-74. The information supplied by these former U. S. Steel employees helped Plaintiffs plead falsity and scienter with respect to Defendants' misstatements.

32.    In addition to this factual research, Lead Counsel thoroughly researched Third Circuit law applicable to the claims asserted and Defendants' potential defenses thereto.

33.    On October 4, 2017, Lead Plaintiff and two additional plaintiffs, Leeann Reed and Robert Myer, filed an Amended Class Action Complaint for Violations of the Federal Securities Laws against the U. S. Steel Defendants, as well as the underwriters of U. S. Steel's August 2016 secondary offering: J.P. Morgan Securities LLC, Goldman Sachs & Co., Barclays Capital Inc., Wells Fargo Securities, LLC, Credit Suisse Securities (USA), LLC, Morgan Stanley & Co. LLC,

Merrill Lynch, Pierce Fenner & Smith, Incorporated, PNC Capital Markets LLC, Scotia Capital (USA) Inc., Citizens Capital Markets, Inc., Suntrust Robinson Humphrey, Inc., BNY Mellon Capital Markets, LLC, Citigroup Capital Markets, Inc., Commerz Markets LLC, The Huntington Investment Company, SG Americas Securities LLC, The Williams Capital Group L.P., and ING Financial Markets LLC (collectively, the "Underwriter Defendants" and, with the U. S. Steel Defendants, the "Defendants").

34.    On October 17, 2017, Lead Plaintiff, Mrs. Reed, and Mr. Myer filed an Errata that included revisions to their Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 65, the "Amended Complaint").

The Amended Complaint asserted the following claims:

☐   Count I For Violations of Section 10(b) of the Exchange Act and Rule 10b-5, alleging violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder against U. S. Steel and the Individual Defendants;

☐   Count II For Violations of Section 20(a) of the Exchange Act, alleging violations of Section 20(a) of the Exchange Act against U. S. Steel and the Individual Defendants;

☐   Count III For Violations of Section 11 of the Securities Act, alleging violations of Section 11 of the Securities Act against U. S. Steel, the Individual Defendants, and the Underwriter Defendants; and

☐   Count IV For Violations of Section 15 of the Securities Act, alleging violations of Section 15 of the Securities Act against the Individual Defendants.

35.    The Amended Complaint alleged that Defendants unlawfully inflated U. S. Steel's stock price by issuing public statements that misled investors about U. S. Steel's investments in, and implementation of, a proactive maintenance program (RCM), benefits U. S. Steel achieved from its RCM program, and U. S. Steel's capacity to meet demand when steel market conditions improved. The Amended Complaint additionally alleged misstatements and omissions concerning cost savings that were purportedly realized from U. S. Steel's "Carnegie Way" project, the

sufficiency of U. S. Steel's capital investments, and the nature and purpose of the SPO during the Class Period.

36.    Plaintiffs allege that the misleading nature of the Defendants' statements remained hidden until a disclosure on April 25, 2017 revealing, *inter alia*, that the U. S. Steel had not been implementing or achieving sustainable benefits from RCM, that ongoing unplanned outages at U. S. Steel's flat-rolled plants were more severe than publicly represented, and that U. S. Steel did not have the capacity to meet demand at a time when market conditions for steel were improving.

37.    On December 14, 2017, the U. S. Steel Defendants and the Underwriter Defendants filed two separate motions to dismiss the Amended Complaint, including voluminous briefing and exhibits in excess of 780 pages. ECF Nos. 109-112, 114-15. Defendants challenged the sufficiency of the Amended Complaint's allegations concerning nearly every element of Plaintiffs' claims. Defendants argued, among other things, that the Amended Complaint failed to allege: their statements were false or misleading, they acted with scienter, or that Plaintiff Reed and additional Plaintiff Robert Myer had standing to assert Securities Act claims. Among other things, Defendants argued:

    a.    None of their statements were false or misleading. For example, Defendants argued that statements regarding proactive maintenance investments (including RCM) were not misleading because U. S. Steel made regular public disclosures that its maintenance investment strategy was a "multi-year journey" and that U. S. Steel purportedly informed investors during the Class Period that such "journey" was ongoing and "not there yet." ECF 110 at 19. Relatedly, Defendants claimed that any statement regarding U. S. Steel's RCM expenditures was not false because U. S. Steel did spend "nearly $1 billion on maintenance" during the Class Period. ECF 126 at 6. Defendants also contended any statements regarding unplanned outages were not misleading because U. S. Steel disclosed it experienced unplanned outages every quarter during the Class Period and warned investors that unplanned outages were a "major risk factor." ECF 110 at 22-23.

    b.    That alleged false statements were vague statements of optimism amounting to inactionable puffery. *Id.* at 24.

     c.   The Amended Complaint failed to plead scienter, especially with regard to any well-pled motive for committing fraud on investors. Defendants asserted that their stock sales did not raise an inference of scienter because they were neither suspicious in timing nor amount, and that they were coincidentally timed with tailwinds stemming from the election of former-President Trump that were experienced across the steel industry. *Id.* at 29-32.

     d.   The Amended Complaint lacked sufficient allegations to plausibly allege standing with respect to Mrs. Reed's and Mr. Myer's Securities Act claims. *Id.* at 35; ECF 114-115.

38.    Defendants asserted these and similar arguments again on numerous occasions including in their first motion for interlocutory appeal pursuant to 28 U.S.C. § 1292(b), their opposition to Plaintiffs' motion for class certification, their second attempt at interlocutory appeal pursuant to Federal Rule of Civil Procedure 23(f), their briefing in connection with the mediations and the settlement conference, their motion for class decertification, and undoubtedly would have done so in further proceedings such as summary judgment, trial, and any appeals.

39.    Plaintiffs filed a single, omnibus opposition to both motions to dismiss on February 12, 2018. ECF 121-22. Because Defendants' arguments were wide-ranging and fact-intensive, Lead Counsel had to devote substantial time and resources to researching and drafting Plaintiffs' opposition. For example, Lead Counsel had to research the law on every disputed element of Plaintiffs' claims, as well as scour the materials referenced in both the Amended Complaint and Defendants' voluminous exhibits in order to marshal evidence to counter Defendants' factual assertions. Lead Counsel's extensive research of the public record, including U. S. Steel's SEC filings, other public statements and the market commentary concerning all of these matters, was essential in responding to Defendants' motions to dismiss. On March 14, 2018, Defendants filed an omnibus reply brief in further support of their motions. ECF 126.

40.    On August 20, 2018, August 23, 2018, September 25, 2018, and September 28, 2018, Plaintiffs and Defendants submitted to the Court and/or responded to supplemental authority

regarding arguments advanced in the briefing for the two motions to dismiss. ECF 129-32.

41.    On September 29, 2018, the Court entered an order granting in part, and denying in part the Defendants' motions to dismiss. ECF 133. Plaintiffs and Lead Counsel immediately developed and began executing a comprehensive discovery plan, including arranging and attending in-person meetings with confidential witnesses cited in the Amended Complaint.

42.    On October 26, 2018, Plaintiffs filed a motion for reconsideration of whether any dismissal should be "with prejudice." ECF 135-36. On November 5, 2018, Defendants filed a memorandum in opposition to Plaintiffs' motion for reconsideration. ECF 141. On November 5, 2018, the Court denied Plaintiffs' motion for reconsideration. ECF 142.

43.    On October 30, 2018, Defendants filed a motion requesting that the Court certify its order on their motions to dismiss for interlocutory appeal pursuant to 28 U.S.C. §1292(b). ECF 138-39. Defendants reasserted that the Amended Complaint did not adequately allege standing to assert Securities Act claims and sought interlocutory review of the Court's holding otherwise. ECF 139. Plaintiffs filed a brief opposing Defendants' motion for a certificate of appealability on November 9, 2018. ECF 147. On November 20, 2018, the Court denied Defendants' motion for a certificate of appealability. ECF 157.

44.    On November 15, 2018, Defendants filed two answers, one by the U. S. Steel Defendants and another by the Underwriter Defendants. ECF 153-54. The U. S. Steel Defendants denied that any of the statements or omissions at issue were materially false or misleading, that they acted with scienter, or that their conduct caused Plaintiffs' losses. The U. S. Steel Defendants also asserted 35 affirmative defenses, including that they did not make any statements that were false or misleading or omit to state any material facts; some or all of the matters claimed by Plaintiffs to have been omitted from U. S. Steel's public disclosures were fully disclosed; and that

Defendants had no duty to disclose any of the alleged omitted material information.

### 4.    Certifying the Class

45.    Following the Court's decision of the motions to dismiss, it set an initial case management conference for January 17, 2019. ECF 155. In advance of the conference, Plaintiffs met and conferred with Defendants and filed a joint report pursuant to Federal Rule of Civil Procedure 26(f). ECF 160. Thereafter, Lead Counsel attended the initial case management conference where the Court ordered that discovery be bifurcated pursuant to Local Civil Rule 23(G)—proceeding first with class certification discovery, with merits discovery to follow in a second phase. ECF 165.

46.    On February 15, 2019, the Parties jointly filed a stipulation and proposed protective order regarding discovery confidentiality which was vigorously negotiated. ECF 169. The Court entered the stipulated protective order on February 19, 2019. ECF 170.

47.    Class certification in this case was hotly contested. Indeed, the U. S. Steel Defendants' subsequent motion for class decertification was still pending when the Parties reached the Settlement. Plaintiffs and Lead Counsel filed, and responded to, copious briefing; spent weeks preparing for, traveling to, attending, and defending the depositions of Mr. Vrakas, Mrs. Reed, and Mrs. Reed's husband, Chad Reed; and filed two substantial expert reports in support of their motion. Given the U. S. Steel Defendants' vigorous opposition to class certification, Lead Counsel had to devote significant resources (including time and money) and skill to prepare their motion for class certification and respond to the U. S. Steel Defendants' arguments.

48.    Furthermore, Plaintiffs took significant party and third-party discovery regarding class certification issues, including with respect to whether Mrs. Reed's and Mr. Myer's trades were "traceable" to the SPO for purposes of the Securities Act Claims. Plaintiffs were unsuccessful in tracing their securities to the SPO and, ultimately, Mr. Myer voluntarily dismissed his claims,

and Plaintiffs voluntarily dismissed all Securities Act Claims. ECF Nos. 172-73, 175-76.

49.    Plaintiffs included five exhibits to their motion for class certification, including, declarations swearing that they stood ready and willing to represent the Class, and a 57-page report prepared by their expert financial economist, Michael Hartzmark, Ph.D., that provided opinions that the market for U. S. Steel's common stock and stock options traded efficiently, and that also provided a common out-of-pocket methodology to calculate damages in this Action. ECF 184.

50.    The U. S. Steel Defendants issued broad document requests to Plaintiffs in connection with their motion for class certification. Plaintiffs, with Lead Counsel's assistance, responded to these document requests by: preparing and serving responses and objections to those requests; exchanging discovery correspondence with the U. S. Steel Defendants; and producing many documents, which Lead Counsel reviewed for privilege.

51.    In April 2019, both Mrs. Reed and her husband sat for depositions noticed by the U. S. Steel Defendants. The U. S. Steel Defendants took Mr. Vrakas's deposition in May 2019, and took Dr. Hartzmark's deposition in June 2019. Lead Counsel's litigation team was critical in assisting with the extensive preparation required for these depositions and defending them.

52.    On June 18, 2019, the U. S. Steel Defendants submitted a brief in opposition to Plaintiffs' motion for class certification and exhibits thereto, including the expert report of their own financial economist, Dr. Paul Zurek. ECF 203-04. The U. S. Steel Defendants opposed Plaintiffs' motion for class certification, either in whole or in part, on three grounds:

   a.    Plaintiffs had not made a showing, by a preponderance of the evidence, that the proposed class of U. S. Steel securities purchasers was sufficiently numerous to warrant class treatment;

   b.    Plaintiffs could not establish a class-wide theory of damages under a common

methodology, and therefore, the Action should not be maintained as a class action. According to the U. S. Steel Defendants, Plaintiffs had not established that their expert's out-of-pocket damages methodology could disaggregate any confounding impacts on U. S. Steel's stock price during the Class Period, including the impacts, if any, from statements that Plaintiffs alleged to be false and misleading in the Amended Complaint, but the Court found inactionable in its decision on the motions to dismiss. Thus, the U. S. Steel Defendants claimed that because there was supposedly an incongruence between Plaintiffs' theory of liability and their expert's proposed damages methodology, that Plaintiffs' class certification motion must fail as a matter of law under the Supreme Court's opinion in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013); and

    c.  Mrs. Reed was not an adequate class representative.

53.  On June 27, 2019, Lead Counsel took Dr. Zurek's deposition. Preparing for Dr. Zurek's deposition took a significant amount of time, effort, and expense, including conferences with Dr. Hartzmark and his support staff regarding the opinions that Dr. Zurek proffered and the supposed bases for those opinions.

54.  On July 18, 2019, Plaintiffs filed a detailed, thoroughly researched reply (ECF 205), supported by, among other things, a survey of representative case law from across the country rejecting the U. S. Steel Defendants' arguments concerning Dr. Hartzmark's damages methodology as premature loss-causation arguments that are never appropriate to consider at class certification. In support of their reply, Plaintiffs submitted a rebuttal expert report prepared by Dr. Hartzmark. ECF 206-1.

55.  On July 25, 2019, Defendants filed a motion to strike Dr. Hartzmark's rebuttal

report in support of class certification. ECF 207-08. Plaintiffs filed a response in opposition to the motion to strike on August 5, 2019. ECF 210. On August 12, 2019, the U. S. Steel Defendants filed a motion for leave to file a reply in further support of the motion to strike, which the Court denied. ECF 211-12.

56.     On November 15, 2019, Plaintiffs filed supplemental authority in support of their motion for class certification. ECF 213. The U. S. Steel Defendants filed a response on November 20, 2019. ECF 214.

57.     On December 31, 2019, the Court granted Plaintiffs' motion for class certification in full, appointing Mr. Vrakas and Mrs. Reed as Class Representatives and appointing Levi & Korsinsky as Class Counsel. ECF 215.

58.     On January 14, 2020, the U. S. Steel Defendants filed a petition for interlocutory appellate review of the Court's class certification decision in the United States Court of Appeals for the Third Circuit pursuant to Fed. R. Civ. P. 23(f). *See Vrakas v. U. S. Steel Corp.*, et al., Case No. 20-8003 (3d Cir.). Plaintiffs filed a brief in opposition on January 24, 2020. The U.S. Steel Defendants then moved for leave to file a reply, which Plaintiffs opposed. The Third Circuit denied the U. S. Steel Defendants' petition on April 1, 2020.

59.     On May 28, 2020, Plaintiffs filed their unopposed motion to approve the form and manner of class notice, (ECF 224), which the Court granted the same day. ECF 225.

60.     At that time, the Court approved the proposed form and manner for providing the Notice of Pendency of the Action ("Long Form Notice") and a post card notice ("Post Card Notice"). ECF 225.

61.     In accordance with the Court's Order granting the motion to provide notice of pendency of the Action, 83,272 copies of the Post Card Notice were mailed to potential Class

Members. Ex. 3 at ¶4 (Declaration of Eric Nordskog Regarding Settlement Class Notice and Report and Requests for Exclusion Received). In response, A.B. Data only received 37 requests for exclusion. *Id.* at ¶16.

### 5.    The Parties' Extensive Discovery Efforts

#### a)    Written Discovery

62.    Merits discovery in the Action commenced in February 2020. As outlined below, discovery involved significant efforts by Plaintiffs and Lead Counsel, including substantial document discovery, written discovery efforts, and depositions – all conducted concurrently. In addition, throughout the discovery process, Lead Counsel continued to consult extensively with experts, and participated in expert discovery.

63.    Discovery in the Action was highly contested. Plaintiffs served one hundred and seventy-three (173) Rule 34 requests for production—served over the course of six sets of requests as new information became known about U. S. Steel's maintenance processes, RCM, operations and performance, in addition to thirty-five (35) Rule 33 interrogatories. The scope of this discovery was contentious and hard-fought, as ostensibly each and every request for production and interrogatory was vigorously contested between the Parties.

64.    Lead Counsel and counsel for the Defendants exchanged voluminous correspondence and participated in numerous meet-and-confer sessions regarding discovery and disputes over the scope of documents to be produced. Notably, many of these efforts took place while the COVID-19 pandemic displaced counsel from their office space. Notwithstanding these obstacles, Lead Counsel made every effort, working through difficult circumstances, to keep the process moving expeditiously so as both to comply with Court's discovery schedule, and to advance the Action toward trial for the benefit of Plaintiffs and the Settlement Class. Through frequent and fruitful negotiation, Plaintiffs and the U. S. Steel Defendants achieved resolution on

an overwhelming majority of their discovery disputes without the Court's involvement. However, Plaintiffs and Lead Counsel zealously litigated disputes that could not be resolved.

65.    On July 28, 2020, the Court held a First Telephonic Status Conference to address discovery disputes identified by Plaintiffs and the U. S. Steel Defendants, which Plaintiffs' Counsel Attended. ECF 231. In advance of the First Telephonic Status Conference, Lead Counsel met and conferred with counsel for the U. S. Steel Defendants regarding disputed issues, including with respect to the U. S. Steel Defendants' responses to Plaintiffs' discovery requests, and prepared a detailed position statement that was emailed to the Court. On July 28, 2020, the Court ordered that the Parties meet and confer regarding outstanding discovery disputes and scheduled a Second Telephonic Status Conference to address any remaining disputes.

66.    Thereafter, in accordance with the Court's order, Plaintiffs and the U. S. Steel Defendants met and conferred regarding their discovery disputes. On August 3, 2020, Plaintiffs and the U. S. Steel Defendants filed a joint motion requesting a continuance of the Second Telephonic Status Conference to continue negotiating, which the Court granted. ECF 233-34. As a result of the Parties' efforts, they were able to significantly narrow the issues in dispute.

67.    On August 18, 2020, the Court held a Second Telephonic Status Conference, which Plaintiffs' Counsel attended. ECF 235. In advance of the Second Telephonic Status Conference, Plaintiffs and the U. S. Steel Defendants met and conferred regarding their positions and prepared a joint statement that was emailed to the Court.

68.    On August 19, 2020, the Court entered an order regarding the U. S. Steel Defendants' responses to Plaintiffs' discovery requests, including the relevant time period, search terms to run, and custodians whose documents were to be searched. ECF 236. Further, the Court ordered the Parties to meet and confer in light of its guidance at the Second Telephonic Status

Conference and file motions to compel regarding any disputes outstanding after doing so. *Id.*

69.     On August 25, 2020, Plaintiffs filed a motion to compel the U. S. Steel Defendants to comply with their discovery requests, including for an order preventing the U. S. Steel Defendants from unilaterally withholding responsive documents on the basis of relevance. ECF 242-44. Also on August 25, 2020, the U. S. Steel Defendants filed a motion to compel documents from Plaintiffs in response to their requests for production. ECF 241.

70.     On August 28, 2020, Plaintiffs filed a memorandum in opposition to the U. S. Steel Defendants' motion to compel. ECF 256. On August 31, 2020, the U. S. Steel Defendants filed a motion to withdraw their motion to compel, which the Court granted. ECF 264, 267.

71.     Additionally, on August 28, 2020, the U. S. Steel Defendants filed a memorandum in opposition to Plaintiffs' motion to compel dated August 25, 2020. ECF 258. In support of their opposition to Plaintiffs' motion, the U. S. Steel Defendants attached exhibits including three affidavits—two from U. S. Steel employees and one from U. S. Steel's discovery vendor Consilio, LLC. ECF 259. On August 31, 2020, Plaintiffs moved to strike the three affidavits as the facts contained therein were not shared with Plaintiffs before the affidavits were filed, and because the affidavits related to issues that had already been decided by the Court rather than issues raised in Plaintiffs' motion to compel. ECF 263. The U. S. Steel Defendants opposed Plaintiffs' motion to strike on September 2, 2020.

72.     On September 29, 2020, Plaintiffs requested that the Court schedule a conference to discuss Defendants' compliance with the Court's order dated August 19, 2020. On September 30, 2020, in response to Plaintiffs' correspondence, the Court order that the Parties file cross-supplements to Plaintiffs' outstanding motion to compel by October 2, 2020. ECF 268. On October 2, 2020, Plaintiffs and Defendants filed supplemental memoranda as directed by the Court. ECF

273, 275.

73.    On November 20, 2020, Plaintiffs and the U. S. Steel Defendants filed a joint motion for extension of the case management deadlines in light of Plaintiffs' outstanding motion to compel. On November 24, 2020, the Court ordered that the parties meet and confer regarding all outstanding discovery disputes by video conference. ECF 282. The Court further ordered that the Parties exchange proposed orders regarding all remaining discovery disputes, and that if any disputes remained after the video conference the Parties should file their proposed orders.

74.    In compliance with the Court's order, the parties met and conferred and resolved all but one issue: whether the U. S. Steel Defendants could withhold documents based on their unilateral assessment of relevance. On December 7, 2020, Plaintiffs and Defendants filed competing motions for entry of their respective proposed orders. ECF 283-84. On December 15, 2020, the Court entered Plaintiffs' proposed order, without alteration. ECF 286.

75.    As discovery progressed, in addition to monitoring Defendants' compliance with outstanding discovery requests, Lead Counsel needed to analyze the U. S. Steel Defendants' lengthy privilege logs, which asserted many novel claims of privilege and protection. Lead Counsel met and conferred with Defendants' counsel regarding their claims of privilege, and exchanged correspondence regarding the same, which successfully resulted in the additional productions of documents.

76.    In addition, over the course of discovery, Lead Plaintiffs subpoenaed and negotiated production of documents from over 40 non-parties. This was no simple task. Even the simplest subpoenas required Lead Counsel to meet and confer with counsel for each of the third parties to explain the Action, describe the information that was being sought, and participate in extensive negotiations to secure the information needed to pursue this Action on behalf of Plaintiffs and the

22

Settlement Class.

77.    In total, the U. S. Steel Defendants and non-parties produced documents totaling more than 2.5 million pages. This figure is conservative as many large documents were produced in native format, and thus, only recorded by Plaintiffs' discovery software as a single page.

### b)    Fact Witness Depositions

78.    Discovery in the Action included 34 fact witness depositions, with a total of 37 deponents due to the seven-part 30(b)(6) deposition of U. S. Steel. The chart below identifies the fact depositions that were taken in the Action, categorized by deponent, deposition date, and the witness's affiliation or title during the Class Period:

| Deponent | Date | Witness Affiliation or Title |
|---|---|---|
| Leeann Reed | 4/25/19 | Plaintiff |
| Chad Reed | 4/26/19 | Mrs. Reed's husband |
| Christakis Vrakas | 5/29/19 | Lead Plaintiff |
| Megan Bombick | 3/30/21 | 30(b)(6) witness U. S. Steel |
| Kevin Lewis | 3/30/21 | 30(b)(6) witness U. S. Steel |
| Melissa Davin | 4/8/21 | 30(b)(6) witness U. S. Steel |
| David Rogers | 4/8/21 | 30(b)(6) witness U. S. Steel |
| Plaintiffs' CW5 | 4/13/21 | Director of RCM, Great Lakes Works |
| Colleen Darragh | 4/21/21 | VP, Controller |
| Rob Kopf | 4/22/21 | General Manager, Business Support; 30(b)(6) witness U. S. Steel |
| Doug Matthews | 4/28/21 | Senior Vice President, Service Center & Mining Solutions; 30(b)(6) witness U. S. Steel |
| Randy Heisler | 4/29/21 | Vice President, Life Cycle Engineering |
| Joseph Diggins | 5/4/21 | Partner, Ernst & Young |
| Geron Davis | 5/5/21 | Director of RCM |
| James Dudek | 5/7/21 | Managing Director, Strategy & Transformation; 30(b)(6) witness U. S. Steel |
| James Loewer | 5/11/21 | Director, FP&A |
| Jim Phillips | 5/12/21 | Director of RCM, Gary Works |
| Plaintiffs' CW1 | 5/12/21 | Administrative Assistant, Gary Works; Organizational Change & Transformation Facilitator |
| Branko Alavanja | 5/14/21 | Director of RCM, Gary Works |
| Plaintiffs' CW7 | 5/17/21 | Buyer/Purchasing Specialist |
| Christine Breves | 5/18/21 | Vice President & Chief Supply Chain Officer |
| Jim Bruno | 5/19/21, 5/21/21 | Senior Vice President, Automotive Solutions |

| Mark Tabler | 5/20/21 | Vice President & General Manager, Gary Works |
|---|---|---|
| James Gray | 5/25/21 | General Manager, Great Lakes Works |
| Pipasu Soni | 5/27/21 | Vice President, Finance |
| Sara Greenstein | 6/2/21 | Senior Vice President, Consumer Solutions |
| Mario Longhi | 6/3/21 | Chief Executive Officer |
| Plaintiffs' CW4 | 6/4/21 | Reliability Engineer |
| Matt Perkins | 6/4/21 | General Manager, Gary Works |
| Dan Lesnak | 6/7/21 | General Manager, Investor Relations |
| Mark Jeffrey | 6/8/21 | Director of RCM, Mon Valley Works |
| Ron Lachman | 6/9/21 | Corporate Reliability Specialist |
| David Burritt | 6/10/21 | Chief Financial Officer |
| John Goodish | 6/10/21, 6/23/21 | Former Chief Operating Officer |
| Asutosh Padhi | 6/11/21 | Senior Partner, McKinsey & Co. |
| Aaron Jablonsky | 6/17/21 | Mr. Vrakas's Investment Advisor |
| Scott Mohr | 6/17/21 | Director of RCM, Great Lakes Works |

79.    Lead Counsel believes that information elicited during these depositions was supportive of Plaintiffs' claims. Lead Counsel recognizes, however, that there was also information elicited during these depositions that a jury could view as supportive of the U. S. Steel Defendants' positions. Nevertheless, these depositions, and the documents discussed therein, provided Lead Counsel with a solid basis to understand the risks and strengths of the case, and on how to move forward in the litigation, including defending against Defendants' summary judgment motion and preparing for trial.

### c)    Expert Discovery

80.    In addition to conducting comprehensive fact discovery, Lead Counsel retained experts while investigating and prosecuting the case. These experts offered opinions in the areas of damages, loss causation, RCM processes, the maintenance of steelmaking equipment, statistical analysis, insider trading and executive compensation, and economic conditions in the steel market. The process of assisting the experts in offering their opinions involved careful analysis of the discovery record, including documents produced by Defendants and third parties. The expert

opinions were used to support Plaintiffs' statement of the Action during mediation, oppose Defendants' motion for class decertification, and to prepare Plaintiffs' case for trial. A significant portion of Lead Counsel's consultation with these experts occurred during the COVID-19 pandemic, requiring Lead Plaintiffs and counsel to effectively share information, strategize, and coordinate with these experts in a remote environment.

81.     Lead Plaintiffs served four opening expert reports on July 12, 2021:

a.  Michael L. Hartzmark, Ph.D., President of Hartzmark Economics Litigation Practice, LLC, present and former contractor for the Offices of the Attorneys General for the States of New Jersey and New York, who opined on loss causation and damages;

b.  Frederick C. Rorick, President of Rorick, Inc. Global Consulting, who opined regarding the steelmaking process, the importance and necessity of proper maintenance practices as it relates to steelmaking, and the deterioration throughout the relevant time period of Thirteen Critical Assets within U. S. Steel's North American Flat Rolled segment;

c.  Blake A. Baca, Certified Maintenance & Reliability Professional and Certified Reliability Leader, who opined regarding RCM processes, RCM deployment and implementation, and the progress of U. S. Steel's RCM program throughout the relevant time period; and

d.  G. William Kennedy, Ph.D., Managing Director in the global Expert Services practice of Duff & Phelps, a Kroll Business, Certified Public Accountant and Accredited in Business Valuation, who opined on the dynamics in the United States market for steel throughout the relevant time period and U. S. Steel's capacity to

meet demand.

82.     In total, Lead Plaintiffs' opening expert reports encompassed 492 pages along with voluminous supporting exhibits, and citations to hundreds of documents.

83.     On August 12, 2021, Defendants served four expert reports containing a combination of affirmative and rebuttal opinions as follows:

a.  Douglas J. Skinner, Ph.D., a professor at the University of Chicago, Booth School of Business, who opined with both affirmative opinions and in rebuttal to Dr. Hartzmark regarding loss causation and damages;

b.  Klaus M. Blache, Ph.D., a professor at the University of Tennessee, who opined with both affirmative opinions and in rebuttal to Mr. Baca regarding RCM processes;

c.  Carlyn Irwin, Senior Advisor with Cornerstone Research, who opined with both affirmative opinions and in rebuttal to Dr. Kennedy regarding the steel market, U. S. Steel's capacity, and certain of Dr. Kennedy's methodologies; and

d.  Todd Milbourn, Ph.D., a professor at the Olin Business School at Washington University in St. Louis, who affirmatively opined regarding the sale of securities by officers of publicly traded companies.

84.     On August 20, 2021, Defendants served the expert report of Ian Cameron, Principal Metallurgist – Ferrous for Hatch, Ltd., containing affirmative opinions and in rebuttal to Mr. Rorick regarding steelmaking and the performance of U. S. Steel's Thirteen Critical Assets

85.     In total, Defendants' opening expert reports encompassed 492 pages along with voluminous supporting exhibits, and citations to hundreds of documents.

86.     On September 13, 2021, Plaintiffs served reports from Dr. Hartzmark, Mr. Baca,

and Dr. Kennedy each in rebuttal to Defendant' experts' opening expert reports. On September 13, 2021, Plaintiffs also served a declaration from Mr. Rorick in further support of his opening expert report. Additionally, Plaintiffs served rebuttal reports from two new experts as follows:

     a. Charles Parekh, Ph.D., Managing Director at Duff & Phelps, a Kroll Business, regarding statistical analyses within Mr. Cameron's report that were outside the scope of Mr. Rorick's report and analyses;

     b. Steven Hall, MBA, Managing Director of Steven Hall & Partners, who opined regarding the sale of securities by officers of publicly traded companies, and that the Individual Defendants' insider sales were suspicious in timing and amount.

87.    In total, Lead Plaintiffs' experts' rebuttal reports encompassed 267 pages along with voluminous supporting exhibits and many citations to the documentary record.

88.    On October 13, 2021, Defendants served three additional rebuttal reports—one each from Dr. Skinner, Dr. Blache, and Dr. Milbourn.

89.    On October 21, 2021, in connection with Defendants' motion for class decertification, Defendants filed a Declaration of Douglas J. Skinner, Ph.D., containing new affirmative opinions regarding market efficiency.

90.    In addition, Lead Counsel took and/or defended the depositions of 14 expert witnesses, including all of Plaintiffs' experts and Defendants' experts. The chart below identifies the expert depositions taken in the Action by deponent, date of deposition, and affiliation:

| Deponent | Date | Witness Affiliation or Title |
|---|---|---|
| Michael L. Hartzmark, Ph.D. | 6/4/19 | Plaintiffs' expert regarding market efficiency and damages methodology |
| Paul Zurek, Ph.D. | 6/27/19 | Defendants' expert regarding damages methodology |
| Michael L. Hartzmark, Ph.D. | 8/24/21 | Plaintiffs' expert regarding loss causation and damages |

| Blake Baca | 9/2/21 | Plaintiffs' RCM expert |
|---|---|---|
| G. William Kennedy, Ph.D. | 9/3/21 | Plaintiffs' expert regarding the U.S. market for steel |
| Frederick Rorick | 9/8/21 | Plaintiffs' steelmaking expert |
| Carlyn Irwin | 9/9/21 | Defendants' expert regarding the steel market and U. S. Steel's capacity to meet demand |
| Douglas Skinner, Ph.D. | 9/13/21 | Defendants' expert regarding loss causation and damages |
| Klaus Blache, Ph.D. | 9/14/21 | Defendants' RCM expert |
| Ian Cameron | 9/17/21 | Defendants' steelmaking expert |
| Todd Milbourn, Ph.D. | 9/24/21 | Defendants' insider selling expert |
| Steven Hall | 10/13/21 | Plaintiffs' insider selling expert |
| Charles Parekh, Ph.D. | 11/10/21 | Plaintiffs' expert regarding statistical analysis |
| Douglas Skinner, Ph.D. | 11/30/21 | Defendants' expert regarding market efficiency |

### 6.    The U. S. Steel Defendants' Motion to Decertify the Class

91.    On June 21, 2021, the Supreme Court issued its opinion in *Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 141 S. Ct. 1951 (2021). *Goldman Sachs* decided an appeal of an order granting class certification in a securities fraud class action and concerned issues of market efficiency and price impact. The U. S. Steel Defendants contended that the holding in *Goldman Sachs* warranted class decertification in this Action.

92.    On September 21, 2021, the Parties attended a Settlement Conference before the Court. ECF 308. During the Settlement Conference, the U. S. Steel Defendants requested a briefing schedule for filing their motion for class decertification which the Court entered the same day. ECF No. 309.

93.    On October 21, 2021, the U. S. Steel Defendants filed a motion for class decertification, together with a supporting brief and exhibits totaling 1,097 pages. ECF 316-18.

The motion for class decertification argued strenuously that the alleged misstatements in this Action had no impact on the price of U. S. Steel stock because, among other reasons: 1) the misstatements were too general to impact the Company's stock price; 2) there was a "mismatch" between the alleged misstatements and the alleged corrective disclosure; and 3) analysts reacting to and reporting on the corrective disclosures did not specifically refer to the alleged misstatements. ECF 317. Additionally, the U. S. Steel Defendants' motion for class decertification argued that the Plaintiffs did not suffer any damages and, thus, were atypical of the class and inadequate class representatives. *Id.*

94.    On December 3, 2021, Plaintiffs filed a memorandum in opposition to the U. S. Steel Defendants' motion for class decertification, together with supporting exhibits totaling 446 pages. ECF 321-22.

95.    On December 8, 2021, on remand from the Supreme Court, the United States District Court for the Southern District of New York (Crotty, J.), recertified the class in the *Goldman Sachs* Case. *In re Goldman Sachs Group, Inc. Sec. Litig.*, 2021 U.S. Dist. LEXIS 235241 (S.D.N.Y. Dec. 8, 2021). On December 10, 2021, Plaintiffs submitted Judge Crotty's newly issued opinion in *Goldman Sachs* as supplemental authority in further opposition to the U. S. Steel Defendants' motion for class decertification. ECF 325.

96.    On December 13, 2021, the U. S. Steel Defendants filed a reply memorandum and supporting exhibits in further support of their motion for class decertification. ECF 326. The motion for class decertification was pending at the time the Parties reached the Settlement.

97.    Maintaining class certification was by no means guaranteed. There are very few judicial decisions analyzing and applying the Supreme Court's *Goldman Sachs* decision and Plaintiffs risked the possibility the Court could side with the U. S. Steel Defendants and find that

the alleged RCM misstatements were too generic and, thus, had no price impact, as evidenced by the fact few analysts expressly discussed "RCM" in their reports.

### 7.    Mediation and Settlement

98.    On May 15, 2019, pursuant to the Court's Case Management Order (ECF 165), the Parties participated in a mediation session with Ret. United States District Judge Layn R. Phillips of Phillips ADR Enterprises LLC (the "First Mediation"). In advance of the First Mediation, the Parties exchanged (and submitted to Judge Phillips) detailed initial and responsive mediation statements addressing liability and damages. The mediation briefs addressed the specific allegations in the Amended Complaint and legal arguments each side believed supported their respective claims and defenses. The Parties were unable to reach a settlement at that time.

99.    On April 19, 2021, the Parties participated in a mediation session with Robert Meyer, Esq. of JAMS (the "Second Mediation"). In advance of the Second Mediation, the Parties exchanged (and submitted to Mr. Meyer) detailed mediation statements addressing liability and damages. As the Second Mediation took place after the commencement of merits discovery, Plaintiffs and the U. S. Steel Defendants were able to submit documentary evidence in support of their claims and defenses. The Parties were unable to reach a settlement at that time.

100.    On August 26, 2021, the Parties participated in a mediation session with Mr. Meyer (the "Third Mediation"). In advance of the Third Mediation, the Parties exchanged (and submitted to Mr. Meyer) detailed mediation statements addressing liability and damages. As the Third Mediation took place after all fact depositions had been taken and the Parties had exchanged their respective opening expert reports, Plaintiffs and the U. S. Steel Defendants were able to submit such evidence in support of their claims and defenses. The Parties were unable to reach a settlement at that time.

101.    On September 21, 2021, the Court held a Settlement Conference. In advance of the

Settlement Conference, the Parties exchanged (and submitted to the Court) detailed position statements addressing liability and damages. The Parties were unable to reach a settlement at that time.

102.    On February 15, 2022, the Parties participated in a mediation session with David Murphy, Esq., of Phillips ADR Enterprises LLC (the "Fourth Mediation"). In advance of the Fourth Mediation, the Parties exchanged (and submitted to Mr. Murphy) detailed mediation statements addressing liability and damages. The Parties were unable to reach a settlement at that time.

103.    Following additional negotiations, on February 25, 2022, Mr. Murphy issued a mediator's proposal to resolve the Action for $40 million. The Parties accepted Mr. Murphy's recommendation and memorialized their agreement in principle to settle the Action in a term sheet executed on February 28, 2021 (the "Term Sheet"). The Term Sheet set forth, among other things, the Parties' agreement to settle and release all claims against Defendants in return for a cash payment by or on behalf of the U. S. Steel Defendants for $40 million in cash for the benefit of the Settlement Class, subject to the execution of a customary "long form" stipulation and agreement of settlement and related papers.

104.    After execution of the Term Sheet, the Parties spent additional weeks negotiating the final terms of the Settlement as embodied in the Stipulation and the exhibits thereto, and exchanged multiple drafts of the Stipulation and its exhibits. On May 20, 2021, the Parties executed the Stipulation setting forth their binding agreement to settle the Action (and superseding and replacing the Term Sheet).

105.    The U. S. Steel Defendants have made cash payments totaling $40 million into escrow for the benefit of the Settlement Class certified by the Court, and upon the Settlement

becoming effective, the Parties will provide mutual releases, as defined in the Stipulation.

III.     SUMMARY OF THE SETTLEMENT, PLAN OF ALLOCATION & NOTICE
         PROGRAM

106.     The Settlement consists of $40,000,000 in cash, plus interest earned thereon. The Settlement Class is defined in the Notice (ECF 329-1) as all persons or entities who purchased or otherwise acquired United States Steel Corporation common stock and options during the period from January 27, 2016 through April 25, 2017, inclusive, and were injured thereby. Excluded from the Settlement Class are: (1) the U. S. Steel Defendants; (2) the Individual Defendants' immediate family members; (3) any person who was an Officer or director of the Company during the Settlement Class Period; (4) any firm, trust, corporation, or other entity in which a U. S. Steel Defendant has or had a controlling interest; and (5) the legal representatives, affiliates, heirs, successors in interest, or assigns of any such excluded person or entity. Also excluded from the Settlement Class are: (i) the Persons and entities listed in Appendix 1 to the Stipulation who requested exclusion from the Settlement Class in connection with the Class Notice; and (ii) any Persons who submit valid and timely requests for exclusion from the Settlement Class in accordance with the requirements set forth in the Notice.

107.     The Plan of Allocation is designed to fairly and rationally allocate the Settlement proceeds among Settlement Class Members. Under the Plan of Allocation, each Authorized Claimant will receive his, her, or its *pro rata* share of the Net Settlement Fund. The Plan of Allocation does not provide preferential treatment to any Settlement Class Member, segment of the Settlement Class, or to Plaintiffs and is thus fair, reasonable, and adequate. Lead Counsel developed the Plan of Allocation in conjunction with Plaintiffs' damages expert. The Plan of Allocation creates a framework for the equitable distribution of the Net Settlement Fund among

Settlement Class Members who suffered economic losses because of Defendants' alleged violations of the federal securities laws.[3]

108.    Pursuant to the Court's Preliminary Approval Order (ECF 341), Lead Counsel, through the Claims Administrator, implemented a comprehensive notice program whereby the Notice was mailed to members of the Settlement Class, which contains: information regarding the Settlement; a Claim Form; instructions on how to submit a Claim Form or objection or request exclusion from the Settlement; as well as directions for potential Settlement Class Members to visit the Claims Administrator's website that has been specifically created for the administration of this Settlement, and that contains all of the documents related to this Settlement, including the Preliminary Approval Order, the Stipulation, and all exhibits. *See generally* Ex. 3.

109.    As of February 6, 2023, the Claims Administrator mailed 315,783 copies of the Notice to potential Settlement Class Members and nominees. *Id.* at ¶11. In addition, A.B. Data has remailed 2,236 Notice Packages to persons and entities whose original mailings were returned by the U.S. Postal Service and for which updated addresses were provided to A.B. Data or obtained through a third-party vendor. *Id.* Pursuant to the Court's Preliminary Approval Order, Summary Notice was also published in *Investor's Business Daily* and transmitted over the internet via *PR Newswire*. *Id.* at ¶12.

110.    The Notice disclosed, among other things, the following information necessary to evaluate the benefits of the Settlement to Settlement Class Members: (i) the rights of Settlement Class Members, including the right to accept, object, or opt out of the Settlement; (ii) the nature, history, and progress of the litigation; (iii) the details of the proposed Settlement; (iv) the process

---

[3] However, the Plan of Allocation is not a formal damages analysis and the calculations made pursuant to the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after a trial.

for filing a proof of claim; (v) a description of the Plan of Allocation; (vi) the maximum attorneys' fees and out-of-pocket expenses to be sought by Lead Counsel; (vii) reimbursement for Plaintiffs' costs and expenses; and (viii) the necessary information for any Settlement Class Member to examine the Court records should they desire to do so.

111.    The Notice also sets forth instructions to securities brokers and other nominee holders for forwarding the Notice to those persons for whom the nominees held shares in street name. Additionally, the Notice explains procedures and deadlines for opting out of the Settlement or submitting comments or objections.

112.    As a result of the Court's entry of the Preliminary Approval Order, the deadline for Settlement Class Members to object to the Settlement, the Plan of Allocation, or to the application for attorneys' fees and Litigation Expenses—or to exclude themselves from the Settlement Class— is currently February 20, 2023. While such date has not yet passed, to date, there are no pending objections to the Settlement by any Settlement Class Member.

113.    On January 28, 2023, Lead Counsel received an email from a purported investor in U. S. Steel securities containing purported objections to the Claim Form. On January 30, 2023, Lead Counsel participated in a teleconference with the investor and explained, based on review of the investor's purported transactions, he was not a member of the Settlement Class. Accordingly, on January 30, 2023, the individual confirmed by email to Lead Counsel that he was withdrawing any objections.

114.    Furthermore, to date, the Claims Administrator has only received 43 requests for exclusion, representing 36,250.48 shares in U. S. Steel stock. Ex. 3, ¶16.

## IV.    RISKS OF CONTINUED LITIGATION

115.    Plaintiffs and Plaintiffs' Counsel have a thorough understanding of the strengths

and potential weaknesses of the Action. Plaintiffs and Plaintiffs' Counsel were prepared to proceed to trial and believe they have gathered substantial evidence to support the Settlement Class's claims.

116.    Nonetheless, Plaintiffs recognize that they faced considerable challenges and defenses – both factual and legal – if the Action were to continue through trial, as well as the inevitable appeals that would follow even if Plaintiffs won a favorable verdict against the U. S. Steel Defendants.

117.    The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a $40 million cash payment and represents a significant portion of the recoverable damages in the Action. Plaintiffs and Plaintiffs' Counsel believe that the proposed Settlement is a positive, outstanding result for the Settlement Class considering these risks of continued litigation, some of the most serious of which are discussed below.

### A.    Risks Concerning Liability

118.    While Plaintiffs and Plaintiffs' Counsel believe that the claims asserted against the U. S. Steel Defendants in the Action are meritorious, they recognize that this Action presented several substantial risks to establishing Defendants' liability. At all stages of this litigation, the U. S. Steel Defendants had vigorously contended that there were no material misstatements or omissions at issue in the public statements, and they would have continued this argument vigorously through trial.

119.    *First*, the U. S. Steel Defendants have strenuously argued that Plaintiffs have not adduced evidence to support jury findings that any alleged misstatements were materially false or misleading because, among other things, (i) U. S. Steel employed individuals with "RCM" in their titles and that U. S. Steel purportedly achieved over $70 million in benefits from RCM during the

Settlement Class Period as evidenced by a project listing in U. S. Steel's Wave system and as audited by Ernst & Young, LLP; (2) U. S. Steel properly disclosed its outages at U. S. Steel flat-rolled facilities and its capacity to meet demand; and (3) the alleged misstatements were too "general" to be materially misleading.

120.    **Second**, the U. S. Steel Defendants argued that Plaintiffs could not establish the element of scienter because the evidence did not support that any statements, even potentially misleading ones, were made with the requisite intent to defraud. Additionally, the U. S. Steel Defendants argued that Defendants Burritt's and Longhi's insider sales were not suspicious because there were legal and financial restrictions that prevented them from selling any sooner and their sales were otherwise consistent with those of other executives in the industry at that time after the Trump election.

121.    While many of these arguments were made unsuccessfully by Defendants in their motions to dismiss, when the Court was required to accept all allegations in the Amended Complaint as true, the U. S. Steel Defendants could have succeeded in these arguments at subsequent stages of the litigation, when allegations in the Amended Complaint would need to be supported by admissible evidence.

122.    Moreover, Plaintiffs' claims would be subject to complex expert testimony, offered by the U. S. Steel Defendants' experts, that conflicts with Plaintiffs' experts' analyses. Indeed, the opinions of each side's experts vary substantially, and continued litigation poses the risk that the U. S. Steel Defendants would prevail in a "battle of experts." Such a battle would increase the expense involved with advancing the litigation, as well as the risk that a jury might credit the U. S. Steel Defendants' experts and accordingly reject Plaintiffs' claims.

123.    Even if Plaintiffs had prevailed at class decertification and a virtually certain

motion by the U. S. Steel Defendants for summary judgment, Plaintiffs would still have to prevail at several additional stages in the litigation, including at trial, as well as on the appeals that would likely follow. At each of those stages, there are significant risks attendant to the continued prosecution of the Action, and there are no guarantees that further litigation would have resulted in a higher recovery, or any recovery at all.

### B.    Risks Concerning Loss Causation and Damages

124.    Even assuming that Plaintiffs overcame each of the above risks and successfully established liability, they also faced substantial risks in proving damages and loss causation. Throughout the litigation, the U. S. Steel Defendants maintained that, even if liability were established, Plaintiffs' claims did not give rise to any cognizable damages, and that Plaintiffs' expert failed to disaggregate any damages that could potentially be attributable to the alleged misstatements. Defendants also argued that any issues regarding capacity to meet demand were limited to three specific unplanned outages in early 2016 for which there was purportedly no related corrective disclosure.

125.    Relatedly, the U. S. Steel Defendants contended and would have continued to argue, among other things, that Plaintiffs could not show loss causation to support their damages theory and/or that Plaintiffs could not establish that the alleged misstatements had any impact on the price of U. S. Steel common stock. Indeed, Defendants' motion for class decertification was pending at the time the Settlement was reached and, if granted, would have been fatal to Plaintiffs' claims.

126.    This case presented complex questions with respect to determining the amount of damages that could be recovered and the range of possible damages varied widely depending on the assumptions and methodology adopted. In connection with the Settlement, Lead Counsel

conferred with a damages expert to assess the reasonableness of potential settlement offers. Pursuant to Lead Counsel's expert's analysis, the $40 million recovery is approximately 6% to 7% of estimated aggregate damages, net of Settlement Class Period common stock gains, assuming Plaintiffs prevailed on all their arguments. Further, the Settlement represents approximately 13% of estimated aggregate damages if the finder of fact accepted Defendants' expert's opinion that the maximum amount of the stock price decline following the corrective disclosures attributable to the fraud equaled 45%.

127.    U. S. Steel's market capitalization fell from $5.42 billion on April 25, 2017, to $3.98 billion on April 26, 2017, resulting in a one-day market capitalization drop of $1.44 billion.[4] Thus, the Settlement, which represents between 6 and 13% of recoverable aggregate damages, exceeds the 4.2% average percentage recovery in securities class actions settled in 2021 and 2.3% average percentage recovery in securities class actions settled in 2021- 2020 where market cap losses exceeded $1 billion. *See Laarni T. Bulan and Laura E. Simmons, Securities Class Action Settlements: 2021 Review and Analysis*, at 6, fig. 5, (Cornerstone Research 2022), Ex. 5 hereto.

128.    Furthermore, in light of the numerous persuasive arguments presented by the U. S. Steel Defendants and their experts concerning loss causation and damages, including that the alleged stock price decline was not cognizable and that Plaintiffs' expert overstated the amount of the decline that was attributable to the fraud, even if Plaintiffs were able to prove liability, the amount of damages Plaintiffs would be reasonably likely to prove at trial is a fraction of the best-case scenario.

129.    Notably, had the U. S. Steel Defendants' loss causation arguments been accepted in full or even in part at summary judgment or trial, damages could have been significantly lower

---

[4] The market capitalization data herein was reported by S&P.

than that amount, or eliminated entirely. Even if Plaintiffs were successful at trial, the U. S. Steel Defendants could have challenged the damages of each and every large Settlement Class Member in post-trial proceedings, substantially reducing any aggregate recovery by Plaintiffs. Accordingly, the $40 million Settlement represents a substantial percentage of damages that could be reasonably expected to be proven at trial and, particularly considering the considerable other litigation risks discussed above, represents a very favorable resolution of the Action for Settlement Class Members.

130.    Finally, even if Plaintiffs had succeeded in proving all elements of their case at trial and obtained a jury verdict, the U. S. Steel Defendants would almost certainly have appealed. An appeal would not only have renewed all the risks faced by Plaintiffs and the Settlement Class, as Defendants would have re-asserted all their arguments summarized above, but also would have resulted in significant additional delay and costs before Settlement Class Members could have received any recovery from this case.

131.    Given the complexity of this case and the risks and delay inherent in continued litigation, the $40 million Settlement is an exceptional result. Taking into account that the case has been litigated for over five years, and the significant amount of the recovery, the Settlement here falls well within the range of reasonableness in light of the attendant risks and uncertainties of litigation, and should be finally approved. *See Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975).

## V.    THE FEE AND EXPENSE APPLICATION

132.    In addition to seeking final approval of the Settlement and approval of the Plan of Allocation, Lead Counsel, on behalf of all Plaintiffs' Counsel, are applying for an award of attorneys' fees and payment of expenses incurred by Plaintiffs' Counsel during the course of the Action. Specifically, Lead Counsel are applying for attorneys' fees in the amount of one-third of

the Settlement Fund ($13,333,333.33) and for Litigation Expenses in the total amount of $2,711,338.12. This total expense amount includes reimbursement in the aggregate amount of $80,000.00 to Plaintiffs (*i.e.*, $70,000 for Mr. Vrakas and $10,000 for Mrs. Reed) for costs incurred directly in connection with their representation of the Settlement Class in accordance with the PSLRA, 15 U.S.C. §78u-4(a)(4). *See* Exs. 1-2, attached hereto. As noted above, Lead Counsel's Fee and Expense Application is consistent with the amounts set forth in the Settlement Notice and, to date, no objections to Lead Counsel's request for attorneys' fees and expenses have been received.

133.    Below is a summary of the primary factual bases for Lead Counsel's Fee and Expense Application. A full analysis of the factors considered by courts in this Circuit when evaluating requests for attorneys' fees and expenses from a common fund, as well as the supporting legal authority, is presented in the accompanying Fee Memorandum.[5]

A.    **Lead Counsel's Request is Fair and Reasonable and Warrants Approval**

1.    **The Favorable Settlement Achieved**

134.    As described above in Section IV.B., when viewed in absolute terms, the $40 million Settlement is an exceptional result – representing approximately 6% to 7% of total estimated damages, net of Settlement Class Period common stock gains, assuming Plaintiffs

---

[5] The Third Circuit has noted that a district court should consider the following factors in determining a fee award: (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; (7) the awards in similar cases; 8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations; (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained; and (10) any innovative terms of settlement. *See Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000) (citations omitted); *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998). *See also* Fee Memorandum, §III.D.; Fed. R. Civ. P. 23(e).

prevailed on all of their arguments, and 13% of recoverable damages if the finder of fact accepted Defendants' expert's opinions. This result exceeds the 4.2% average percentage recovery in securities class actions settled in 2021 and 2.3% average percentage recovery in securities class actions settled in 2021- 2020 where market cap losses exceed $1 billion. *See Laarni T. Bulan and Laura E. Simmons, Securities Class Action Settlements: 2021 Review and Analysis*, at 6, fig. 5, (Cornerstone Research 2022), Ex. 5 hereto.

135.    This favorable Settlement achieved by Plaintiffs and Lead Counsel was only possible as the result of extensive investigative efforts, contentious and complicated motion practice, the completion of merits and expert discovery which included voluminous documentary records and dozens of depositions, and vigorous, arm's-length settlement negotiations with the assistance of the Court and multiple skilled mediators. As a result of the Settlement, thousands of Settlement Class Members will immediately benefit and receive compensation for their losses and avoid the substantial risks to recovery in the absence of settlement.

### 2.    The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Continent Cases

136.    The risks faced by Lead Counsel in prosecuting this Action are highly relevant to the Court's consideration of an award of attorneys' fees, as well as its approval of the Settlement. As discussed in greater detail above in Section IV, this case was fraught with significant risk factors concerning liability and damages. Plaintiffs' success was by no means assured. Defendants disputed whether Plaintiffs could even establish liability and raised substantial arguments concerning loss causation and damages.

137.    Indeed, were this Settlement not achieved, and even if Plaintiffs prevailed on Defendants' motion for class decertification, on summary judgment, and at trial, Plaintiffs and Lead Counsel faced potentially years of costly and risky appellate litigation against Defendants,

with ultimate success far from certain and the prospect of no recovery a substantial possibility. It is also possible that a jury could have found no liability or no damages.

138.    Moreover, courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. Vigorous private enforcement of the federal securities laws can only occur if private plaintiffs take an active role in protecting the interests of shareholders. Lead Counsel therefore believe that based upon the substantial risk factors present, that an award of attorneys' fees of 33⅓% of the Settlement Fund is reasonable.

### 3.    The Time and Labor Devoted to the Action by Plaintiffs' Counsel

139.    Plaintiffs' Counsel's firms devoted substantial time to the prosecution of the Action. As more fully described above, Lead Counsel: (i) conducted an exhaustive investigation into the Settlement Class's claims; (ii) researched and prepared a detailed Amended Complaint; (iii) successfully opposed Defendants' motions to dismiss; (iv) served document requests and interrogatories on Defendants, and engaged in numerous meet and confers regarding the scope of the discovery requested and the objections thereto; (v) reviewed and analyzed the resulting productions of more than 2.5 million pages of documents produced from the U. S. Steel Defendants and 50 third parties; (vi) responded to the U. S. Steel Defendants' document requests and interrogatories; (vii) conducted and/or defended 34 fact witness depositions; (viii) conducted extensive merits expert discovery, consisting of the retention of six experts, who produced reports and sat for depositions that Lead Plaintiffs defended, and took the depositions of Defendants' five retained experts; (ix) successfully moved for class certification; (x) fully briefed Defendants' motion for class decertification; and (xi) prepared for and engaged in settlement negotiations with Defendants, including a Settlement Conference with the Court and four formal mediation sessions. Lead Counsel advanced the litigation to achieve the most successful outcome for the Settlement

Class, whether through settlement or trial, by the most efficient means possible.

140.    Throughout the litigation, Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this Action. As the lead partner on the case, I personally monitored and maintained control of the work performed by other lawyers at Levi & Korsinsky and Liaison Counsel throughout the litigation. Other experienced attorneys at Levi & Korsinsky were also involved in the drafting of pleadings, motion papers, and in the settlement negotiations. More junior attorneys, paralegals, and other support staff worked on matters appropriate to their skill and experience level.

141.    Moreover, Lead Counsel will continue to work towards effectuating the Settlement in the event the Court grants final approval. No additional compensation will be sought for this work.

142.    As set forth below, Plaintiffs' Counsel's expended a total of 23,690.37 hours prosecuting this Action, equating to a lodestar of $16,401,823.00, using prevailing market rates.

| COUNSEL | HOURS | LODESTAR |
|---|---|---|
| Levi & Korsinsky, LLP | 23,116.37 | $16,028,723.00 |
| Vincent Coppola | 574 | $373,100 |
| **TOTAL** | **23,690.37** | **$16,401,823.00** |

143.    A more detailed account of the time devoted to this action by Lead Counsel's attorneys and professional support staff employees is set forth in the schedule attached hereto as Exhibit 7, which reports the amount of time spent by each attorney and professional support staff employee who worked on the Action and their resulting "lodestar," *i.e.*, their hours multiplied by their current hourly rates. *See also* Ex. 9 (Declaration of Liaison Counsel Vincent Coppola in Support of Application for Award of Attorneys' Fees).

144.    The requested fee results in a negative multiplier of **.81**, a figure demonstrating how

vigorously Plaintiffs' Counsel fought to achieve the result on behalf of the Settlement Class.

### 4.    The Quality of Plaintiffs' Counsel's Representation

145.    The skill and diligence of Plaintiffs' Counsel also supports the requested fee. As demonstrated by Levi & Korsinsky's firm résumé (Ex. 6), Lead Counsel is a highly experienced and skilled law firm in the securities litigation field, with a long and successful track record representing investors in such cases.

146.    The U. S. Steel Defendants in this case were represented by experienced counsel from the nationally prominent litigation firm of Jones Day. Defense counsel vigorously and ably defended the Action for nearly five years. In the face of this formidable defense, Lead Counsel was nonetheless able to develop a case that was sufficiently strong to persuade the U. S. Steel Defendants to settle the Action on terms that are very favorable to the Settlement Class.

147.    The record in this case, along with the matters described in this Declaration, demonstrate the enormous effort and expense that went into successfully resolving this Action. The substantial result achieved for the Settlement Class here reflects the superior quality of Lead Counsel's representation, demonstrating that a one-third fee is fair and reasonable.

### B.    Lead Counsel's Request for Litigation Expenses Warrants Approval

#### 1.    Lead Counsel Seeks Payment of Plaintiffs' Counsel's Reasonable and Necessary Litigation Expenses from the Settlement Fund

148.    Lead Counsel seek payment from the Settlement Fund of $2,711,338.12 for expenses, costs, and charges that were reasonably and necessarily incurred by Plaintiffs' Counsel in connection with the Action. The Notice informs the Settlement Class that Lead Counsel will apply for payment of Litigation Expenses in an amount not to exceed $3,300,000, which amount may include an application for reimbursement of the reasonable costs and expenses incurred by Lead Plaintiffs directly related to their representation of the Settlement Class in accordance with

15 U.S.C. §78u-4(a)(4). The amount of Litigation Expenses requested by Lead Counsel, along with the aggregate amount requested by Lead Plaintiffs (*i.e.*, $2,711,338.12), is materially below the maximum expense amount set forth in the Notice.

149.    From the inception of this Action, Plaintiffs' Counsel were aware that they might not recover any of the expenses they incurred in prosecuting the claims against Defendants and, at a minimum, would not recover any expenses until the Action was successfully resolved. Plaintiffs' Counsel also understood that, even assuming the Action was ultimately successful, an award of expenses would not compensate counsel for the lost use or opportunity costs of funds advanced to prosecute the claims against Defendants. Plaintiffs' Counsel were motivated to, and did, take appropriate steps to avoid incurring unnecessary expenses and to minimize costs without compromising the vigorous and efficient prosecution of the Action.

150.    Plaintiffs' Counsel's expenses, are summarized in the chart, attached hereto as Exhibit 8, which identifies each category of expense and the amount incurred for each.

151.    Plaintiffs' Counsel's expenses are reflected on the books and records maintained by the firm. These books and records are prepared from expense vouchers, check records, and other source materials, and are an accurate record of the expenses incurred. These expense items are billed separately and are not duplicated in each firm's hourly rates.

152.    The largest component of Plaintiffs' Counsel's expenses (*i.e.*, $1,506,562.22, or approximately 55% of their total expenses) was incurred for experts and consultants. As noted above, Lead Counsel consulted with experts in the fields of damages and loss causation, RCM processes, the maintenance of steelmaking equipment, statistical analysis, insider trading and executive compensation, and economic conditions in the steel market during the Class Period. Lead Counsel consulted with the experts at various stages of the litigation, including during their

investigation and the preparation of the Complaint, throughout fact and expert discovery, in connection with briefing on motions including Lead Plaintiffs' class certification motion and opposition to Defendants' motion for decertification, in connection with expert discovery, in preparation for mediation, and in connection with the development of the proposed Plan of Allocation. These experts and consultants were essential to the prosecution of the Action.

153.    Plaintiffs' Counsel also incurred a total of $418,809.63 for document review services and $216,824.93 for document hosting and management/litigation support, paid to JND Legal Administration.

154.    Another significant expense (*i.e.*, $70,513.48) was incurred for legal and factual research. This amount includes charges for computerized research services such as Lexis, Westlaw, and PACER. It is standard practice for attorneys to use online services to assist them in researching legal and factual issues, and indeed, courts recognize that these tools create efficiencies in litigation and ultimately save money for clients and the Settlement Class.

155.    In addition, Lead Counsel incurred $61,935.00 for charges related to mediations with Judge Phillips, Mr. Meyer, and Mr. Murphy.

156.    The other expenses for which Lead Counsel seek payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among others, court fees, telephone costs, copying, and postage and delivery expenses. *See* Ex. 8 All of the litigation expenses incurred by Plaintiffs' Counsel were reasonable and necessary to the successful litigation of the Action, and have been approved by Plaintiffs. Ex. 1 at ¶8; Ex. 2 at ¶9.

### 2.    Reimbursement to Lead Plaintiffs is Fair and Reasonable

157.    The PSLRA specifically provides that an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made to "any

representative party serving on behalf of a class." 15 U.S.C. §78u-4(a)(4). Accordingly, Plaintiffs seek reimbursement of their reasonable costs incurred directly for their work supervising counsel and participating in the litigation in the aggregate amount of $80,000. Specifically, Mr. Vrakas seeks reimbursement of $70,000 for 209 hours he expended in connection with the Action, and Mrs. Reed seeks reimbursement of $10,000 for 31 hours she expended and 42 her husband expended in connection with the Action. Exs. 1-2.

158.    As discussed in the Fee Memorandum and in Plaintiffs' supporting declarations, each Plaintiff has been fully committed to pursuing the Settlement Class's claims since they became involved in the litigation. Plaintiffs have provided valuable assistance to Lead Counsel during the prosecution and resolution of the Action. Moreover, the efforts expended by Plaintiffs during the course of this Action, as set forth in Plaintiffs' declarations submitted herewith, including communicating with Lead Counsel, reviewing pleadings and motion papers, gathering and reviewing documents in response to discovery requests, preparing and sitting for deposition, and participating in the settlement negotiations, are precisely the types of activities courts have found to support reimbursement to class representatives, and fully support the request for reimbursement here.

## VI.    EXHIBITS

159.    Attached hereto as Exhibit 1 is a true and correct copy of the Declaration of Christakis Vrakas in Support of: (A) Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (B) Lead Counsel's Motion for Award of Attorneys' Fees and Litigation Expenses, and Service Awards to Plaintiffs Pursuant to 15 U.S.C. §78u-4(a)(4).

160.    Attached hereto as Exhibit 2 is a true and correct copy of the Declaration of Leeann Reed in Support of: (A) Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan

of Allocation; and (B) Lead Counsel's Motion for Award of Attorneys' Fees and Litigation Expenses, and Service Awards to Plaintiffs Pursuant to 15 U.S.C. §78u-4(a)(4).

161.    Attached hereto as Exhibit 3 is a true and correct copy of the Declaration of Eric Nordskog Regarding Settlement Class Notice and Report on Requests for Exclusion Received.

162.    Attached hereto as Exhibit 4 is a true and correct copy of the Declaration of David M. Murphy.

163.    Attached hereto as Exhibit 5 is a true and correct copy of *Laarni T. Bulan and Laura E. Simmons, Securities Class Action Settlements: 2021 Review and Analysis*, (Cornerstone Research 2022)

164.    Attached hereto as Exhibit 6 is a true and correct copy of Levi & Korsinsky's firm résumé.

165.    Attached hereto as Exhibit 7 is a true and correct copy of a chart reflecting Lead Counsel's professional time spent litigating this Action.

166.    Attached hereto as Exhibit 8 is a true and correct copy of a chart reflecting Lead Counsel's Litigation Expenses.

167.    Attached hereto as Exhibit 9 is a true and correct copy of the Declaration of Liaison Counsel Vincent Coppola in Support of Application for Award of Attorneys' Fees.

## VII.    CONCLUSION

168.     For all the reasons set forth above, Lead Counsel respectfully submits that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate. Lead Counsel further submit that the requested fee in the amount of one third of the Settlement Fund, or $13,333,333.33 should be approved as fair and reasonable, and the request for Plaintiffs' Counsel's Litigation Expenses in the amount of $2,711,338.12, and Lead Plaintiffs' costs in the

aggregate amount of $80,000, should also be approved.

I declare, under penalty of perjury, that the foregoing is true and correct. Executed in Stamford, Connecticut this 6th day of February 2023.

SHANNON L. HOPKINS